STUART DELERY
Assistant Attorney General

ELIZABETH J.  SHAPIRO
Deputy Director

AMY POWELL
Trial Attorney
Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue, N.W., Room 5377
Washington, D.C. 20001
Telephone: 202-514-9836
Facsimile: 202-616-8517
Amy.Powell@usdoj.gov
*Attorneys for Defendants*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FIRST AMENDMENT COALITION,<br><br>    Plaintiff,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF JUSTICE,<br><br>    Defendant. | No. CIV 12-1013 - CW<br><br><br>DEFENDANT'S NOTICE AND MOTION FOR SUMMARY JUDGMENT<br><br>DATE:   November 7, 2013<br>TIME:    2:00pm<br>PLACE:  Oakland Courthouse, Courtroom 2 |

## **DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

**PAGE**

INTRODUCTION ................................................................................................................1

BACKGROUND .................................................................................................................2

ARGUMENT ......................................................................................................................5

I.      FOIA STANDARDS ................................................................................................6

     A.      FOIA Standard of Review ...........................................................................6

     B.      Exemption One .............................................................................................7

     C.      Exemption Three ..........................................................................................8

     D.      Exemption Five ...........................................................................................10

II.      DOJ PROPERLY WITHHELD THE RESPONSIVE DOCUMENT
     PERTAINING TO DOD EXEMPTIONS 1, 3 and 5 .........................................12

     A.      Exemption 1 .................................................................................................12

     B.      Exemption 3 .................................................................................................14

     C.      Exemption 5 .................................................................................................14

     D.      Non-Segregability ......................................................................................15

III.      DOJ PROPERLY REFUSED TO CONFIRM OR DENY THE
     EXISTENCE OF ANY ADDITIONAL RECORDS PURSUANT TO
     EXEMPTIONS 1 AND 3 .....................................................................................16

     A.      Exemption 1 .................................................................................................17

     B.      Exemption 3 .................................................................................................19

IV.      DEFENDANT HAS NOT WAIVED THESE EXEMPTIONS BY OFFICIAL
     ACKNOWLEDGMENT ........................................................................................20

CONCLUSION.................................................................................................................22

i

# TABLE OF AUTHORITIES

**CASES**                                                          **PAGE(S)**

*ACLU v. CIA*,
  710 F.3d 422 (D.C. Cir. 2013) .........................................................................3

*ACLU v. DOD*,
  628 F.3d 612 (D.C. Cir. 2011) .......................................................................22

*ACLU v. DOD*,
  752 F. Supp. 2d 361 (S.D.N.Y. 2010).............................................................20

*ACLU v. DOJ*,
  681 F.3d 61 (2d Cir. 2012).................................................................................7

*Assembly of State of Cal. v. Dep't of Commerce*,
  968 F.2d 916 (9th Cir. 1992) ..........................................................................11

*Baldrige v. Shapiro*,
  455 U.S. 345 (1982)...........................................................................................6

*CIA v. Sims*,
  471 U.S. 159 (1987).................................................................................8, 9, 19

*Carter v. Dep't of Commerce*,
  307 F.3d 1084 (9th Cir. 2002) ........................................................................10

*Church of Scientology v. U.S. Department of the Army*,
  611 F.2d 738 (9th Cir. 1979) ............................................................................6

*Citizens for Responsibility & Ethics in Wash. v. Office of Admin.*,
  249 F.R.D. 1 (D.D.C. 2008)............................................................................14

*Coastal States Gas Corp. v. Dep't of Energy*,
  617 F.2d 854 (D.C. Cir. 1980) ........................................................................12

*Ctr. for Biological Diversity v. OMB*,
  625 F. Supp. 2d 885 (N.D. Cal. 2009) ............................................................12

*Ctr. for Nat'l Sec. Studies v. DOJ*,
  331 F.3d 918 (D.C. Cir. 2003) ......................................................................6, 7

*Dep't of the Interior v. Klamath Water Users Protective Ass'n*,
  532 U.S. 1 (2001)..........................................................................................6, 11

*Elec. Privacy Info. Ctr. v. DOJ*,
    584 F. Supp. 2d 65 (D.D.C. 2008) ...................................................................15

*Elec. Frontier Found. v. DOJ*,
    892 F. Supp. 2d 95 (D.D.C. 2012) ...................................................................14

*Eslaminia v. FBI*,
    2011 WL 5118520 (N.D. Cal. 2011) .................................................................7

*Fitzgibbon v. CIA*,
    911 F.2d 755 (D.C. Cir. 1990) ................................................................... *passim*

*Frugone v. CIA*,
    169 F.3d 772 (D.C. Cir. 1999) .........................................................................7

*Gardels v. CIA*,
    689 F.2d 1100 (D.C. Cir. 1982) .....................................................................16

*Goland v. CIA*,
    607 F.2d 339 (D.C. Cir. 1978) .......................................................................10

*Halperin v. CIA*,
    629 F.2d 144 (D.C. Cir. 1980) .........................................................................7

*Hiken v. DOD*,
    521 F. Supp. 2d 1047 (N.D. Cal. 2007) ............................................................7

*Hunt v. CIA*,
    981 F.2d 1116 (9th Cir. 1992) .................................................................7, 8, 16

*John Doe Agency v. John Doe Corp.*,
    493 U.S. 146 (1989) .......................................................................................6

*Klamath Siskiyou Wildlands Ctr. v. Dep't of Interior*,
    Civ. No. 07-325-CL, 2007 WL 4180685 (D. Or. Nov. 21, 2007) .....................16

*Krikorian v. Dep't of State*,
    984 F.2d 461 (D.C. Cir. 1993) .........................................................................8

*Lahr v. NTSB*,
    569 F.3d 964 (9th Cir. 2009) ...............................................................8, 9, 11, 12

*Lane v. Dep't of Interior*,
    523 F.3d 1128 (9th Cir. 2008) .........................................................................6

*Larson v. Dep't of State*,

565 F.3d 857 (D.C. Cir. 2009) ............................................................7, 8, 9, 17

*Lawyers Comm. for Civil Rights of S.F. Bay Area v. Dep't of Treasury,*
    534 F. Supp. 2d 1126 (N.D. Cal. 2008) ...................................................6

*Long v. IRS,*
    742 F.2d 1173 (9th Cir. 1984) .................................................................7

*Minier v. CIA,*
    88 F.3d 796 (9th Cir. 1996) ...............................................................9, 16

*Miscavige v. IRS,*
    2 F.3d 366 (11th Cir. 1993) ....................................................................6

*Morrison v. DOJ,*
    No. 87-3394, 1988 WL 47662 (D.D.C. Apr. 29, 1988).......................15

*NLRB v. Sears,*
    421 U.S. 132 (1975).............................................................................11

