THOMAS R. BURKE (State Bar No. 141930)
JONATHAN L. SEGAL (State Bar No. 264238)
DAVIS WRIGHT TREMAINE LLP
505 Montgomery Street, Suite 800
San Francisco, California 94111
Telephone: (415) 276-6500
Facsimile: (415) 276-6599
Email: thomasburke@dwt.com; jonathansegal@dwt.com

Attorneys for Plaintiff
FIRST AMENDMENT COALITION

IN THE UNITED STATES DISTRICT COURT

THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| FIRST AMENDMENT COALITION,<br>Plaintiff,<br>vs.<br>U.S. DEPARTMENT OF JUSTICE,<br>Defendant. | Case No. **CV 12-01013 DMRCW**<br>Assigned to the Hon. Claudia Wilken<br><br>**PLAINTIFF FIRST AMENDMENT COALITION'S REPLY IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT**<br><br>Date: December 5, 2013<br>Time: 2 p.m.<br>Place: Courtroom 2 - 4th Floor |

DAVIS WRIGHT TREMAINE LLP

**TABLE OF CONTENTS**

**Page**

I. INTRODUCTION ............................................................ 1

II. FAC'S MOTION SHOULD BE GRANTED. ............................................................ 4

A. The Government's Disclosures Draw A Straight Line From The Withheld Document(s) To The Government's Policy. ............................................................ 4

B. The Government Has Waived Exemption 5 By Disclosing That The Memo(s) Sought By FAC Are The Basis For The Publicly Disclosed Policy Regarding Targeted Killing. ............................................................ 7

C. Exemptions 1 and 3 Do Not Apply To Pure Legal Analysis. ............................................................ 9

D. *In Camera* Review Is Justified. ............................................................ 12

E. The Admission of Declarations from Distinguished Scholars and Journalists in a FOIA Case Is Entirely Proper. ............................................................ 13

III. CONCLUSION ............................................................ 15

DAVIS WRIGHT TREMAINE LLP

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ACLU v. United States DOD*,
628 F.3d 612 (D.C. Cir. 2011) ........ 12

*Afshar v. Department of State*,
702 F.2d 1125 (D.C. Cir. 1983) ........ 12

*Amnesty Int'l USA v. CIA*,
2008 U.S. Dist. LEXIS 47882 (S.D.N.Y. June 19, 2008) ........ 14

*Barrett v. United States DOJ*,
2010 U.S. Dist. LEXIS 112259 (E.D. Cal. Oct. 20, 2010) ........ 14

*Brennan Center v. U.S. DOJ*,
697 F.3d 184. (2d Cir. 2012) ........ 7

*Bronx Defenders v. DHS*,
2005 U.S. Dist. LEXIS 33364 (S.D.N.Y. Dec. 19, 2005) ........ 2, 8

*Church of Scientology v. United States Dep't of Army*,
611 F.2d 738 (9th Cir. 1979) ........ 1, 9, 15

*Coastal States Gas Corp. v. Department of Energy*,
617 F.2d 854 (D.C. Cir. 1980) ........ 9

*Ctr. for Biological Diversity v. OMB*,
625 F. Supp. 2d 885 (N.D. Cal. 2009) ........ 8

*Curran v. Department of Justice*,
813 F.2d 473 (1st Cir. 1987) ........ 14

*Gardels v. Central Intelligence Agency*,
689 F.2d 1100 (D.C. Cir. 1982) ........ 14

*Gordon v. FBI*,
388 F. Supp. 2d 1028 (N.D. Cal. 2005) ........ 8

*Hayden v. NSA*,
608 F.2d 1381 (D.C. Cir. 1979) ........ 9

*In't Veld v. Dep't of Homeland Sec.*,
589 F. Supp. 2d 16 (D.D.C. 2008) ........ 14

*Kamman v. United States IRS*,
56 F.3d 46 (9th Cir. 1995) ........ 15

*Lewis v. IRS*,
823 F.2d 375 (9th Cir. 1987) .......... 15

*Lion Raisins, Inc. v. USDA*,
354 F.3d 1072 (9th Cir. 2004) .......... 13

*Mead Data Cent., Inc. v. Dep't of the Air Force*,
566 F.2d 242 (D.C. Cir. 1977) .......... 8

*Military Audit Project v. Casey*,
656 F.2d 724 (D.C. Cir. 1981) .......... 9

*N.Y. Times Co. v. DOJ*,
915 F. Supp. 2d 508 (S.D.N.Y. 2013) .......... 10

*Nat'l Immigration Project of the Nat'l Lawyers Guild v. United States Dep't of Homeland Sec.*,
842 F. Supp. 2d 720 (S.D.N.Y. 2012) .......... 9

*National Council of La Raza v. DOJ*,
411 F.3d 350 (2d Cir. 2005) .......... 2, 7