*NY Times v. DOJ,*
    915 F. Supp. 2d 508 (S.D.N.Y. 2013)...................................................4

*Nat'l Sec. Archive Fund, Inc. v. CIA,*
    402 F. Supp. 2d 211 (D.D.C. 2005) ....................................................15

*Phillippi v. CIA,*
    546 F.2d 1009 (D.C. Cir. 1976) ..........................................................16

*Pickard v. DOJ,*
    653 F.3d 782 (9th Cir. 2011) ...............................................16, 20, 21, 22

*Renegotiation Bd. v. Grumman Aircraft Eng'g Corp.,*
    421 U.S. 168 (1975)............................................................................10

*Riquelme v. CIA,*
    453 F. Supp. 2d 103 (D.D.C. 2006) ...............................................10, 19

*Southam News v. INS,*
    674 F. Supp. 881 (D.D.C. 1987) .........................................................15

*Tigue v. DOJ,*
    312 F.3d 70 (2d Cir. 2002)..................................................................11

*U.S. v. Martin,*
    278 F.3d 988 (9th Cir. 2002) ..............................................................12

*US v. Weber Aircraft Corp*,
    465 U.S. 792 (1984)..........................................................................11

*Wilner v. NSA*,
    592 F.3d 60 (2d Cir. 2009)....................................................7, 8, 17

*Wilson v. CIA*,
    586 F.3d 171 (2d Cir. 2009)...............................................20, 21, 22

*Wolf v. CIA*,
    473 F.3d 370 (D.C. Cir. 2007) ................................................ *passim*


**STATUTES**

5 U.S.C. § 552(b) ................................................................... *passim*
50 U.S.C. § 3024(i)(1) ...............................................................9, 14, 19
50 U.S.C. § 3035 *et seq*..........................................................9, 10, 19
50 U.S.C. § 3036(d)(1), (f) ...............................................................10
50 U.S.C. § 3507 ..............................................................................10, 19


**RULES AND REGULATIONS**

28 C.F.R. § 16.9(a)(3) ...........................................................................3


**MISCELLANEOUS**

Exec. Order No. 12333, 46 Fed. Reg. 59941 (Dec. 4, 1981).......................10
Exec. Order No. 13470, 75 Fed. Reg. 45325 (July 30, 2008)....................10
Exec. Order 13526, 75 Fed. Reg. 707 (Dec. 29, 2009)...................... *passim*
Fed. R. Civ. P. 56..............................................................................6

v

## INTRODUCTION

NOTICE is hereby given of the filing of this motion by Defendant United States Department of Justice ("DOJ") for hearing on November 7, 2013.  DOJ respectfully moves for summary judgment in this Freedom of Information Act ("FOIA") matter.  The Government has carefully considered how best to provide the American people as much information as possible about sensitive counterterrorism operations consistent with the protection of our national security.  Accordingly, the Government has disclosed key elements of the principles and procedures involved in the decision to use targeted lethal force, but continues to safeguard properly classified details pertaining to these operations, the disclosure of which could reasonably be expected to damage the Government's counterterrorism efforts.

Here, Plaintiff First Amendment Coalition ("FAC") seeks a memorandum prepared by the Department of Justice ("DOJ"), Office of Legal Counsel ("OLC") providing confidential legal advice to the Executive Branch about a United States drone operation overseas against a specific individual – Anwar al-Aulaqi – a deceased operational leader of Al Qaeda in the Arabian Peninsula.  In light of recently declassified information, the Government can now confirm that there is one responsive document pertaining to the Department of Defense ("DOD").  This document contains confidential legal advice related to a proposed military action and is properly withheld in full pursuant to Exemptions 1, 3, and 5.

Beyond the OLC memorandum pertaining to DOD, to confirm or deny the existence of any other responsive memoranda would reveal information which is currently and properly classified, such as specific details about intelligence operations (or lack thereof) in a foreign country, sensitive matters related to foreign relations, and specific targets and methods of U.S. intelligence.  Moreover, Congress has made the judgment in the National Security Act that information concerning such intelligence sources and methods should be exempt from public

disclosure.  The existence or nonexistence of other responsive documents is therefore exempt from disclosure under FOIA Exemptions 1 and 3.

Based on its unique expertise to evaluate matters of national security and foreign policy, the Executive Branch has determined that, while the Government can acknowledge U.S. participation in drone strikes and can discuss general legal justifications for the use of force against U.S. persons during wartime, it cannot reveal the classified information at issue here without damaging national security.  The Executive Branch has supported these determinations with detailed declarations that explain the harms that could result from further disclosure.  Case law makes clear that substantial deference must be accorded to the Executive's logical and plausible judgments in this regard.

## **BACKGROUND**

Administrative Background

By electronic mail dated October 5, 2011, and received October 6, 2011, Plaintiff submitted a FOIA request for "a legal memorandum prepared by OLC concerning the legality of the lethal targeting of Anwar al-Aulaqi, an American-born radical cleric, who, according to federal government officials, was killed September 30, 2011 in a U.S. drone strike in Yemen." *See* Declaration of John E. Bies, dated September 5, 2013, ¶9 Ex. B.  OLC responded by letter dated October 25, 2011, and explained that it "neither confirms nor denies the existence of the document described in [the] request" because "the very fact of the existence or nonexistence of such a document is itself classified, protected from disclosure by statute, and privileged."  *See id.*, ¶ 10, Ex. C.  The information was therefore deemed exempt from disclosure "[p]ursuant to FOIA Exemptions One, Three and Five. 5 U.S.C. §552(b)(1), (3), and (5)." *Id*.

By letter dated December 12, 2011, Plaintiff appealed this determination.  *See id.*, Ex. D. DOJ had not reached a decision on the appeal at the time this lawsuit was filed, terminating

further administrative proceedings.  *See* 28 C.F.R. § 16.9(a)(3).  Plaintiff filed suit on February 29, 2012, seeking production of records under FOIA.  The Government moved for summary judgment in this matter but later withdrew that motion, electing to reconsider its FOIA response in light of subsequently declassified information.