*New York Times Co. v. United States DOJ*,
872 F. Supp. 2d 309 (S.D.N.Y. 2012) .......... 10

*Pacific Fisheries, Inc. v. United States*,
539 F.3d 1143 (9th Cir. 2008) .......... 15

*Raher v. Fed. Bureau of Prisons*,
2013 U.S. Dist. LEXIS 1128 (D. Or. Jan. 2, 2013) .......... 14

*Safeway v. IRS*,
2006 U.S. Dist. LEXIS 81078 (N.D. Cal. Oct. 24, 2006) .......... 8

*Spannaus v. U.S. Dep't of Justice*,
813 F.2d 1285 (4th Cir. 1987) .......... 14

*Students Against Genocide v. Dep't of State*,
257 F.3d 828 (D.C. Cir. 2001) .......... 12

**Statutes**

National Security Act .......... 3, 9

Patriot Act. .......... 10

DAVIS WRIGHT TREMAINE LLP

## I. INTRODUCTION

More than two years have passed since September 30, 2011, when a U.S. drone killed terrorist and American citizen Anwar al-Awlaki. Since then, the Government has staked out a precarious position: seeking credit for taking al-Awlaki and others "off the field," attempting to mollify critics demanding transparency regarding extra-judicial killings of American citizens, and preserving the secrecy it insists is necessary to conduct the war on terror. Explicitly disclaiming the desire to have any intelligence information disclosed, FAC filed this FOIA suit with a simple purpose: to uncover the legal basis for the Government's killing of its own citizens, in order that scholars, journalists, and the general public could understand their government's actions. That laser focus is reflected in its Complaint, ¶ 5, which states that "**FAC does not seek disclosure of information revealing intelligence sources and methods...**" Now, after a dozen briefs and hundreds of pages of exhibits, the Government still offers conclusory declarations warning that national security, and the ability to seek and obtain legal advice, would be catastrophically impaired if the judiciary orders the information sought released. Yet, in the first round of summary judgment briefing, the Government also warned of incalculable damage to national security if an agency confirmed that the U.S. killed al-Awlaki, or that it used a drone. But now, after months of denial, once the Government explicitly confirmed this information, there has not been any apparent weakening in national security. The Government still insists on blind trust instead of transparency – but it has lost its credibility here.[1]

The series of official disclosures by the President and the Attorney General at the heart of this case, taken as a whole, reveal that the Government developed a legal policy regarding targeted killing of U.S. citizens in secret, then in response to mounting public pressure from public figures – members of Congress and former Executive Branch lawyers, including former OLC head Jack Goldsmith (Ex. K.) – announced details of that policy and revealed the source of those details to be the documents sought in this lawsuit. The Government has thus waived any exemption to FOIA.

---

[1] It is not the Court's role to simply rubber-stamp the Government's judgments. *See Church of Scientology v. United States Dep't of Army*, 611 F.2d 738, 741-744 (9th Cir. 1979).

However, the Government insists that in order to waive Exemptions 1, 3, or 5 to the release of a memo under FOIA, the Government has to do no less than make a formal policy statement in public, and then reveal that the source of the policy was a specific memo, produced by a specific division in a specific agency. This is not, and cannot be the standard for waiver: "Specific explicit language of adoption of incorporation" is not required. *National Council of La Raza v. DOJ*, 411 F.3d 350, 357 n.5 (2d Cir. 2005). Instead, "courts must examine all relevant facts and circumstances in determining whether express adoption or incorporation by reference has occurred." *Id.* Contrary to the Government's position here, there is no requirement that "absent some sort of magic language where the decision-making agency admits reliance on the reasoning in addition to the conclusions of a document, the standard has not been met." *Bronx Defenders v. DHS*, 2005 U.S. Dist. LEXIS 33364, at *19 (S.D.N.Y. Dec. 19, 2005). Examining the Government's high level public disclosures as a whole, the only conclusion is that legal argument contained in the documents sought by FAC must be released.

The Government's attempts to conceal every word of the contents of the OLC memo, which it had previously refused to confirm or deny even existed, fail in the face of its numerous disclosures regarding the legal framework for deciding whether to kill a U.S. citizen abroad, the existence of the OLC memoranda, the killing of al-Awlaki, and the scope of the Government's targeted killing program. Collectively, the Government's public disclosures reveal the entire picture: the Government, working with Yemen, killed al-Awlaki as part of its targeted killing program, after applying a legal framework conceived and solidified by DOJ's Office of Legal Counsel in memoranda for the killing of United States citizens. Disclosures about the program have come from the highest-ranking official sources: the President, the A.G, the directors of the FBI and CIA, and the White House Press Secretary. Yet, in the face of these official disclosures and countless unofficial disclosures, the Government still asserts that it has not waived either the ability to keep legal reasoning, *and even mere legal citations*, shrouded from the public simply because it has not expressly identified the OLC Memo as the specific source of released information justifying targeted killing. This is not and should not be the standard for disclosure.