Other FOIA Requests

The Government has responded to other FOIA requests related to the use of targeted lethal force, including two that specifically allege the use of force by the Intelligence Community.  For example, the American Civil Liberties Union ("ACLU") requested from several agencies records related to the alleged use of drones by the Armed Forces and the Central Intelligence Agency ("CIA").  As negotiated, the request encompassed final OLC opinions regarding the use of such drones to conduct targeted lethal strikes.  In response, OLC acknowledged that it possessed a responsive OLC memorandum pertaining to DOD but refused to confirm or deny the existence of any responsive records related to alleged CIA operations.  The ACLU did not challenge OLC's response, but did challenge the CIA's original Glomar response to the same request.  The District Court for the District of Columbia found for the Government, and the ACLU appealed.  During the pendency of the appeal, the Government declassified additional information. On remand from the D.C. Circuit, *see generally ACLU v. CIA*, 710 F.3d 422 (D.C. Cir. 2013), the CIA modified its response to the FOIA request, and its summary judgment briefing is ongoing.  *See ACLU v. CIA*, Civ. No. 1:10-cv-00436-RMC (D.D.C.).  The modified CIA response confirms that CIA possess responsive records on the topic of drone strikes generally, including the legality of drone strikes, but does not disclose any information that would tend to reveal whether or not CIA has the authority to engage in drone strikes.  *See* Declaration of Jennifer Hudson, dated Sept. 5, 2013, at ¶ 14.  The information

withheld by the CIA includes the number and nature of responsive records, including whether or not any of the responsive records include OLC opinions. *Id.*

Separate FOIA litigation currently pending in the Second Circuit involves similar requests by the ACLU and the *New York Times*. The two *New York Times* requests at issue sought OLC opinions addressing the legal status of targeted lethal operations conducted by "the military, the Central Intelligence Agency, or other intelligence agencies" and OLC opinions analyzing when it would be lawful for the "armed forces or intelligence community assets" to conduct targeted lethal operations specifically against U.S. citizens. The ACLU request sought multiple categories of documents, including records about the basis for targeting U.S. citizens, including Anwar al-Aulaqi. In response to the *New York Times* request, DOJ acknowledged the existence of a responsive OLC memorandum that pertains to DOD; however, it refused to confirm or deny the existence of any responsive OLC memoranda pertaining to other agencies; in response to the ACLU request, DOJ acknowledged that it had identified responsive classified material, including the memorandum pertaining to DOD, but did not provide additional information regarding the number or nature of the classified responsive documents. The CIA, which was a defendant in that matter, submitted a public declaration supporting this response to the extent it pertained to the CIA. The district court granted the Government's motion for summary judgment in that matter, *see NY Times v. DOJ*, 915 F. Supp. 2d 508 (S.D.N.Y. 2013); the appeal is pending.

Disclosures Subsequent to the Glomar Response

Subsequent to the Government's first Motion for Summary Judgment in this matter, President Obama directed the Attorney General to disclose additional information about targeted lethal operations that, until that point, had been properly classified. *See* Hudson Decl. ¶ 9. In a letter to the Chairman of the Senate Judiciary Committee dated May 22, 2013, the Attorney

General publicly acknowledged for the first time that the United States specifically targeted and killed one U.S. citizen, Anwar al-Aulaqi, in the conduct of U.S. counterterrorism operations and further identified three other U.S. citizens who were not specifically targeted but had been killed in counterterrorism operations since 2009. *See* Bies Dec. ¶ 12, Ex. E. This acknowledgement was followed by President Obama's speech at the National Defense University in which he explained that he had declassified this information in order "to facilitate transparency and debate on the issue, and to dismiss some of the more outlandish claims" but still acknowledged the "necessary secrecy" surrounding such operations. *See* Second Declaration of Amy Powell, dated September 5, 2013, at ¶ 4, Ex. C. Notwithstanding these additional official disclosures, it remains the case that no authorized Executive Branch official has disclosed the classified contents of the acknowledged OLC memorandum or the precise nature of the intelligence community's involvement in the use of targeted lethal force.

Updated FOIA Response

In light of this recently declassified information and consistent with its position in other litigation, DOJ updated its original FOIA response in this matter to specify that the OLC opinion previously acknowledged in other litigation pertains specifically to Anwar al-Aulaqi. *See* Bies Decl. Ex. F, Hudson Decl. ¶ 15. Accordingly, insofar as the Plaintiff's request pertained to DOD, OLC identified one responsive document, which it withheld pursuant to exemptions 1, 3 and 5. OLC neither confirmed nor denied the existence of any responsive records pertaining to any other agency. *Id*.

## ARGUMENT

As set forth below and in the attached declarations, the acknowledged OLC memorandum is appropriately withheld because it is currently and properly classified, exempt pursuant to statute and privileged. Moreover, consistent with the Government's position in other

related FOIA litigation, the existence or nonexistence of an OLC memorandum pertaining to any intelligence community agency is a currently and properly classified fact.

## I.      FOIA STANDARDS

**A.      FOIA Standard of Review**.  FOIA represents a balance struck by Congress "'between the right of the public to know and the need of the Government to keep information in confidence.'"  *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 152 (1989) (quoting H.R. Rep. No. 89-1497, at 6 (1966), *reprinted in* 1966 U.S.C.C.A.N. 2418, 2423); *accord Ctr. for Nat'l Sec. Studies v. DOJ*, 331 F.3d 918, 925 (D.C. Cir. 2003).  Thus, while FOIA generally requires disclosure of agency records, the statute recognizes "that public disclosure is not always in the public interest," *Baldrige v. Shapiro*, 455 U.S. 345, 352 (1982), and mandates that records need not be disclosed if "the documents fall within [the] enumerated exemptions," *Dep't of the Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 7 (2001).

Most FOIA actions are resolved through summary judgment motions pursuant to Fed. R. Civ. P. 56.  *See, e.g., Miscavige v. IRS*, 2 F.3d 366, 369 (11th Cir. 1993) ("Generally, FOIA cases should be handled on motions for summary judgment . . ."); *Lawyers Comm. for Civil Rights of S.F. Bay Area v. Dep't of Treasury,* 534 F. Supp. 2d 1126, 1131 (N.D. Cal. 2008) ("As a general rule, all FOIA determinations should be resolved on summary judgment.").  Summary judgment is warranted if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Although the government bears the burden of justifying non-disclosure, it may satisfy that burden through submission of an agency declaration that describes the reasons for non-disclosure.  *See Church of Scientology v. U.S. Dep't of the Army*, 611 F.2d 738, 742 (9th Cir. 1979); *Lane v. Dep't of Interior*, 523 F.3d 1128, 1135 -1136 (9th Cir. 2008) ("A court may rely solely on government affidavits so long as the affiants are knowledgeable about the information sought and the affidavits are detailed

enough to allow the court to make an independent assessment of the government's claim.") (internal quotation marks omitted).