The Government's briefing and declarations are more notable for what the Government

does not, and is apparently unwilling to assert. The Government insists over and over again that FAC has not shown any nexus between the Government's disclosures and the contents of the OLC/DOD Memo whose existence the Government has publicly confirmed. However, the Government never directly denies that the Memo is **not** the source of the Government's policy. Indeed, if the contents of the disclosures, including A.G. Holder's letter, speech at Northwestern University and the White Paper, were not reflected in the DOD Memo (and any other memoranda, the existence of which the Government will not confirm or deny), the Government could simply say so in its declarations or briefing, more effectively denying one of FAC's strongest arguments. Rather than make a straight denial, the Government puts the burden on FAC to show that the OLC Memo is the source of the information contained in the White Paper and other policy disclosures.

This Court should grant FAC's motion for summary judgment and order the disclosure of the legal analyses justifying the targeted killing of United States citizens while they are abroad, which the Government has relied on in making its high profile case to the American public for the legality of these killings. *First*, the high-profile disclosures by the President, Attorney General, and the Directors of the CIA and FBI and others bar the Government from preventing the release of segregable information from the OLC Memo or from validly issuing a Glomar response regarding any other responsive documents. *Second*, the disclosures by these top Government officials confirm that DOJ's legal analyses contain the secret working law of the Government, which means the Government cannot substantiate its assertion of the deliberative process and attorney-client privileges under FOIA Exemption 5. *Third*, FOIA Exemption 1 does not apply because the Government has failed to show that disclosing only the legal analyses regarding the Government's authority to kill United States citizens such as al-Awlaki while abroad are properly classified and could reasonably be expected to harm national security. FOIA Exemption 3 does not apply because the requested legal analyses and legal citations are not "intelligence sources and methods" within the meaning of the National Security Act. *Fourth*, this Court should order *in camera* review of any responsive documents, as the Second Circuit recently ordered. *Fifth and finally*, the declarations of Dean Chemerinsky and Scott Armstrong should be admitted for the purpose of showing the value that would be realized by the public if only a redacted form of the OLC memo were released. The

Government's declarations should be stricken in the places noted.

## II. FAC'S MOTION SHOULD BE GRANTED.

### A. The Government's Disclosures Draw A Straight Line From The Withheld Document(s) To The Government's Policy.

Officials at the highest levels of the Government have made repeated, explicit disclosures that, taken together, show the existence of DOJ materials that explain the legal justification for the targeted killing of United States citizens abroad, and the general contours of that legal argument. *See, e.g.* exs. G, H, I, O, GG, JJ, KK, TT. Those disclosures include:

- An exchange between Attorney General Holder and Senator Leahy at a March 2012 congressional hearing. EX. O. Sen. Leahy asked to "see the [OLC] memorandum" and acknowledged that the memo's release was "a matter of some debate within the administration." *Id.* A.G. Holder replied, "That would be true;"
- A 16-page, unclassified, Nov. 8, 2011 Department of Justice White Paper, released in Feb. 2013, containing an extensive discussion of the legal justification of the targeted killing of United States citizens, including numerous citations to legal authority. Ex. DD; Exs. EE-KK;
- A statement from White House spokesman Jay Carney Feb. 5, 2013, that the Government has disclosed a "document was produced by the administration, provided not for public release but provided to senators who have jurisdiction on these issues last year and for the very purposes of consideration that we've been discussing here," Ex. JJ;
- An additional statement from Mr. Carney on Feb. 7, 2013, that the Government has disclosed a "White Paper from the Department of Justice, which was another effort provided to Congress to explain the legal reasoning - detached from specific operations - the legal reasoning that undergirds the matters that we're discussing." The "matters" discussed at the press briefing were focused primarily on the targeted killing of al-Awlaki; Ex. KK;
- An additional statement by Mr. Carney on Feb. 7, 2013, that that "the information [provided to Congress] is classified Office of Legal Counsel advice related to the subject of targeted attacks that was discussed in the Department of Justice White Paper;" *Id.;*
- An additional statement by Mr. Carney on Feb. 7, responding to the question of

DAVIS WRIGHT TREMAINE LLP

whether the Government would release the OLC memo, that "there is an effort underway to provide Congress information – those who have oversight over these matters – classified information as well as unclassified with the White Paper and the public intonation as much as possible;" *Id.;*

- A letter dated May 22, 2013 from A.G. Holder to Sen. Patrick Leahy stating that

> "[T]he Administration's legal views on this weighty issue have been clear and consistent over time. The analysis in my speech at Northwestern University Law School is entirely consistent with not only the analysis found in the unclassified White Paper the Department of Justice provided to your Committee soon after my speech, *but also with the classified analysis the Department shared with other congressional committees in May 2011* [and] also *entirely consistent with the classified legal advice on this issue the Department of Justice has shared with your Committee more recently*…" Ex. TT (emphasis added);

- A March 2012 speech by A.G. Holder given to Northwestern University Law School that formally laid out the bare bones of the U.S.'s legal justification for the targeted killing of United States citizens. Ex. H. That speech is similar in content to the White Paper, which Carney confirmed in Feb. 2012 is based on "classified OLC materials" a statement he made when responding to questions regarding a "memo." Ex. KK. An April 2012 speech by John Brennan also stated that "these targeted strikes are legal" citing legal opinions from the DoD, DOJ and State Depts. Ex. G.