Moreover, courts must accord "substantial weight" to agencies' affidavits regarding national security.  *See Hunt v. CIA,* 981 F.2d 1116, 1119 (9th Cir. 1992); *Long v. IRS,* 742 F.2d 1173, 1182-83 (9th Cir. 1984); *Hiken v. DOD*, 521 F. Supp. 2d 1047, 1058 (N.D. Cal. 2007); *Eslaminia v. FBI*, 2011 WL 5118520, 2 (N.D. Cal. 2011); *see also Wilner v. NSA*, 592 F.3d 60, 73 (2d Cir. 2009); *Wolf v. CIA*, 473 F.3d 370, 374 (D.C. Cir. 2007).  In FOIA cases involving matters of national security, "the court is not to conduct a detailed inquiry to decide whether it agrees with the agency's opinions; to do so would violate the principle of affording substantial weight to the expert opinion of the agency."  *Halperin v. CIA*, 629 F.2d 144, 148 (D.C. Cir. 1980); *see also Wilner*, 592 F.3d at 76 ("Recognizing the relative competencies of the executive and judiciary, we believe that it is bad law and bad policy to 'second-guess the predictive judgments made by the government's intelligence agencies regarding . . . whether disclosure of the [withheld information] would pose a threat to national security.'") (internal citation omitted); *Ctr. for Nat'l Sec. Studies*, 331 F.3d at 927 (courts have "consistently deferred to executive affidavits predicting harm to the national security, and have found it unwise to undertake searching judicial review"); *Frugone v. CIA*, 169 F.3d 772, 775 (D.C. Cir. 1999) ("Courts have little expertise in either international diplomacy or counterintelligence operations").  Rather, "an agency's justification for invoking a FOIA exemption is sufficient if it appears logical or plausible.'"  *Wilner*, 592 F.3d at 73 (quoting *Larson v. Dep't of State*, 565 F.3d 857, 862 (D.C. Cir. 2009)); *ACLU v. DOJ*, 681 F.3d 61 (2d Cir. 2012); *Wolf*, 473 F.3d at 374-75; *see also Hunt*, 981 F.2d at 1119.

**B.     Exemption One.**  Exemption 1 exempts from public disclosure matters that are "(A) specifically authorized under criteria established by an Executive order to be kept secret in

the interest of national defense or foreign policy and (B) are in fact properly classified pursuant

to such Executive order." 5 U.S.C. § 552(b)(1).  The current standard for classification is set

forth in Executive Order 13526, 75 Fed. Reg. 707 (Dec. 29, 2009) ("E.O. 13526").  Section 1.1

of the Executive Order lists four requirements for the classification of national security

information: (1) an "original classification authority" must classify the information; (2) the

information must be "owned by, produced by or for, or [] under the control of the United States

Government;" (3) the information must fall within one or more of eight protected categories of

information listed in section 1.4 of the E.O.; and (4) an original classification authority must

"determine[] that the unauthorized disclosure of the information reasonably could be expected to

result in damage to the national security" and be "able to identify or describe the damage."  E.O.

13526 § 1.1(a)(1)-(4).

      **C.**    **Exemption Three**.  Under Exemption 3, matters "specifically exempted from

disclosure" by certain statutes need not be disclosed.  5 U.S.C. § 552(b)(3).  In examining an

Exemption 3 claim, a court determines whether the claimed statute is an exemption statute under

FOIA and whether the withheld material satisfies the criteria for the exemption statute.  *CIA v.

Sims*, 471 U.S. 159, 167 (1985); *Lahr v. NTSB*, 569 F.3d 964, 985 (9th Cir. 2009); *Wilner*, 592

F.3d at 72.  Thus, a court should "not closely scrutinize the contents of a withheld document;

instead, [it should] determine only whether there is a relevant statute and whether the document

falls within that statute."  *Krikorian v. Dep't of State*, 984 F.2d 461, 465 (D.C. Cir. 1993).

Significantly, to support its claim that information may be withheld pursuant to Exemption 3, the

Government need not show that there would be harm to national security from disclosure, only

that the withheld information logically or plausibly falls within the purview of the exemption

statute.  *Hunt*, 981 F.2d at 1119; *accord Wilner*, 592 F.3d at 73; *Larson*, 565 F.3d at 868;

Two such statutes are at issue in this matter.  First, Section 102A(i)(1) of the National Security Act ("NSA"), as amended, 50 U.S.C. § 3024(i)(1) (formerly codified at 50 U.S.C. § 403-1), provides that "[t]he Director of National Intelligence shall protect intelligence sources and methods from unauthorized disclosure."  It is well settled that section 102A(i)(1) of the NSA is an exempting statute within the meaning of Exemption 3.  *See Sims*, 471 U.S. at 167 (discussing prior version of NSA); *Minier v. CIA*, 88 F.3d 796, 801 (9th Cir. 1996) (same); *Larson*, 565 F.3d at 865 (discussing current version of NSA).  In *CIA v. Sims*, the Supreme Court, recognizing the "wide-ranging authority" provided by the NSA to protect intelligence sources and methods, held that it was "the responsibility of the Director of Central Intelligence, not that of the judiciary, to weigh the variety of complex and subtle factors in determining whether disclosure of information may lead to an unacceptable risk of compromising the Agency's intelligence-gathering process."  471 U.S. at 180.  The Court observed that Congress did not limit the scope of "intelligence sources and methods" in any way.  *Id*. at 183.  Rather, it "simply and pointedly protected all sources of intelligence that provide, or are engaged to provide, information the Agency needs to perform its statutory duties with respect to foreign intelligence."  *Id*. at 169-70; *see Minier*, 88 F.3d at 801 (finding "very broad authority" to protect all sources and methods from disclosure).  Under the NSA, "information is properly withheld if the agency describes the intelligence activity involved, and shows why disclosure of requested materials could reveal the nature of that activity."  *Lahr*, 569 F.3d at 985 (internal alternations omitted).  Significantly, the agency "need not make a specific showing of potential harm to national security because Congress has already, in enacting the statute, decided that disclosure of NSA activities is potentially harmful."  *Id.*(internal quotation marks omitted).

Second, it is well established that the Central Intelligence Agency Act of 1949, as amended, 50 U.S.C. § 3035 *et seq.* (the "CIA Act") (formerly codified at 50 U.S.C. § 403-4),

satisfies the criteria for withholding of information pursuant to Exemption 3.  *See Fitzgibbon*, 911 F.2d at 761 (recognizing that courts have determined that the CIA Act is an Exemption 3 statute and noting that "[t]his conclusion is supported by the plain meaning of the statute, by the legislative history of FOIA, and by every federal court of appeals that has considered the matter").  Section 6 of the CIA Act exempts CIA from the provision of any law requiring the publication or disclosure of several categories of information relating to the CIA's organization and workforce, including the "functions" of its personnel.  *See* 50 U.S.C. § 3507; *see also* Hudson Decl. ¶ 25.  Accordingly, the CIA Act protects information that would reveal the functions of the CIA, which "plainly include clandestine intelligence activities and the utilization of intelligence sources and methods." Hudson Dec. ¶ 25; *see, e.g., Goland v. CIA*, 607 F.2d 339, 351 (D.C. Cir. 1978) (holding that intelligence sources and methods are "functions" of the CIA within the meaning of the CIA Act, and thus exempt from disclosure under Exemption 3); *Riquelme v. CIA*, 453 F. Supp. 2d 103, 111-12 (D.D.C. 2006) (same).  Indeed, Executive Order 12333, as amended, provides that the CIA shall, among other functions, "[c]ollect . . ., analyze, produce, and disseminate foreign intelligence and counterintelligence," "[c]onduct covert action activities approved by the President," and "[c]onduct foreign intelligence liaison relationships." *See* United States Intelligence Activities, Exec. Order No. 12333, 46 Fed. Reg. 59941 (Dec. 4, 1981), amended most recently by Exec. Order No. 13470, 73 Fed. Reg. 45325 (July 30, 2008); *see also* 50 U.S.C. § 3036(d)(1), 3036(f) (formerly at §403-4a(d)(1), §403-4a(f)) (authorizing functions of the CIA).