- Numerous statements by Secretary of Defense and CIA Director Leon Panetta confirming the use of drones by the CIA and Department of Defense and Panetta's personal involvement in the killing of al-Awlaki. Exs. F, M, Y.

At the same time as it has made these extensive, explicit, disclosures, connecting the killing of al-Awlaki to A.G. Holder's speech at Northwestern, to the White Paper, to "classified OLC materials," to a "memo," the Government has tied itself up in knots in this case arguing that it cannot even *acknowledge* an obvious fact – that OLC memoranda exist that support and reflect the very same legal analysis delivered by Attorney General Eric Holder and President Obama in support of their proclamations that the United States provides due process for those citizens targeted for killing as terrorists abroad. Coupling the Government's eagerness to talk about the legal analysis with its refusal to acknowledge *even the legal citations* that it considered, it is unmistakable that the Government seeks to control how and when its legal analysis and policy

regarding targeted killing is revealed. That control is Congress's to exercise, and it did so with the Freedom of Information Act.

Indeed, in his lecture at Northwestern University Law School in May 2012, Attorney General Holder had ample time before a rapt audience to spell out the OLC's legal analysis, with a favorable gloss on the standards of proof and sources of law. Ex. H. Oral argument in a courtroom offers the same benefits; yet every lawyer knows it is the written brief, including case citations and logic, that enables others to grasp and critique a legal argument. Congress enacted FOIA to give the public that same chance, to look past the speeches and examine the Government's position for themselves. At a minimum, the Government is not permitted to hold information that belongs to the public as a bargaining chip, threatening to walk away from the public conversation altogether if it is forced to play by Congress's rules. Yet that is precisely what the Government insists here, claiming that a court order compelling it to release written legal analysis on targeted killing "would have the perverse effect of discouraging voluntary disclosures about important national security matters to avoid compelled disclosure of other classified or privileged information." Opp. at 1. *See also* Opp. at 5 (claiming that disclosure would discourage "policymakers from seeking and relying on confidential legal advice in the course of formulating policy, or publicly discussing the legal bases for their policies"). This Court should reject this obvious overreach by the Executive Branch. These arguments ignore a simple fact – those disclosures were made under pressure from an aggressive press and intense public interest in these issues – pressure that would not come to bear absent suits like this one. Accordingly, the Government has voluntarily revealed information, through prominent public disclosures by its top officials, including the directors of the FBI, CIA, and Department of Justice, *and* the President, that show the existence of the very legal analyses sought here. The Government now attempts to parse its own leaders' statements, insisting that it has not disclosed what exists in plain sight.

Examining these official disclosures in a simple sequence reveals that the Government's position, and its arguments that no official disclosure has occurred, are ludicrous. This collection of evidence belies the Government's claim that the evidence consists of "either a general analysis of the legal basis for targeted lethal force, statements about the targeting of Aulaqi generally, or an

DAVIS WRIGHT TREMAINE LLP

unsourced media report." Opp. at 10. Rather, taking only statements produced by the Government itself, it is apparent that the "analysis of the legal basis" is based on OLC materials, including the memo, as disclosed by A.G. Holder's answer to questioning under the Senate Judiciary Committee and by Mr. Carney's statements to the Press. Exs. O, GG, JJ-K, TT. **Indeed, the Government has never denied that the OLC memo is the basis for its publicly disclosed policy.**

### B. The Government Has Waived Exemption 5 By Disclosing That The Memo(s) Sought By FAC Are The Basis For The Publicly Disclosed Policy Regarding Targeted Killing.

The Government has not met its burden to show that either the deliberative process privilege or the attorney-client privilege apply. Both the deliberative process and the attorney-client privilege may be waived by either public disclosure of the information that is sought, or by adoption of a withheld document as working law. *Brennan Center v. U.S. DOJ*, 697 F.3d 184, 207-208 (2d Cir. 2012). It is clear from the scope of the disclosures, the contents of the memoranda in question have been disclosed publicly, ***and*** constitute working law. *See* MSJ at 14-15. However, responding to FAC's arguments regarding Exemption 5, the Government offers a "magic words" approach.[2] The Government states that a document cannot be released unless a government official discloses the working law, and states that the working law is written down in an unreleased document, which it identifies. Opp. at 6.