**D.    Exemption Five**.  Exemption 5 protects "inter-agency or intra-agency memorandums or letters which would not be available by law to a party . . . in litigation with the agency."  5 U.S.C. § 552(b)(5).  By this provision, Congress intended to incorporate into the FOIA all the normal civil discovery privileges.  *See Carter v. Dep't of Commerce*, 307 F.3d 1084, 1088 (9th Cir. 2002); *accord Renegotiation Bd. v. Grumman Aircraft Eng'g Corp.*, 421

U.S. 168, 184 (1975).  "Stated simply, agency documents which would not be obtainable by a private litigant in an action against the agency under normal discovery rules (*e.g.*, attorney-client, work-product, executive privilege) are protected from disclosure under Exemption 5." *Tigue v. DOJ*, 312 F.3d 70, 76 (2d Cir. 2002) (citation omitted).

The deliberative process privilege shields "certain intra-agency communications from disclosure to allow agencies freely to explore possibilities, engage in internal debates, or play devil's advocate without fear of public scrutiny." *See Lahr v. NTSB*, 569 F.3d at 979-80 (internal quotation marks omitted).  To fall within this privilege, "a document must be both predecisional and deliberative." *Id.* The Ninth Circuit has defined these labels:

> A "predecisional" document is one prepared in order to assist an agency decisionmaker in arriving at his decision, and may include recommendations, draft documents, proposals, suggestions, and other subjective documents which reflect the personal opinions of the writer rather than the policy of the agency. A predecisional document is a part of the "deliberative process," if the disclosure of the materials would expose an agency's decisionmaking process in such a way as to discourage candid discussion within the agency and thereby undermine the agency's ability to perform its functions.

*Assembly of State of Cal. v. Dep't of Commerce*, 968 F.2d 916, 920 (9th Cir. 1992) (alterations and citations omitted).  The Government need not "identify a specific decision" made by the agency to establish the predecisional nature of a particular record.  *NLRB v. Sears*, 421 U.S. 132, 151 n.18 (1975).  Rather, the privilege covers "documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated." *Klamath*, 532 U.S. at 8.  "Agencies are, and properly should be, engaged in a continuing process of examining their policies; this process will generate memoranda containing recommendations which do not ripen into agency decisions; and the lower courts should be wary of interfering with this process." *Sears*, 421 U.S. at 151 n.18.

Exemption 5 also incorporates the attorney-client privilege.  *Sears*, 421 U.S. at 154; *US v. Weber Aircraft Corp*, 465 U.S. 792, 799 (1984).  The privilege operates in the government

context as it does between private attorneys and their clients, "extend[ing] to situations in which the agency is consulting its attorney 'as would any private party seeking advice to protect personal interests.'" *Ctr. for Biological Diversity v. OMB*, 625 F. Supp. 2d 885, 892 (N.D. Cal. 2009) (quoting *Coastal States Gas Corp. v. Dep't of Energy,* 617 F.2d 854, 863 (D.C. Cir. 1980). An attorney-client privilege is established "(1) [w]hen legal advice of any kind is sought (2) from a professional legal adviser in his or her capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are, at the client's instance, permanently protected (7) from disclosure by the client or by the legal adviser (8) unless the protection be waived." *U.S. v. Martin*, 278 F.3d 988, 999 (9th Cir. 2002).

## II. DOJ PROPERLY WITHHELD THE RESPONSIVE DOCUMENT PERTAINING TO DOD UNDER EXEMPTIONS 1, 3 and 5

Pursuant to a search reasonably calculated to locate responsive classified and unclassified records, DOJ located one responsive OLC memorandum that pertains to DOD ("the DOD memorandum"). *See* Bies Dec. ¶14; *Lahr v. Nat'l Transp. Safety Bd.*, 569 F.3d 964, 986 (9th Cir. 2009). The attached declarations establish that the DOD memorandum is properly withheld in full pursuant to Exemptions 1, 3 and 5.

**A. Exemption 1.** The withheld information satisfies all the criteria for withholding under Exemption 1. An original classifying authority has determined that such information is currently and properly classified. *See* Declaration of Jennifer Hudson, dated September 5, 2013, ("Hudson Dec.") ¶ 26; Declaration of Vice Admiral Kurt W. Tidd, dated September 5, 2013 ("Tidd Dec."), at ¶6. Further, an original classifying authority has determined that the withheld information falls within the categories of information set forth in sections 1.4 of E.O. 13526 because the content of the document tends to reveal "military plans, weapons systems, or operations," *see* E.O. 13526 § 1.4(a), "intelligence activities (including covert action) [and]

intelligence sources or methods", *see* § 1.4(c), and "foreign relations and foreign activities of the United States, including confidential sources," *see* § 1.4(d).  Tidd Dec. ¶ 10; Hudson Dec. ¶ 26.  Specifically, Hudson explains that it contains "intelligence provided by [Intelligence Community (hereinafter "IC")] elements that was considered by OLC in the provision of its legal advice" regarding a potential overseas operation, including specific "intelligence sources and methods." *Id*. ¶¶ 26- 27.

Moreover, the declarations describe with reasonably specificity that disclosure of this document would cause harm to national security.  *See* Tidd Dec. ¶11; Hudson Dec.  ¶¶27-28.  As Hudson explains, "[t]errorist organizations and other hostile groups have the capacity and ability to gather information from a myriad of public sources, analyze it, and deduce means and methods from disparate details in order to defeat the collection efforts of the USG," and "even seemingly innocuous, indirect references to an intelligence method could have significant adverse effects when juxtaposed with other publicly-available data." *Id.*  ¶28.  Moreover, "[a]lthough the USG has officially acknowledged some information about the continuing and imminent threat that Aulaqi posed to the United States, the means by which the USG obtained some of that information remain classified, as are additional undisclosed details about Aulaqi's terrorist activities. . . . [I]t would greatly benefit AQAP and other terrorist organizations to know which clandestine sources and methods were used to obtain information about Aulaqi, as well as the specific intelligence that these techniques produced.  This information could be used by AQAP and other terrorist organizations to uncover current collection activities and take countermeasures to avoid future detection by the USG, thereby harming national security." *Id.* ¶28.  *See also* Tidd Dec. ¶11.