The Government urges an overly formal approach to the law, arguing that to be disclosed, an agency must first disclose the working law at issue, and repeatedly state that it is contained in an unreleased document. This interpretation is untenable. Courts have rejected the Government's efforts to mandate a bright-line test in which a document is not adopted unless the agency uses the "specific explicit language of adoption of incorporation." *National Council of La Raza v. DOJ*, 411 F.3d 350, 357 n.5 (2d Cir. 2005). Instead, "courts must examine all relevant facts and circumstances in determining whether express adoption or incorporation by reference has occurred." Other courts have affirmed that Exemption 5 contains no requirement that "absent some

[2] Even under such an approach, FAC argues that, in total, the Government has disclosed that the desired memorandum contains the legal analysis FAC seeks.

DAVIS WRIGHT TREMAINE LLP

sort of magic language where the decision-making agency admits reliance on the reasoning in addition to the conclusions of a document, the standard has not been met." *Bronx Defenders v. DHS*, 2005 U.S. Dist. LEXIS 33364, at *19 (S.D.N.Y. Dec. 19, 2005). Instead, courts have looked at the Government's actual statements, and determined whether those statements amount to an implicit acknowledgment that the agency has adopted reasoning and analysis from the OLC, making it the agency's working law. *Id.*

Here, the statements of President Obama, his spokesman, Mr. Carney, A.G. Holder, and Leon Panetta, confirm that the analyses contain the working law of the Government. The Government fails to acknowledge that the wide-ranging disclosures made by Government officials actually fit into criteria for waiver. As outlined above, the Government has clearly: (1) disclosed a legal policy for determining when the Government may target and kill a U.S. citizen suspected of terrorism (Ex. H); (2) disclosed a White Paper containing the contours and bases for this policy (Ex. DD); (3) stated that the White Paper is based on "classified OLC materials," including making that statement in response to a question about a specific memo (Exs. JJ, KK, TT). Given these unequivocal public admissions, there can be little doubt that the memoranda constitute secret law and should be disclosed under FOIA.

Exemption 5 also incorporates the attorney-client privilege, which applies to confidential communications by the attorney to the client "only if that communication is based on confidential information provided by the client." *Mead Data Cent., Inc. v. Dep't of the Air Force*, 566 F.2d 242, 254 (D.C. Cir. 1977). Again, the Government attempts to impose an overly formal definition of working law that would require a piece of legal advice to be "repeatedly, publicly, and expressly relied upon" to be disclosed. Opp. at 9. The Government must put forth evidence to gain the benefit of the privilege. *See e.g. Gordon v. FBI*, 388 F. Supp. 2d 1028, 1039 (N.D. Cal. 2005); *Safeway v. IRS*, 2006 U.S. Dist. LEXIS 81078, at *23-*29 (N.D. Cal. Oct. 24, 2006); *Ctr. for Biological Diversity v. OMB*, 625 F. Supp. 2d 885, 892-893 (N.D. Cal. 2009). The Government fails to offer specific evidence, instead relying on ¶ 18 of the Bies declaration, which conclusorily states that the document is protected by the attorney client privilege because it was prepared at an unknown time at the behest of unknown "senior Executive Branch officials." These vague facts are

not sufficient to show that Exemption 5 applies here. This is especially true given the fact that cumulatively, the Government's revelations show that it has explicitly adopted the policies in the desired memoranda and prominently publicized them. As such, they must be released. *See Nat'l Immigration Project of the Nat'l Lawyers Guild v. United States Dep't of Homeland Sec.*, 842 F. Supp. 2d 720, 728 (S.D.N.Y. 2012) (holding that "[h]aving chosen to assert the existence of a previously undisclosed policy," the Government waived the attorney-client privilege); *Coastal States Gas Corp. v. Department of Energy*, 617 F.2d 854, 863 (D.C. Cir. 1980) (holding "neutral, objective analyses of agency regulations" were not privileged).

**C. Exemptions 1 and 3 Do Not Apply To Pure Legal Analysis.**

Despite the Government's obfuscation and desire for deference, the Government, and not FAC, bears the burden of proof to show that it can withhold a mere acknowledgment or denial of the legal analyses. *Church of Scientology v. Dep't of the Army*, 611 F.2d 738, 742 (9th Cir. 1979); *Hayden v. NSA*, 608 F.2d 1381, 1386 (D.C. Cir. 1979). The Government seeks to flip the burden by claiming that FAC must point to an "exception for legal analysis" within the FOIA exemptions. Opp. at 3. To the contrary, under the Executive Branch's own standards for responding to FOIA requests, FOIA "should be administered with a clear presumption: In the face of doubt, openness prevails." FOIA Memorandum, Op. Att'y Gen. No. 09-253 (Mar. 19, 2009). Surely that includes the Justice Department's own legal analysis. Yet the Government has failed to prove that this legal analysis fits within one of the exemptions.