Accordingly, the OLC memorandum pertaining to DOD is exempt from disclosure under Exemption 1.

**B.  Exemption 3.**

The declarations amply demonstrate that disclosure of the requested record would disclose information pertaining to intelligence sources and methods, which falls squarely within the scope of section 102A(i)(1) of the NSA, 50 U.S.C. § 3024(i)(1).  *See* Hudson Dec. ¶ 29.   The information withheld in this document includes intelligence activities, sources and/or methods and thus falls squarely within the scope of the protective mandate under the NSA.  *Id.*  Thus, the decision neither to confirm nor deny the existence of responsive records is justified by Exemption 3.

**C.  Exemption 5**.

The Bies and Tidd Declarations establish that the DOD memorandum is also wholly exempt from disclosure under Exemption 5 because it is subject to the deliberative process privilege and the attorney client privilege.  As Bies explains, OLC provides legal advice and analysis to the Executive Branch, often in connection with highly sensitive and complex matters.  Bies Dec. ¶4.  The particular document in question here is "pre-decisional because it was prepared in advance of Executive Branch decisions regarding a potential military operation in a foreign country;"  it is also "deliberative because it contains confidential legal advice by OLC attorneys to other Executive Branch officials in connection with potential decisions regarding such an operation."  Bies Dec. ¶17; Tidd Dec. ¶13.  Moreover, "compelled disclosure of this document would undermine the deliberative processes of the Government and chill the candid and frank communications necessary for effective governmental decision-making."  Bies Dec. ¶17; Tidd Dec. ¶13.

Courts routinely uphold withholding of OLC opinions on similar grounds.  *See Elec. Frontier Found. v. DOJ*, 892 F. Supp. 2d 95, 103 (D.D.C. 2012) (finding OLC memorandum properly withheld as deliberative); *Citizens for Responsibility & Ethics in Wash. v. Office of*

*Admin.,* 249 F.R.D. 1, 5–7 (D.D.C. 2008) (OLC memorandum fits within the scope of

deliberative process privilege because it "contains legal advice from the equivalent of [the Office

of Administration's] outside counsel", "does not mandate a particular policy", and "can[not]

rightly be described as itself a statement of the Executive Branch's legal position"); *Elec.*

*Privacy Info. Ctr. v. DOJ,* 584 F. Supp. 2d 65, 75 (D.D.C. 2008) ("If OLC provides legal advice

as part of a decision-making process, this legal advice is protected under the deliberative process

privilege."); *Southam News v. INS,* 674 F. Supp. 881, 886 (D.D.C. 1987) (concluding that OLC

opinion letters "generated in the course of formulating policies and positions that were being

considered" falls within the deliberative process privilege); *Morrison v. DOJ,* No. 87–3394, 1988

WL 47662, at *1–2 (D.D.C. Apr. 29, 1988) (finding that an OLC legal opinion analyzing the

constitutionality of a proposed *amendment* was exempt from disclosure under the deliberative

process privilege).

  Moreover, the attached declarations establish that the DOD memorandum is subject to

the attorney-client privilege.  As Bies explains, "OLC attorneys stand in a special relationship of

trust with their agency clients" and incorporate client communications into that advice.  *See* Bies

Dec. ¶5.  The document in question "reflects confidential communications between OLC and

Executive Branch clients made for the purpose of obtaining legal advice."  *Id.* ¶18; *see also* Tidd

Dec. ¶14.  It thus falls squarely within the protections of the attorney-client privilege.

### D.  Non-Segregability

  FOIA requires that "[a]ny reasonably segregable portion of a record shall be provided to

any person requesting such record after deletion of the portions which are exempt under this

subsection."  5 U.S.C. § 552(b)(9).  This provision does not require disclosure of records in

which the non-exempt information that remains is meaningless. *See Nat'l Sec. Archive Fund,*

*Inc. v. CIA*, 402 F. Supp. 2d 211, 220-21 (D.D.C. 2005) (concluding that no reasonably

segregable information exists because "the non-exempt information would produce only incomplete, fragmented, unintelligible sentences composed of isolated, meaningless words."); *see also Klamath Siskiyou Wildlands Ctr. v. Dep't of Interior*, Civ. No. 07-325-CL, 2007 WL 4180685, at *8 (D. Or. Nov. 21, 2007) ("In cases where nonexempt material is inextricably intertwined with exempt material and the deletion of the exempt material would leave only meaningless words and phrases, the entire document is exempt.").  The declarations establish that the exempt information is not reasonably segregable from non-exempt information.  *See* Hudson Dec. ¶ 30; Bies Dec ¶¶ 17-18

### III.  DOJ PROPERLY REFUSED TO CONFIRM OR DENY THE EXISTENCE OF ANY ADDITIONAL RECORDS PURSUANT TO EXEMPTIONS 1 AND 3.

OLC properly provided a partial "Glomar" response, refusing to confirm or deny the existence or nonexistence of responsive OLC opinions pertaining to any other agency, because to confirm or deny the existence of such an opinion would reveal a currently and properly classified fact.[1]  A "government agency may issue a 'Glomar Response,' that is, refuse to confirm or deny the existence of certain records, if the FOIA exemption would itself preclude the acknowledgment of such documents."  *See Minier*, 88 F.3d at 800; *Pickard v. DOJ*, 653 F.3d 782, 785-86 (9th Cir. 2011); *Gardels v.  CIA*, 689 F.2d 1100, 1103 (D.C. Cir. 1982); *see generally Hunt v. CIA*, 981 F.2d 1116, 1118-21 (9th Cir. 1992) (approving CIA's refusal to confirm the existence or non-existence of documents and surveying cases).  As the Second Circuit recently explained, "[t]o properly employ the *Glomar* response to a FOIA request, an agency must tether its refusal to respond to one of the nine FOIA exemptions – in other words, a government agency may . . . refuse to confirm or deny the existence of certain records . . . if the

---

[1]  This type of response to a FOIA request is called a "Glomar response" after the CIA's refusal to confirm or deny the existence of records regarding a ship named the Glomar Explorer in *Phillippi v. CIA*, 546 F.2d 1009, 1011 (D.C. Cir. 1976).