Under Exemption 1, the Government must show that that the existence of the legal analyses is properly classified, containing facts about the military, intelligence or foreign relations, and that its public release could reasonably be expected to harm national security. *Church of Scientology v. Dep't of the Army*, 611 F.2d 738, 742 (9th Cir. 1979). Furthermore, to prevail under Exemption 3, the Government must show that the OLC's legal analysis on targeted killing logically falls within the scope of the government's authority under the National Security Act to protect its intelligence sources and methods, *Military Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981), or that it is necessary to protect the secrecy of the CIA. The only specific arguments the Government has put forward here are that there is no segregable information that would not reveal intelligence

sources and methods, and that confirming the existence of memos besides the DOD Memo would show that intelligence agencies may have been involved in the targeting or killing of al-Awlaki. However, as explained below, this position is untenable.

The Government argues a court has rejected an argument that documents containing legal analysis may be properly classified. However, the cases cited by the Government are readily distinguishable. For example, in *New York Times Co. v. United States DOJ*, 872 F. Supp. 2d 309 (S.D.N.Y. 2012), the Court already had the opportunity to review the documents at issue *in camera*¸ and acknowledged that "this Court need not decide whether the Government's public submissions are sufficient if this Court reviewed the Report in camera," *Id.* at 315. Additionally, what was sought in the case was not a legal memorandum to justify actions that the Government already repeatedly publicly disclosed; rather, the plaintiffs in that case sought a *report* that would have disclosed unknown government activities performed under the Patriot Act. *Id.* at 312-13. Here, there is no risk that the memo would reveal a previously undisclosed activity, as the Government has finally admitted its involvement in the targeted killings of United States citizens abroad. Ex. TT. *N.Y. Times Co. v. DOJ*, 915 F. Supp. 2d 508, 535 (S.D.N.Y. 2013), is currently under appeal in the Second Circuit, where the Court has requested to see the relevant documents *in camera*, as FAC requests here.

Additionally, and most importantly, from the beginning of this case FAC has specifically disclaimed that it seeks disclosure of *any* information about intelligence sources or methods. *See* MSJ at 1. Rather, it has consistently sought *only* legal authority and analysis – not the intelligence that was being analyzed. *Id.* Consistently, the Government fails to demonstrate that intelligence cannot be segregated from legal analysis. The Government's proffered declarations consistently fail to explain how legal analysis and citation, with facts removed, could, as it generically asserts, "cause harm to intelligence sources, methods and operations." Opp. at 4. It is simply implausible that releasing legal analysis and case citations that is similar to the already unclassified White Paper, or, at the very least, releasing a document consisting only of citations and authorities, would reveal any "details" of the operation to kill Al-Awlaki, and what agencies or personnel were involved in such an operation. Nor has the Government shown how, if this legal analysis were

revealed, national security could be harmed. While it is not Plaintiff's place to speculate about such matters, if the legal analysis contained in the sought documents follows the tests that already have been publicized by top officials of the Government, the most that a person may be able to infer is that the United States possessed sufficient intelligence to satisfy its test for targeted killing.

Any such concerns are misplaced. While it is widely acknowledged that the United States uses Predator drones to kill terrorists on foreign soil, FAC is not seeking information about the method that was used to kill al-Awlaki, *nor is it seeking the identity of the agency responsible for the killing*.[3] Given the volume of official disclosures regarding these subjects, it is unclear how the release of the legal authority contained in memoranda could further degrade the confidentiality of these already-open "secrets." If there is any information left that is not already public knowledge, the Government can readily segregate information about Yemeni intelligence and methods of killing that continues to be classified.

The main thrust of the information sought – legal analyses of the legality of killing U.S. citizens who are terrorists on foreign soil – is information that top officials in the Administration have affirmatively sought to publicize. This is not a FOIA case in which the Government believes that the substance of the materials requested – the contents of the memoranda, duly segregated from sensitive facts – should be secret. Rather, the Government knows – and has publicly acknowledged – that the public ought to hear why it believes it can lawfully target and kill U.S. citizens abroad and has dispatched the top lawyers from the Departments of State and Justice, the Pentagon and the CIA to make their case to legally minded audiences, in particular, at association meetings and national law schools. *See* Compl. ¶ 11; Exs. G, H, I. A.G. Holder has spoken about "generations-old legal principles and Supreme Court decisions," "cases arising under the Due Process Clause" and the "balancing approach" the Court takes to resolve them, as well as the three "circumstances"

---

[3] The Government can simply redact the identity of the recipient of the analyses, and then releasing the memoranda would not reveal what agency carried out the death of al-Awlaki if such information is truly a national security secret. The Government's previous disclosures suggest otherwise. *See* Mot. at 24; Exs. M, Y, QQ; Opp. at 12-13. The Government does not even address this argument in its briefing, nor does it sufficiently address the argument that the only reason the CIA is even mentioned in this case is that it voluntarily introduced that agency into this proceeding – had it just provided properly redacted memoranda sent to that agency, there would be no risk of official acknowledgement that CIA or any other specific intelligence agency was involved.