FOIA exemption would itself preclude the *acknowledgment* of such documents." *Wilner*, 592 F.3d at 68 (citation and internal quotation marks omitted). "[W]hen the Agency's position is that it can neither confirm nor deny the existence of the requested records, there are no relevant documents for the court to examine other than the affidavits which explain the Agency's refusal." *Wolf*, 473 F.3d at 374 n.4 (internal quotation marks omitted); *see also Larson,* 565 F.3d at 861.

In crafting the Government's response to FAC's FOIA request, the Government took account of information already in the public sphere, including the existence of an OLC memorandum pertaining to DOD. Now that the U.S. Government's use of force against Aulaqi has been declassified, OLC can identify that this previously acknowledged opinion is specific to the targeting of Aulaqi. The Government nonetheless must maintain a more limited Glomar response regarding the existence or nonexistence of opinions related to any agency other than DOD because the existence or nonexistence of such documents is properly classified and exempt from disclosure by statute. This posture is consistent with the position that the Government has taken in other FOIA litigation on similar subject matters.

**A. Exemption 1.** The existence or nonexistence of responsive documents pertaining to any agency other than DOD is exempt because it is currently and properly classified. An original classifying authority has determined that the withheld information falls within the categories of information set forth in sections 1.4 of E.O. 13526 because the existence or non-existence of such responsive document would tend to reveal "intelligence activities (including covert action) [and] intelligence sources or methods", *see* § 1.4(c), and "foreign relations or foreign activities of the United States, including confidential sources," *see* § 1.4(d). *See* Hudson Dec. ¶¶19, 31. As explained in the Bies Declaration, an OLC opinion generally provides legal advice to the Executive Branch only where there is a practical need for the advice. Bies Dec. ¶4. Confirming or denying the existence of such advice tends to confirm the existence and some detail regarding the nature and extent of the IC's involvement in specific alleged operations,

1    particularly in light of the specificity of the request (seeking legal analysis about an alleged "U.S.

2    drone strike" against Aulaqi) and Aulaqi's death.  Hudson Dec. ¶ 31.  Conversely, if OLC were

3    to publicly deny the existence of such documents, it would indicate that authority may not have

4    been granted to conduct such operations by the intelligence community or possibly that the issue

5    had not been raised with OLC and therefore may not have been considered.  *Id.*  Moreover, if

6    OLC were to invoke the Glomar response only when the documents exist, it would have the

7    same effect as confirming the existence of the documents.  Thus, the Government must assert a

8    Glomar response consistently, even where documents do not exist, in order to maintain the

9    credibility of the Glomar.  *See* Hudson Dec. ¶ 31.  The existence or nonexistence of such

10   authorities for the intelligence community would reveal "foreign activities of the United States"

11   as well as revealing "intelligence activities (including covert action) and "intelligence sources

12   and methods."  *Id.* ¶ 19.

13          Such disclosures of intelligence activities, sources and methods could reasonably be

14   expected to cause damage to national security.  Hudson Dec. ¶¶ 31-34.  As explained in the

15   Hudson Declaration, "the U.S. military and Intelligence Community have different roles,

16   capabilities, and authorities," and "admissions of their respective activities generate different

17   responses by unfriendly foreign powers, including terrorist organizations, but also U.S. foreign

18   partners."  *Id.* ¶ 32.  Because of these differing authorities, to reveal that an IC entity was

19   engaging in such an activity would result in a different response from foreign nations that could

20   harm U.S. foreign policy and national security.  *Id.* ¶¶ 32-33

21          For example, if it were revealed that an intelligence entity such as the CIA engages in

22   drone strikes, it could reveal that the CIA had been granted broad authority beyond traditional

23   intelligence-gathering and heighten suspicion that the CIA was involved in other nontraditional

24   activities, leading foreign governments and groups to conclude rightly or wrongly that the CIA

25   was responsible for other activities.   Hudson Dec. ¶ 33.  Such beliefs could harm foreign affairs

26   and reduce the effectiveness of future operations.  *Id.*  Conversely, to reveal a lack of such of

27   activities would allow terrorists to concentrate their resources into countermeasures against U.S.

28   military operations, knowing that they could not be targeted by the CIA via drones or other non-

1    traditional intelligence activities.  Hudson Dec. ¶34    And denying the existence of such a

2    document would eliminate the efficacy of the Glomar that would be needed in other similar

3    situations where the existence or nonexistence; the Government must assert a Glomar

4    consistently, even where documents do not exist, in order to maintain the credibility of the

5    Glomar.  *Id.* ¶ 31.

6        **B.  Exemption 3.**  The Hudson Declaration establishes that the partial Glomar is justified

7    by the NSA and, insofar as the Glomar concerns equities of the CIA, the CIA Act.  *See* Hudson

8    Dec. ¶¶23-25, 31.  As discussed above, Hudson explains that to reveal the existence or

9    nonexistence of responsive records as they pertain to the Intelligence Community necessarily

10   tends to reveal intelligence sources and methods, information which is protected under the NSA.

11   *Id.* ¶¶ 32; *see, e.g.*, *Wolf*, 473 F.3d at 377-78 (relying on the NSA in holding that CIA's affidavits

12   "establish that disclosure of information regarding whether or not CIA records of a foreign

13   national exist would be unauthorized under Exemption 3 because it would be reasonably harmful

14   to intelligence sources and methods"); *Riquelme*, 453 F. Supp. 2d at 111-12 (affirming CIA's

15   Glomar response pursuant to the NSA and CIA Act regarding certain alleged CIA activities in

16   Paraguay and, *inter alia*, information relating to a foreign national because the fact of the

17   existence or nonexistence of such records "are pertinent to the Agency's intelligence sources and

18   methods").  Such broad discretion is proper under the Exemption 3 analysis because even

19   "superficially innocuous information" might reveal valuable intelligence sources and methods.

20   *Sims*, 471 U.S. at 178; *see also Fitzgibbon*, 911 F.2d at 762 ("the fact that the District Court at

21   one point concluded that certain contacts between CIA and foreign officials were 'nonsensitive'

22   does not help [plaintiff] because apparently innocuous information can be protected and

23   withheld").

24       It is also protected information under the CIA Act.  Compelled disclosure of the existence

25   or nonexistence of records pertaining to CIA would require the CIA to disclose information

26   about its core functions, an outcome the CIA Act expressly prohibits.  *See* 50 U.S.C. § 3507.

27   Any other response could disclose statutorily-protected information regarding CIA functions,

28

1    including the nature of the CIA's role in drone strike operations, and intelligence activities,

2    sources and methods.  *See* Hudson Dec. ¶¶ 25, 31n.5.