DAVIS WRIGHT TREMAINE LLP

in which the Government believes it can lawfully target a citizen abroad. Ex. H. Holder and others are anxious to convince their audiences that "the rule of law should be one of the cornerstones of national security" in this country. Ex. I. The Government has released and confirmed a declassified document containing these materials, and has had these issues addressed by the White House spokesman and the President himself.

These undisputed facts make this case unlike the cases cited by the Government in defense of its actions. For example, the "widely disseminated" information that the plaintiff sought to use to justify its waiver argument in *ACLU v. United States DOD*, 628 F.3d 612, 621 (D.C. Cir. 2011) consisted largely of non-governmental disclosures and official disclosures that the Court found to be irrelevant. Similarly, in *Afshar v. Department of State*, 702 F.2d 1125, 1130 (D.C. Cir. 1983), the disclosures plaintiff claimed justified disclosure were "widespread media and public speculation," and not official acknowledgements. As argued above, here, the disclosures are straight from the Executive Branch. The materials at issue *Students Against Genocide v. Dep't of State*, 257 F.3d 828, 835-836 (D.C. Cir. 2001), were unreleased photographs – the plaintiff argued that release of some photographs should compel the release of the whole set, even if the remaining photos were harmful to security. Here, **FAC does not seek any actual intelligence materials**, like photographs, but seeks legal analysis – not facts – it contends has already been largely disclosed in the White Paper and other policy statements by the nation's top officials. MSJ at 1.

**D. *In Camera* Review Is Justified.**

This Court should order the Government to submit any responsive document to the Court for *in camera* review. Here the Government cannot defeat FAC's request that the Court review the documents at issue *in camera*, as the Government's declarations fail to provide support for the Government's withholding of segregable information in this case. The Government insists now, as it has throughout this case, that its declarations deserve substantial weight. *See* e.g. Opp. at 14. However, the Government's insistence that it is trustworthy has been eroded by the events that have occurred in the months since it first moved for Summary Judgment. In its original motion, the Government's declarations made a number of dire predictions that, if it were to acknowledge that a memorandum addressing al-Awlaki existed, and that the U.S. killed al-Awlaki, that its intelligence

interests and ability to share information across agencies would be irreparably harmed.[4] In the interim, both of these facts have been confirmed, yet the Government has not offered any evidence of the resulting harm, nor has any harm been readily apparent to the public. As such, in deciding these summary judgment motions, the weight to be accorded to the Government's consistently vague declarations predicting intelligence disasters from the disclosure of the memo is degraded.

The main case the Government cites to justify the denial of *in camera* review is the under-appeal New York case. However, in the same breath as the Government seeks to use that case as a sword, it urges the Court to ignore the obvious: that the Second Circuit has asked for "in camera inspection" of: "the so-called OLC-DOD Memo; [and] (2) the so-called Unclassified Memos;" and, to make available to the Court "Any Other Responsive OLC Memoranda" for "possible in camera inspection upon request in due course…" Ex. RR Despite the clear language of the Court's request for "in camera inspection" of the same "OLC-DOD Memo," the Government misleadingly insists that "the Court has not indicated whether or not in camera review is required to resolve the issues." Opp. at 15. The other case relied upon by the Government, *Lion Raisins, Inc. v. USDA*, 354 F.3d 1072, 1080 (9th Cir. 2004), is readily distinguishable as it involved a plaintiff objecting that the Court based its decision on an *in camera* review of a sealed declaration because the Government's public declarations were inadequate to justify reliance on the law enforcement exemption. Here, it is the plaintiff that urges *in camera* review of the actual document at issue (and other, as-yet unidentified documents). Thus, the case is inapposite.

### E. The Admission of Declarations from Distinguished Scholars and Journalists in a FOIA Case Is Entirely Proper.

---

[4] *See e.g.* Dkt. 30-2 ¶ 16: "In short, disclosing whether the requested opinion exists or that a specific individual was reviewed by OLC provides significant insight into how the U.S. conducts counterterrorism operations. Such information is valuable to terrorists seeking to attack the U.S., who can and do compare such disclosures to others publicly available in order to learn about how and when DOD conducts operations, under what circumstances and with what information. **Compelling disclosure of such information could be expected to cause serious harm to national security.**" (emphasis added); Dkt.30-1:¶ 15. "Compelled disclosure of whether or not OLC was asked to provide confidential legal advice on a particular question would undermine the special relationship of trust and confidentiality essential for effective attorney-client communications."