3    **IV.     DEFENDANT HAS NOT WAIVED THESE EXEMPTIONS BY OFFICIAL**
         **ACKNOWLEDGMENT**

4

5            There has been no official acknowledgment that would waive the assertion of these

6    exemptions.  An agency may be compelled to provide information over a valid FOIA exemption

7    claim only when the specific information at issue has already been fully, publicly, and officially

8    disclosed.  *See Wolf*, 473 F.3d at 378.  Plaintiff "bear[s] the initial burden of pointing to specific

9    information in the public domain that appears to duplicate that being withheld."  *Id.*   The

10   Plaintiff must show (1) that the requested information is "as specific as the information

11   previously released;" (2) that the requested information "match[es] the information previously

12   disclosed;" and (3) that the information has "already . . . been made public through an official

13   and documented disclosure." *See Pickard*, 653 F.3d at 786 (quoting *Fitzgibbon v. CIA*, 911 F.2d

14   755, 765 (D.C. Cir. 1990)).  This test is applied with "exactitude" out of deference to "'the

15   Government's vital interest in information relating to national security and foreign affairs.'"

16   *Wolf*, 473 F.3d at 378 (citation omitted); *see, e.g., ACLU v. DOD*, 752 F. Supp. 2d 361, 367

17   (S.D.N.Y. 2010) (noting that although statements of government officials indicated "that the CIA

18   is involved in U.S. activities in Afghanistan, none of the statements specifically disclose the

19   existence or nonexistence of records pertaining to the rendition or transfer of detainees to

20   Bagram . . . or the interrogation and treatment of detainees at Bagram").

21           With regard to the requirement of "official and documented disclosure," moreover, the

22   courts have recognized "'a critical difference between official and unofficial disclosures.'"

23   *Wilson v. CIA*, 586 F.3d 171, 186 (2d Cir. 2009)  (quoting *Fitzgibbon*, 911 F.2d at 765).  "[T]he

24   law will not infer official disclosure of [classified information] from (1) widespread public

25   discussion of a classified matter; (2) statements made by a person not authorized to speak for the

Agency; (3) release of information by another agency, or even by Congress." *Id.* at 186-87

(citations omitted); *see also Fitzgibbon*, 911 F.2d at 766 (courts have "unequivocally recognized

that the fact that information resides in the public domain does not eliminate the possibility that

further disclosures can cause harm to intelligence sources, methods and operations"); *accord*

*Wolf*, 473 F.3d at 378.   Accordingly, the Ninth Circuit has held that such official confirmation

must "mean an intentional, public disclosure made by or at the request of a government officer

acting in an authorized capacity by the agency in control of the information at issue." *See*

*Pickard*, 653 F.3d at 787.[1]

The declarations establish that the U.S. Government has not officially acknowledged the

contents of the withheld document; nor has the Government officially acknowledged whether or

not additional responsive documents exist.  *See* Bies Dec. ¶ 24; Hudson Dec. ¶¶ 15, 32, 35; Tidd

Dec. ¶ 15.[2]

In support of the proposition that the Government has officially acknowledged the

contents of the memorandum at issue, Plaintiff's Complaint cites unspecified, unsourced media

reports containing speculation about an OLC opinion on the topic.  *See* Complaint, ¶¶4, 11.[3]   As

---

[1] In *Pickard*, the Ninth Circuit was elaborating the meaning of "official confirmation" within the context of confirming the identity of a confidential informant but opined that the test was the same as that for "official acknowledgment."  653 F.3d at 786.  If anything, one would expect the test for acknowledgment of properly classified information to be more stringent than that applied to law enforcement information.

[2] Since the filing of this suit, and the filing of other related litigation, senior U.S. officials have publicly addressed significant legal and policy issues pertaining to U.S. counterterrorism operations and the potential use of lethal force against U.S. citizens who are senior operational leaders of al-Qaida or associated forces.  Although these speeches provided a detailed justification for the use of lethal force against U.S. persons, none of these speeches resulted in disclosures of the specific information sought by Plaintiffs here. *See, e.g.*, Remarks of Attorney General Eric Holder at Northwestern University School of Law dated March 5, 2012, Remarks by John Brennan on April 30, 2012, and Remarks by the President at National Defense University on May 23, 2013.  *See* Powell Dec.  ¶¶ 2-4, Exs. A-C.

[3] The Complaint also alleged that the President had officially acknowledged a U.S. drone strike against al-Aulaqi at the time the Complaint was filed.  That was inaccurate, as the fact that the

Plaintiff admits, those news reports do not cite authorized officials.  *Id.*   An unsourced media report or "leak" by definition cannot constitute the type of "official and documented disclosure" that is required to establish a waiver of an agency's ability to protect classified information.  *See Pickard*, 653 F.3d at 787; *Wilson*, 586 F.3d at 186; *see, e.g.*, *ACLU v. DOD*, 628 F.3d 612, 621 (D.C. Cir. 2011) (explaining that leaked report could not be considered officially acknowledged).  Although the newspaper articles cited by plaintiff purport to describe an OLC memorandum regarding Aulaqi, they do not establish that the content was made public through any "official and documented disclosure."  *Wilson*, 586 F.3d at 186; *see id.* at 174 (concluding that "evidence of public disclosure does not deprive information of classified status," even where it was undisputed that document on agency letterhead containing classified information had been published in the Congressional Record).

Accordingly, none of the cited reports comes close to meeting the stringent standard for an official acknowledgment.

## CONCLUSION

For the foregoing reasons, Defendant respectfully requests that the Court grant the Defendant's motion for summary judgment.

Respectfully submitted this 5th day of September, 2013.

STUART DELERY
Assistant Attorney General

ELIZABETH J.  SHAPIRO
Deputy Director

*/s/ Amy E. Powell*

AMY POWELL

---

U.S. targeted al-Aulaqi was still a properly classified fact at the time.  The issue is moot, however, because the Executive Branch has subsequently declassified that information and acknowledged the existence of a responsive document.

Trial Attorney
Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue, N.W., Room 5377
Washington, D.C. 20001
Telephone: 202-514-9836
Facsimile: 202-616-8517
Amy.Powell@usdoj.gov
*Attorneys for Defendants*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FIRST AMENDMENT COALITION,<br><br>     Plaintiff,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF JUSTICE,<br><br>     Defendant. | No. CIV 12-1013 - CW<br><br><br>[PROPOSED] ORDER |

## [PROPOSED] ORDER

Having considered the submissions of the parties, the Defendant's motion is hereby

GRANTED.


SO ORDERED.


_____

U.S. DISTRICT COURT JUDGE
CLAUDIA WILKEN

## CERTIFICATE OF SERVICE

I hereby certify that on September 5, 2013, I caused to be electronically transmitted the foregoing document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrant:

Thomas R. Burke
*thomasburke@dwt.com*


     */s/ Amy E. Powell*