DAVIS WRIGHT TREMAINE LLP

Contrary to the Government's protest, there is no rule against the admission of declarations by FOIA plaintiffs. Courts regularly admit declarations from plaintiffs in FOIA cases to testify about a variety of subjects. *See Raher v. Fed. Bureau of Prisons*, 2013 U.S. Dist. LEXIS 1128 (D. Or. Jan. 2, 2013) (admitting an expert declaration that addressed Exemption 4 claims by the agency); *Barrett v. United States DOJ*, 2010 U.S. Dist. LEXIS 112259 (E.D. Cal. Oct. 20, 2010) (admitting declaration of a handwriting expert to dispute Government claims); *In't Veld v. Dep't of Homeland Sec.*, 589 F. Supp. 2d 16, 20 (D.D.C. 2008) (admitting declaration of travel expert); *Amnesty Int'l USA v. CIA*, 2008 U.S. Dist. LEXIS 47882 (S.D.N.Y. June 19, 2008) (admitting expert in Boolean search techniques to dispute the efficacy of the Government's search). The cases cited by the Government do not say that admission of non-governmental declarations is improper, or that declarations should be accorded "no weight." Nor do they say that such declarations are rarely admitted. Rather, in the cases cited, the declarations were admitted and considered. *Spannaus v. U.S. Dep't of Justice*, 813 F.2d 1285 (4th Cir. 1987) (admitting plaintiff's declaration but finding it was insufficient to defeat a motion for summary judgment); *Gardels v. Central Intelligence Agency*, 689 F.2d 1100, 1106 (D.C. Cir. 1982) (admitting declarations but finding them insufficient to defeat summary judgment); *Curran v. Department of Justice*, 813 F.2d 473, 477 (1st Cir. 1987) (admitting but disregarding a declaration consisting of "a potpourri of conjecture, supposition, innuendo, and surmise -- nothing more").

Here, the Chemerinsky and Armstrong declarations consist of facts and opinions submitted by two preeminent figures in their fields. The purpose for their submission is twofold: *first*, to emphasize the great import of receipt of the information sought here, contradicting the Government's assertion that even a mere list of legal citations would be "meaningless;" and *second* to offer historical perspective that, even when the Government insists that a disclosure will be damaging, that assertion is often not borne out. Indeed, in this very case, the Government previously asserted that merely the official disclosure of U.S. involvement in Anwar al-Awlaki's death would have cataclysmic consequences for foreign policy and national security. Yet, no such cataclysm has come to pass as the Government, by its silence, concedes.

It is inadequate and improper for the Government to simply state in its declarations that

DAVIS WRIGHT TREMAINE LLP

certain privileges apply, or otherwise attempt to reach the legal conclusions that are the building blocks of these exemptions. However, time and time again, the Government lards its declarations with legal conclusions. *See* MSJ at 24-25; *see generally* Dkt. 30-1, 30-2. In fact, the Government's general arguments regarding FAC's evidentiary objections mischaracterize the main thrust of its arguments. The Government claims government workers, like other declarants, can rely on information they have gleaned in the course of their duties to make declarations. Opp. at 15 (collecting cases). But the Government is not allowed to make legal conclusions as to FOIA exemptions in declarations, as it repeatedly does here. *See* e.g., *Pacific Fisheries, Inc. v. United States*, 539 F.3d 1143, 1148 (9th Cir. 2008) ("[T]he government 'may not rely upon conclusory and generalized allegations of exemptions.' The affidavits must contain 'reasonably detailed descriptions of the documents and allege facts sufficient to establish an exemption.'"); *Kamman v. United States IRS*, 56 F.3d 46, 48 (9th Cir. 1995) *quoting Church of Scientology*, and *Lewis v. IRS*, 823 F.2d 375, 378 (9th Cir. 1987). The Government candidly admits that the declarations consist of "conclusions on behalf of the government regarding the applicability of particular Exemptions." Opp. at 15. These statements should be stricken. Moreover, it may not proffer speculative opinions about the deleterious future effects of disclosing that OLC legal analyses with citations exist on the legality of killing U.S. citizens such as al-Awlaki. If, as the Government contends, the Court must defer to the blatant legal conclusions and unsupported opinions in declarations that are supposed to contain facts, then it begs the question of what the Government envisions the Court's role to be, except to rubber stamp the Executive Branch's own judgments and determinations.

## III. CONCLUSION

The Government wants everyone in America to know about the legality of its targeted killing of United States citizens abroad – but will not reveal a word of the actual legal analyses used to build this program. The legal analyses underlying the Government's program should be disclosed under FOIA. For all the reasons set forth here and in the Motion, FAC respectfully requests that the Court grant FAC's Cross-Motion for Summary Judgment and deny DOJ's Cross-Motion for Summary Judgment.

DATED: This 16th day of November, 2013 By: /s/Thomas R. Burke

DAVIS WRIGHT TREMAINE LLP