IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

FIRST AMENDMENT COALITION,

      Plaintiff,

  v.

U.S. DEPARTMENT OF JUSTICE,

      Defendant.

_____/

No. C 12-1013 CW

ORDER GRANTING
DEFENDANT'S MOTION
FOR SUMMARY
JUDGMENT AND
DENYING
PLAINTIFF'S CROSS-
MOTION FOR SUMMARY
JUDGMENT

    The parties have filed cross-motions for summary judgment in this Freedom of Information Act (FOIA) case.  Having considered the parties' papers and oral argument on the motion, the Court GRANTS Defendant's motion for summary judgment and DENIES Plaintiff's cross-motion.[1]

BACKGROUND

    In September 2011, Anwar al-Awlaki, a United States citizen and a supporter and propagandist for Al Qaeda in the Arabian

---

   [1] Both parties raise evidentiary objections to the other side's submissions.

   Plaintiff makes a variety of evidentiary objections to the declarations filed in support of Defendant's motion for summary judgment.  The objections are set out in list form, stating the Federal Rule of Evidence and a list of the paragraphs to which those objections apply.  To the extent that the Court relies on the paragraphs listed, the Court OVERRULES the objections.  To the extent the Court does not rely on the paragraphs listed, it OVERRULES the objections as moot.  Plaintiff also objects to Defendant's lodging of classified information for the Court's review.  The Court did not rely on any of the classified information.  Accordingly, the objection is OVERRULED as moot.

   Defendant objects to Plaintiff's submission of declarations from Erwin Chemirinsky and journalist Scott Armstrong.  The Court OVERRULES that objection as moot because the Court did not rely on the declarations.

**United States District Court**
For the Northern District of California

Peninsula, was killed.  Compl. ¶ 3; Answer ¶ 3.   Plaintiff
alleges that his death was the result of a United States drone
strike.  Compl. ¶ 3.  Al-Awlaki was believed by United States
officials to have taken on an operational role in organizing
terrorist attacks against the United States.  Compl. ¶ 3; Answer
¶ 3.  President Obama, in multiple statements, confirmed that al-
Awlaki had been killed.  Compl. ¶ 3.  The President said that the
killing of al-Awlaki was a "success" that is a "tribute to our
intelligence community."  Bies Dec., Ex. E at 1.  The President
also said of the attack on al-Awlaki, "[W]e were able to remove
him from the field."  Bies Dec., Ex. T at 4.

    In October 2011, the New York Times, Washington Post and
other news organizations reported on a purported DOJ legal
memorandum, written in early or mid-2010, concerning legal issues
raised by the government's targeted killing of terrorists who were
United States citizens.  See, e.g., Peter Finn, Secret U.S. memo
sanctioned killing of Aulaqi, Washington Post (September 30,
2011), available online at
http://www.washingtonpost.com/world/national-security/aulaqi-
killing-reignites-debate-on-limits-of-executive-
power/2011/09/30/gIQAx1bUAL_story.html (last accessed April 3,
2014); Charlie Savage, Secret U.S. Memo Made Legal Case to Kill a
Citizen, New York Times (October 8, 2011), available online at
http://www.nytimes.com/2011/10/09/world/middleeast/secret-us-memo-
made-legal-case-to-kill-a-citizen.html?pagewanted=all (last
accessed April 3, 2014).  According to news reports, the
memorandum was prepared by DOJ's Office of Legal Counsel (OLC) and

provided a legal analysis and justification for the government's targeted killing of al-Awlaki.  Compl. ¶ 4.

A.   Procedural Background

On October 5, 2011, Plaintiff made a written FOIA request to Defendant, seeking

> A legal memorandum prepared by OLC concerning the
> legality of the lethal targeting of Anwar al-Aulaqi, an
> American-born radical cleric who, according to federal
> government officials, was killed September 30, 2011 in a
> U.S. drone strike in Yemen.  The memorandum was the
> subject of a story ("Secret U.S. memo sanctioned killing
> of Aulaqi") in the September 30, 2011 Washington Post,
> in which multiple (albeit unnamed) administration
> officials discussed the memorandum and internal
> government debates on the legal issues addressed in it.

Compl. ¶ 11, Ex. A, 1.  Plaintiff acknowledged, "The memorandum is almost certainly classified," and noted that it was "not interested in factual information about intelligence sources and methods or US military capabilities," but rather "only in the memorandum's discussion of the legal issues posed by prospective military action against a dangerous terrorist who also happens to be a US citizen."  Id.  It asked that "all sensitive factual information" be redacted and that the "discussion of legal issues" be released.  Id.

On October 25, 2011, Defendant responded to Plaintiff's request.  Compl. ¶ 12, Ex. B.  It said that it "neither confirms nor denies the existence of the document described in your request, . . . because the very fact of the existence or nonexistence of such a document is itself classified, protected from disclosure by statute, and privileged."  Id.

United States District Court
For the Northern District of California

3

On December 12, 2011, Plaintiff filed an administrative appeal of Defendant's denial of its FOIA request.  Compl. ¶ 13. Defendant did not respond within the time allowed by statute. Compl. ¶ 14.

On February 29, 2012, Plaintiff filed this case, seeking release of the OLC memorandum.  Docket No. 1.  The parties filed cross-motions for summary judgment and the Court stayed ruling on the motions until the Southern District of New York (SDNY) ruled on pending cross-motions for summary judgment in two earlier-filed related cases.  In January 2013, the SDNY ruled on the motions before it, declining to order the disclosure of the memorandum at issue in this suit.[2]  Docket No. 43.  The parties here filed supplemental briefs addressing the SDNY ruling.  Docket No. 46.

Subsequently, on May 22, 2013, Defendant withdrew its motion for summary judgment.  Docket No. 59.  In its notice of withdrawal, Defendant stated that, on that day, "at the direction of the President, the Attorney General officially confirmed that the United States Government targeted Anwar al-Aulaqi and conducted an operation that resulted in his death."  Id. at 1-2. Accordingly, Defendant no longer sought to keep that fact classified.  Id.

On June 21, 2013, Defendant issued a modified response to Plaintiff's FOIA request, acknowledging the existence of one

_____

[2] The SDNY case is summarized below.  It is currently on appeal to the Second Circuit.

responsive OLC opinion pertaining to the Department of Defense (DOD Memo) and refusing to confirm or deny the existence of responsive records related to any other agency.  Bies Decl., Ex. F.  Defendant asserted that the OLC opinion was exempt from disclosure pursuant to FOIA Exemptions One, Three and Five.  The parties agreed that the modified response did not resolve their dispute.  Docket No. 61.  Accordingly, the parties filed the instant cross motions for summary judgment.

B.   SDNY Cases

The first SDNY case, filed on December 20, 2011, involved two FOIA requests by the New York Times.  See New York Times Co. v. United States Dept. of Justice, Case No. 11-9336 (S.D.N.Y.) (NY Times case).  The first FOIA request, originally made on June 11, 2010, sought release of "copies of all Office of Legal Counsel opinions or memoranda since 2001 that address the legal status of targeted killing, assassination, or killing of people suspected of ties to Al Qaeda or other terrorist groups by employees or contractors of the United States government."  NY Times Case Compl. ¶ 37.  The second New York Times FOIA request, made on October 7, 2011, sought a copy of "all Office of Legal Counsel memorandums analyzing the circumstances under which it would be lawful for United States armed forces or intelligence community assets to target for killing a United States citizen who is deemed to be a terrorist."  Id. ¶ 44.  DOJ originally denied both requests on October 27, 2011, stating that it neither confirmed

United States District Court
For the Northern District of California

nor denied the existence of documents described in the requests. Id. at ¶¶ 38-40, 45-46.

The second SDNY case, filed on February 1, 2012, involved a FOIA request the ACLU filed with DOJ, DOD, and the Central Intelligence Agency (CIA). See American Civil Liberties Union v. United States Dept. of Justice, Case No. 12-794 (S.D.N.Y.) (ACLU case). In that request, made on October 19, 2011, the ACLU sought multiple categories of documents, including records related to the "legal authority and factual basis for the targeted killing" of al-Awlaki and two other United States citizens. ACLU case Compl. ¶ 30. On October 27, 2011, DOJ informed the ACLU that it would not be able to respond to the request within the statutory deadline. Id. at ¶ 33.

After the NY Times and ACLU cases were filed, and after public statements by government officials regarding the use of drones and targeted killings, the OLC and the DOJ's Office of Information Policy (OIP) produced three Vaughn Indices,[3] listing unclassified documents and the reasons they were being withheld. The CIA produced the text of public speeches by Attorney General Eric Holder and John Brennan, Assistant to the President for Homeland Security and Counterterrorism. The SDNY noted, "None of these disclosures added anything to the public record." New York

---

[3] A Vaughn Index is a filing, including detailed affidavits or declarations identifying the records withheld and explaining the reasons for withholding them. See Vaughn v. Rosen, 484 F.2d 820 (D.C. Cir. 1973) (requiring the production of such a filing).

United States District Court
For the Northern District of California

Times Co. v. U.S. Dep't of Justice, 915 F. Supp. 2d 508, 518 (S.D.N.Y. 2013).  The CIA further asserted a Glomar response,[4] refusing to confirm or deny the existence of other responsive documents.  In addition, the DOD and OLC admitted the existence of one classified legal opinion, but asserted that it was properly withheld from disclosure pursuant to Exemptions One, Three and Five to the FOIA.  This is the same document that was described and withheld in the government's modified response to the FOIA request at issue in the present case.  Finally, the government partially superseded its original Glomar response to both the NY Times and ACLU requests with "No Number, No List responses," which acknowledged the existence of responsive documents, but withheld information about the number or nature of those documents pursuant to Exemptions One and Three to the FOIA.

The ACLU and NY Times cases were administratively related in the SDNY and the DOJ filed a single motion for summary judgment in both cases.  The requests at issue in the SDNY cases encompass the document at issue in this case; however, both of the SDNY cases also encompass a great deal of other material.  The SDNY granted the government's motion for summary judgment and denied the ACLU's and NY Times' cross-motions.  The SDNY declined to conduct an in

---

[4] The refusal to confirm or deny the existence of responsive records is called a Glomar response.  See Phillippi v. CIA, 546 F.2d 1009, 1013 (D.C. Cir. 1976) (discussing issue of whether CIA could refuse to confirm or deny its ties to Howard Hughes' submarine retrieval ship, the Glomar Explorer).

camera review of the withheld documents.  The ACLU and the NY Times both filed notices of appeal on February 1, 2013.  The Second Circuit ordered the submission of withheld documents for in camera review.  ACLU v. United States, 2d Cir. 13-445, Docket No. 123.  Oral arguments were heard on October 1, 2013.  Id. at Docket No. 133.

> C.   Public Discussion of Drones and Targeted Killings

Various government officials have publicly discussed the government's use of drones and targeted killings.  Some of these public comments have referred to the legal justifications for targeted killings, but none has provided extensive legal analysis or discussion of the statutes and cases that underpin that analysis.  The primary comments relied upon by Plaintiff are summarized below.

> > 1.   April 30, 2012 Speech by John Brennan, then Assistant to the President for Homeland Security and Counterterrorism

John Brennan delivered a speech at the Wilson Center on April 30, 2012 in which he discussed post-9/11 counterterrorism efforts.  In that speech, he made several general comments about the fact that those efforts "are rooted in, and are strengthened by, adherence to the law, including the legal authorities that allow us to pursue members of al-Qaida, including U.S. citizens, and to do so using technologically advanced weapons."  Burke Dec., Ex. G at 7.  Mr. Brennan opined that "the United States government has never been so open regarding its counterterrorism

policies and their legal justification." Id. Mr. Brennan went on to discuss the legality of drone attacks more specifically:

> First, these targeted strikes are legal. Attorney General Holder, Harold Koh, and Jeh Johnson have all addressed this question at length. To briefly recap, as a matter of domestic law, the Constitution empowers the president to protect the nation from any imminent threat of attack. The Authorization for Use of Military Force, the AUMF, passed by Congress after the September 11th attacks authorized the president "to use all necessary and appropriate forces" against those nations, organizations and individuals responsible for 9/11. There is nothing in the AUMF that restricts the use of military force against al-Qaida to Afghanistan.
>
> As a matter of international law, the United States is in an armed conflict with al-Qaida, the Taliban, and associated forces, in response to the 9/11 attacks, and we may also use force consistent without inherent right of national self-defense. There is nothing in international law that bans the use of remotely piloted aircraft for this purpose or that prohibits us from using lethal force against our enemies outside of an active battlefield, at least when the country involved consents or is unable or unwilling to take action against the threat.

Id. at 8-9. Mr. Brennan did not provide any more detailed legal analysis.

> 2. March 5, 2012 Speech by Attorney General Eric Holder

Attorney General Eric Holder gave a speech at Northwestern University School of Law on March 5, 2012. In that speech, he also discussed the "tools [the government uses] to identify suspected terrorists and to bring captured terrorists to justice." Burke Dec., Ex. H at 4. He then went on to discuss the legal justification for using lethal force, including drone attacks. Like Mr. Brennan, the Attorney General noted that "Congress has authorized the President to use all necessary and appropriate

force against those groups," referring to "al-Qaeda, the Taliban, and associated forces."  Id.  The Attorney General went on to state,

> Because the United States is in an armed conflict, we are authorized to take action against enemy belligerents under international law.  The Constitution empowers the President to protect the nation from any imminent threat of violent attack.  And international law recognizes the inherent right of national self-defense.  None of this is changed by the fact that we are not in a conventional war.

Id.

The most specific statements the Attorney General made about drone attacks on U.S. citizens were as follows:

> Now, it is an unfortunate but undeniable fact that some of the threats we face come from a small number of United States citizens who have decided to commit violent attacks against their own country from abroad. Based on generations-old legal principles and Supreme Court decisions handed down during World War II, as well as during this current conflict, it's clear that United States citizenship alone does not make such individuals immune from being targeted.  But it does mean that the government must take into account all relevant constitutional considerations with respect to United States citizens – even those who are leading efforts to kill innocent Americans.  Of these, the most relevant is the Fifth Amendment's Due Process Clause, which says that the government may not deprive a citizen of his or her life without due process of law.

> The Supreme Court has made clear that the Due Process Clause does not impose one-size-fits-all requirements, but instead mandates procedural safeguards that depend on specific circumstances.  In cases arising under the Due Process Clause – including in a case involving a U.S. citizen captured in the conflict against al Qaeda – the Court has applied a balancing approach, weighing the private interest that will be affected against the interest the government is trying to protect, and the burdens the government would face in providing additional process.  Where national security

United States District Court
For the Northern District of California

operations are at stake, due process takes into
account the realities of combat.

Here, the interests on both sides of the scale are
extraordinarily weighty.  An individual's interest in
making sure that the government does not target him
erroneously could not be more significant.  Yet it is
imperative for the government to counter threats posed
by senior operational leaders of al Qaeda, and to
protect the innocent people whose lives could be lost
in their attacks.

Any decision to use lethal force against a United
States citizen--even one intent on murdering Americans
and who has become an operational leader of al-Qaeda
in a foreign land--is among the gravest that
government leaders can face.  The American people can
be--and deserve to be--assured that actions taken in
their defense are consistent with their values and
their laws.  So, although I cannot discuss or confirm
any particular program or operation, I believe it is
important to explain these legal principles publicly.

Let me be clear: an operation using lethal force in a
foreign country, targeted against a U.S. citizen who
is a senior operational leader of al Qaeda or
associated forces, and who is actively engaged in
planning to kill Americans, would be lawful at least
in the following circumstances: First, the U.S.
government has determined, after a thorough and
careful review, that the individual poses an imminent
threat of violent attack against the United States;
second, capture is not feasible; and third, the
operation would be conducted in a manner consistent
with applicable law of war principles.

The evaluation of whether an individual presents an
"imminent threat" incorporates considerations of the
relevant window of opportunity to act, the possible
harm that missing the window would cause to civilians,
and the likelihood of heading off future disastrous
attacks against the United States.  As we learned on
9/11, al Qaeda has demonstrated the ability to strike
with little or no notice--and to cause devastating
casualties.  Its leaders are continually planning
attacks against the United States, and they do not
behave like a traditional military--wearing uniforms,
carrying arms openly, or massing forces in preparation
for an attack.  Given these facts, the Constitution

does not require the President to delay action until some theoretical end-stage of planning--when the precise time, place, and manner of an attack become clear.  Such a requirement would create an unacceptably high risk that our efforts would fail, and that Americans would be killed.

Whether the capture of a U.S. citizen terrorist is feasible is a fact-specific, and potentially time-sensitive, question.  It may depend on, among other things, whether capture can be accomplished in the window of time available to prevent an attack and without undue risk to civilians or to U.S. personnel. Given the nature of how terrorists act and where they tend to hide, it may not always be feasible to capture a United States citizen terrorist who presents an imminent threat of violent attack.  In that case, our government has the clear authority to defend the United States with lethal force.

Of course, any such use of lethal force by the United States will comply with the four fundamental law of war principles governing the use of force.  The principle of necessity requires that the target have definite military value.  The principle of distinction requires that only lawful targets--such as combatants, civilians directly participating in hostilities, and military objectives--may be targeted intentionally. Under the principle of proportionality, the anticipated collateral damage must not be excessive in relation to the anticipated military advantage. Finally, the principle of humanity requires us to use weapons that will not inflict unnecessary suffering.

These principles do not forbid the use of stealth or technologically advanced weapons.  In fact, the use of advanced weapons may help to ensure that the best intelligence is available for planning and carrying out operations, and that the risk of civilian casualties can be minimized or avoided altogether.

Some have argued that the President is required to get permission from a federal court before taking action against a United States citizen who is a senior operational leader of al Qaeda or associated forces. This is simply not accurate.  "Due process" and "judicial process" are not one and the same, particularly when it comes to national security.  The

Constitution guarantees due process, not judicial process.

Id. at 4-5.  The only other statement that could be construed as legal analysis that the Attorney General made in that speech was,

> The Constitution's guarantee of due process is ironclad, and it is essential--but, as a recent court decision makes clear, it does not require judicial approval before the President may use force abroad against a senior operational leader of a foreign terrorist organization with which the United States is at war--even if that individual happens to be a U.S. citizen.
>
> That is not to say that the Executive Branch has--or should ever have--the ability to target any such individuals without robust oversight.  Which is why, in keeping with the law and our constitutional system of checks and balances, the Executive Branch regularly informs the appropriate members of Congress about our counterterrorism activities, including the legal framework, and would of course follow the same practice where lethal force is used against United States Citizens.
>
> Now, these circumstances are sufficient under the Constitution for the United States to use lethal force against a U.S. citizen abroad—-but it is important to note that the legal requirements I have described may not apply in every situation—-such as operations that take place on traditional battlefields.

Id. at 5-6.

> 3.   February 22, 2012 Speech by Jeh Johnson, General Counsel of the Department of Defense

Jeh Johnson gave a speech at Yale Law School on February 22, 2012 in which he set out "some of the basic legal principles that form the basis for the U.S. military's counterterrorism efforts against Al Qaeda and its associated forces."  Burke Dec., Ex. I at 5.  Mr. Johnson stated, "These are principles with which the top national security lawyers in our Administration broadly agree."

United States District Court
For the Northern District of California

He cautioned that his "comments are general in nature." Id. Mr. Johnson set out the following seven principles:

> First: in the conflict against an unconventional enemy such as al Qaeda, we must consistently apply conventional legal principles. We must apply, and we have applied, the law of armed conflict, including applicable provisions of the Geneva Conventions and customary international law, core principles of distinction and proportionality, historic precedent, and traditional principles of statutory construction. . . .
>
> Second: in the conflict against al Qaeda and associated forces, the bedrock of the military's domestic legal authority continues to be the Authorization for the Use of Military Force passed by the Congress one week after 9/11. . . .
>
> But, the AUMF, the statutory authorization from 2001, is not open-ended. It does not authorize military force against anyone the Executive labels a "terrorist." Rather, it encompasses only those groups or people with a link to the terrorist attacks on 9/11, or associated forces.
>
> Nor is the concept of an "associated force" an open-ended one, as some suggest. This concept, too, has been upheld by the courts in the detention context, and it is based on the well-established concept of co-belligerency in the law of war. The concept has become more relevant over time, as al Qaeda has, over the last 10 years, become more de-centralized, and relies more on associates to carry out its terrorist aims.
>
> An "associated force," as we interpret the phrase, has two characteristics to it: (1) an organized, armed group that has entered the fight alongside al Qaeda, and (2) is a co-belligerent with al Qaeda in hostilities against the United States or its coalition partners. In other words, the group must not only be aligned with al Qaeda. It must have also entered the fight against the United States or its coalition partners. Thus, an "associated force" is not any terrorist group in the world that merely

United States District Court
For the Northern District of California

embraces the al Qaeda ideology.  More is required
before we draw the legal conclusion that the group
fits within the statutory authorization for the use
of military force passed by the Congress in 2001.

Third: there is nothing in the wording of the 2001
AUMF or its legislative history that restricts this
statutory authority to the "hot" battlefields of
Afghanistan.  Afghanistan was plainly the focus when
the authorization was enacted in September 2001, but
the AUMF authorized the use of necessary and
appropriate force against the organizations and
persons connected to the September 11th attacks--al
Qaeda and the Taliban--without a geographic
limitation.
. . .

However, this legal conclusion too has its limits.
It should not be interpreted to mean that we believe
we are in any "Global War on Terror," or that we can
use military force whenever we want, wherever we
want.  International legal principles, including
respect for a state's sovereignty and the laws of
war, impose important limits on our ability to act
unilaterally, and on the way in which we can use
force in foreign territories.

Fourth: I want to spend a moment on what some people
refer to as "targeted killing."  Here I will largely
repeat Harold [Koh]'s much-quoted address to the
American Society of International Law in March 2010.
In an armed conflict, lethal force against known,
individual members of the enemy is a long-standing
and long-legal practice.  What is new is that, with
advances in technology, we are able to target
military objectives with much more precision, to the
point where we can identify, target and strike a
single military objective from great distances.
Should the legal assessment of targeting a single
identifiable military objective be any different in
2012 than it was in 1943, when the U.S. Navy targeted
and shot down over the Pacific the aircraft flying
Admiral Yamamoto, the commander of the Japanese navy
during World War Two, with the specific intent of
killing him?  Should we take a dimmer view of the
legality of lethal force directed against individual
members of the enemy, because modern technology makes
our weapons more precise?  As Harold stated two years
ago, the rules that govern targeting do not turn on

the type of weapon system used, and there is no
prohibition under the law of war on the use of
technologically advanced weapons systems in armed
conflict, so long as they are employed in conformity
with the law of war.  Advanced technology can ensure
both that the best intelligence is available for
planning operations, and that civilian casualties are
minimized in carrying out such operations.

On occasion, I read or hear a commentator loosely
refer to lethal force against a valid military
objective with the pejorative term "assassination."
Like any American shaped by national events in 1963
and 1968, the term is to me one of the most repugnant
in our vocabulary, and it should be rejected in this
context.  Under well-settled legal principles, lethal
force against a valid military objective, in an armed
conflict, is consistent with the law of war and does
not, by definition, constitute an "assassination."

Fifth: as I stated at the public meeting of the ABA
Standing Committee on Law and National Security,
belligerents who also happen to be U.S. citizens do
not enjoy immunity where non-citizen belligerents are
valid military objectives.  Reiterating principles
from Ex Parte Quirin in 1942, the Supreme Court in
2004, in Hamdi v. Rumsfeld, stated that "[a] citizen,
no less than an alien, can be 'part of or supporting
forces hostile to the United States or coalition
partners' and 'engaged in an armed conflict against
the United States.'"

Sixth: contrary to the view of some, targeting
decisions are not appropriate for submission to a
court.  In my view, they are core functions of the
Executive Branch, and often require real-time
decisions based on an evolving intelligence picture
that only the Executive Branch may timely possess.  I
agree with Judge Bates of the federal district court
in Washington, who ruled in 2010 that the judicial
branch of government is simply not equipped to become
involved in targeting decisions.

As I stated earlier in this address, within the
Executive Branch the views and opinions of the
lawyers on the President's national security team are
debated and heavily scrutinized, and a legal review
of the application of lethal force is the weightiest
judgment a lawyer can make.  (And, when these

United States District Court
For the Northern District of California

judgments start to become easy, it is time for me to
return to private law practice.)

Finally: as a student of history I believe that those
who govern today must ask ourselves how we will be
judged 10, 20 or 50 years from now.  Our applications
of law must stand the test of time, because, over the
passage of time, what we find tolerable today may be
condemned in the permanent pages of history tomorrow.

Id. at 5-9.

LEGAL STANDARD

FOIA determinations are generally resolved on summary

judgment.  See Nat'l Wildlife Fed'n v. U.S. Forest Service, 861

F.2d 1114 (9th Cir. 1998).  Summary judgment is properly granted

when no genuine and disputed issues of material fact remain, and

when, viewing the evidence most favorably to the non-moving party,

the movant is clearly entitled to prevail as a matter of law.

Fed. R. Civ. P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 322-23

(1986); Eisenberg v. Ins. Co. of N. Am., 815 F.2d 1285, 1288-89

(9th Cir. 1987).

The moving party bears the burden of showing that there is no

material factual dispute.  Therefore, the Court must regard as

true the opposing party's evidence, if supported by affidavits or

other evidentiary material.  Celotex, 477 U.S. at 324; Eisenberg,

815 F.2d at 1289.  The Court must draw all reasonable inferences

in favor of the party against whom summary judgment is sought.

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574,

587 (1986); Intel Corp. v. Hartford Accident & Indem. Co., 952

F.2d 1551, 1558 (9th Cir. 1991).

Material facts which would preclude entry of summary judgment

are those which, under applicable substantive law, may affect the

outcome of the case.  The substantive law will identify which

facts are material.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S.
242, 248 (1986).

DISCUSSION

"FOIA entitles private citizens to access government
records." <u>Minier v. CIA</u>, 88 F.3d 796, 800 (9th Cir. 1996). "The
Supreme Court has interpreted the disclosure provisions broadly,
noting that the act was animated by a 'philosophy of full agency
disclosure.'" <u>Lion Raisins v. U.S. Dep't of Agriculture</u>, 354 F.3d
1072, 1079 (9th Cir. 2004) (quoting <u>John Doe Agency v. John Doe
Corp.</u>, 493 U.S. 146, 152 (1989). However, to prevent disclosure
of a limited number of sensitive government documents, FOIA
contains nine statutory exemptions. 5 U.S.C. § 552(b)(1)-(9).
"Unlike the disclosure provisions of FOIA, its statutory
exemptions 'must be narrowly construed.'" <u>Lion Raisins</u>, 354 F.3d
at 1079, (quoting <u>John Doe Agency</u>, 493 U.S. at 152).

The Court reviews the government's withholding of agency
records de novo, and the government bears the burden of justifying
non-disclosure. 5 U.S.C. § 552(a)(4)(B). "To prevail on summary
judgment in a FOIA Action, the government must establish that its
search for responsive documents was reasonable and that it has
described with reasonable specificity the nature of the responsive
documents and its justification for any non-disclosure." <u>Hilken
v. Dep't of Def.</u>, 521 F. Supp. 2d 1047, 1054 (N.D. Cal. 2007).
"The agency may meet its burden by submitting a detailed affidavit
showing that the information 'logically falls within one of the
claimed exemptions.'" <u>Minier</u>, 88 F.3d at 800. "However, the
government may not rely upon conclusory and generalized
allegations of exemptions." <u>Kamman v. IRS</u>, 56 F.3d 46, 48 (9th
Cir. 1995).

18

**United States District Court**
For the Northern District of California

A.   Reasonableness of Defendant's Search

1.   Defendant's Interpretation of Plaintiff's Request

Plaintiff first argues that Defendant adopted an improperly narrow interpretation of its FOIA request when Defendant construed the request as asking for a single document.  The Court interprets this as a challenge to the reasonableness of Defendant's search.

Plaintiff contends that it seeks "all 'agency records that address the government's use of targeted lethal force against U.S. citizens abroad who are believed to have joined forces with terrorist organizations engaged in attacks against Americans.'" Plaintiff's Cross-Motion at 7 (quoting Complaint ¶ 1).  Plaintiff further argues, "To the extent that the Government has prepared multiple documents reciting the legal arguments and policy on the targeted killing of U.S. citizens such as al-Awlaki, those documents also should be disclosed as part of this litigation." Plaintiff's Cross-Motion at 7-8.

However, Plaintiff's request specifically asked for "the following document: A legal memorandum prepared by OLC concerning the legality of the lethal targeting of Anwar al-Aulaqi."  Bies Dec., Ex. B.  "An agency has a duty to construe a FOIA request liberally."  Lawyers Comm. for Civ. Rights of the San Francisco Bay Area v. U.S. Dep't of the Treasury, 534 F. Supp. 2d 1126, 1130 (N.D. Cal. 2008) (citing Truitt v. U.S. Dep't of State, 897 F.2d 540, 544-45 (D.C. Cir. 1990)).  Plaintiff has asked for a legal memorandum prepared by OLC.  Indeed, the request goes on to discuss "the memorandum" and asks that OLC produce "the redacted memorandum."  Plaintiff's position is also undermined by its statement that it would accept "a copy of the DoD memo that is wholly redacted, save for the legal citations and authority use to

support its contentions." Plaintiff's Cross-Motion at 6. This contradicts its own argument about the scope of the request.

Defendant further argues that it already interpreted the request as broader than drafted when it responded that it had found one document responsive to Plaintiff's request to the extent it "pertains to the Department of Defense" and refused to confirm or deny the existence of responsive records with respect to any other agencies. Bies Dec., Ex. F. According to Defendant, if it had interpreted Plaintiff's request as seeking a single memorandum, it would not have included the refusal to confirm or deny the existence of any memoranda with respect to other agencies.

Although Defendant is required to interpret FOIA requests liberally, the plain language of Plaintiff's request conflicts with its characterization of what it seeks. Defendant's interpretation of the request as seeking one or more OLC memoranda regarding the targeted killing of al-Awlaki is reasonable.

B.   DOD Memorandum

Defendant claims that it is exempt from disclosing the DOD memorandum pursuant to Exemptions One, Three and Five.

1.   Exemption One

Exemption One to the FOIA protects from disclosure records that are "(A) specifically authorized under criteria established by an Executive Order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive Order." 5 U.S.C. § 552(b)(1). The relevant standard for classification is set out in Executive Order 13526 (E.O. 13526), 75 Fed. Reg. 707. Under § 1.1 of E.O. 13526 information may be classified if

(1) an original classification authority is classifying the information;

(2) the information is owned by, produced by or for, or is under the control of the United States Government;

(3) the information falls within one or more of the categories of information listed in section 1.4 of this order; and

(4) the original classification authority determines that the unauthorized disclosure of the information reasonably could be expected to result in damage to the national security, which includes defense against transnational terrorism, and the original classification authority is able to identify or describe the damage.

75 Fed. Reg. 707.  Section 1.4 provides that information may only be considered for classification if it pertains to one or more of the following categories:

(a) military plans, weapons systems, or operations;

(b) foreign government information;

(c) intelligence activities (including covert action), intelligence sources or methods, or cryptology;

(d) foreign relations or foreign activities of the United States, including confidential sources;

(e) scientific, technological, or economic matters relating to the national security;

(f) United States Government programs for safeguarding nuclear materials or facilities;

(g) vulnerabilities or capabilities of systems, installations, infrastructures, projects, plans, or protection services relating to the national security; or

(h) the development, production, or use of weapons of mass destruction.

Id.

"Though an executive agency's classification decisions are accorded substantial weight, the FOIA permits challenges to Exemption 1 withholdings, requires the district court to review the propriety of the classification, and places the burden on the

21

**United States District Court**
For the Northern District of California

withholding agency to sustain its Exemption 1 claims." <u>Wiener v.</u> <u>FBI</u>, 943 F.2d 972, 980 (9th Cir. 1991) (internal citations omitted).  Defendant provides declarations from various government officials that it argues establish that an original classifying authority has determined that information in the DOD memorandum is currently and properly classified and pertains to the categories identified in §§ 1.4(a), (c) and (d) of E.O. 13526.  In addition, the declarations provide explanations of how the material in the memorandum could harm future intelligence-gathering efforts.

"[T]he text of Exemption 1 itself suggests that little proof or explanation is required beyond a plausible assertion that information is properly classified." <u>Morley v. CIA</u>, 508 F.3d 1108, 1124 (D.C. Cir. 2007).  Indeed Plaintiff does not directly challenge the classified nature of the memorandum as a whole. Plaintiff counters that it is only seeking "legal analysis," and goes so far as to say that it would accept a copy of the memorandum, "wholly redacted, save for the legal citations and authority used to support its contents, whatever they may be." Plaintiff argues that such analysis and citations are not "information" as contemplated by E.O. 13526.  Plaintiff does not provide any authority for its contention that legal analysis and citations are not covered by Exemption One.

Defendant responds that E.O. 13526 contains no exception for legal analysis, relying on the SDNY court's analysis in the N.Y. Times and ALCU litigation.  The plaintiffs in those cases also argued that "legal analysis is not the proper subject of classification." <u>NY Times Co.</u>, 915 F. Supp. 2d at 535.  The SDNY noted that E.O. 13526 applies to any information that "pertains to" the categories listed in Section 1.4 and found that "legal

analysis that 'pertains to' military plans or intelligence

activities (including covert action), sources or methods--all of

which are classified matters--can indeed be classified."  Id.

Plaintiff further argues that the government has already

officially confirmed the information contained in the withheld

memorandum.  "Voluntary disclosure of documents, either in whole

or in part, to third parties has sometimes been held to waive FOIA

exemptions for those documents."  Mobil Oil Corp. v. U.S. EPA, 879

F.2d 698, 700 (9th Cir. 1989).  Plaintiff bears the "initial

burden of pointing to specific information in the public domain

that appears to duplicate that being withheld."  Afshar v. Dep't

of State, 702 F.2d 1125, 1130 (D.C. Cir. 1983).

As summarized above, Plaintiff points to various press

conferences, speeches and interviews given by executive branch

officials.  While some of these speeches and interviews discuss

the general topic of drones and targeted killings and some even

mention legal analyses regarding the propriety of such killings,

none of the speeches or interviews reaches the level of

specificity required for a waiver.  The Ninth Circuit has held,

> A fact is deemed "officially acknowledged" only if it
> meets three criteria: First, the information requested
> must be as specific as the information previously
> released.  Second, the information requested must match
> the information previously disclosed; we noted, for
> example, that official disclosure did not waive the
> protection to be accorded information that pertained to
> a later time period.  Third, we held that the
> information requested must already have been made public
> through an official and documented disclosure.

Pickard v. DOJ, 653 F.3d 782, 786 (9th Cir. 2011) (internal

quotation marks omitted).  Here it appears that the document

requested includes more detail than that contained in the speeches

United States District Court
For the Northern District of California

and interviews cited by Plaintiff.  For example, the Attorney General's March 5, 2012 speech at Northwestern University referred to "[i]nternational legal principles," "generations-old legal principles and Supreme Court decisions handed down during World War II, as well as during the current conflict."  Burke Dec., Ex. H at 4.  However, the only specific legal citations in the speech are to the Due Process Clause of the Constitution, § 702 of the Foreign Intelligence Surveillance Act, and a general reference to the National Defense Authorization Act.  Burke Dec., Ex. H. Moreover, legal citations are not "facts" that can be acknowledged.  The D.C. Circuit has held that Exemption One is not waived if an official discusses the "general subject matter" of the records requested.  Public Citizen v. Dep't of State, 11 F.3d 198, 201 (D.C. Cir. 1993).  Plaintiff makes much of the fact that the unclassified White Paper prepared for Congress has been leaked and acknowledged by the government.  However, there has been no "official disclosure" of the White Paper.

Accordingly, the Court finds that the classified information in the DOD memorandum is exempt from disclosure under Exemption One.  However, because Plaintiff has stated that it only seeks citations to understand the legal analysis underpinning the memorandum, the next question is whether there is any segregable non-classified information in the memorandum that would provide Plaintiff with the information it seeks without disclosing any classified information.

Defendant contends that there is not.  Plaintiff counters that the only way to make this determination is through in camera review.  As discussed below, Exemption Five to the FOIA clearly applies to the DOD memorandum.  Accordingly, the Court declines to review the memorandum in camera.

2.   Exemption Three

Exemption Three to the FOIA provides that matters that are "specifically exempted from disclosure by statute" need not be disclosed.  5 U.S.C. § 552(b)(3).  Defendant asserts that the withheld documents are exempted from disclosure by two statutes, § 1-2Ai(1) of the National Security Act (NSA), as amended, 50 U.S.C. § 3024(i)(1), and the CIA Act of 1949, 50 U.S.C. § 3035 et seq.

The relevant portion of the NSA provides, "The Director of National Intelligence shall protect intelligence sources and methods from unauthorized disclosure."  50 U.S.C. § 3024(i)(1). It is well settled that this provision is an exempting statute within the meaning of Exemption Three.  See CIA v. Sims, 471 U.S. 159, 167 (1985) (discussing prior version of NSA); Minier v. CIA, 88 F.3d 796, 801 (9th Cir. 1996) (same); Larson v. Dept. of State, 565 F.3d 857, 865 (D.C. Cir. 2009) (discussing current version of NSA).  Defendant cites the declaration of Jennifer Hudson, Director of the Information Management Division for the Office of the Director of National Intelligence in support of its argument that the DOD memorandum includes intelligence activities, sources

and/or methods.  The declaration states, "In reviewing the OLC memorandum pertaining to DOD, I have determined that the information constitutes intelligence sources and methods of IC agencies--information that falls squarely within the scope of" the NSA.  Hudson Dec. ¶ 29.  The CIA Act exempts from disclosure the "functions" of its personnel.  50 U.S.C. § 3507.  Defendant asserts that the CIA's core functions "plainly include clandestine intelligence activities and the utilization of intelligence sources and methods."  Hudson Dec. ¶ 25.  The CIA Act has also been recognized as an exemption statute for purposes of Exemption Three.  <u>Fitzgibbon v. CIA</u>, 911 F.2d 755, 761 (D.C. Cir. 1990).

As in its response with respect to Exemption One, Plaintiff's primary opposition to Defendant's claim under Exemption Three is that Plaintiff seeks only legal citations that cannot be exempt.  Although there might be legal analysis that is segregable from the exempt information, there is no way to make such a determination, except through in camera review.  The Court declines to conduct such a review because it finds that Exemption Five applies to the DOD memorandum.

3.  Exemption Five

Exemption Five to the FOIA provides that "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency."  5 U.S.C. § 552(b)(5).  The Exemption protects from disclosure "those documents, and only those documents, normally

privileged in the civil discovery context." NLRB v. Sears,

Roebuck & Co. (Sears), 421 U.S. 132, 149 (1975).   Defendant argues

that the DOD memorandum is wholly exempt from disclosure under

Exemption Five because it is subject to the deliberative process

privilege and the attorney-client privilege.

a. Deliberative Process Privilege

The purpose of the deliberative process privilege "is to

allow agencies freely to explore possibilities, engage in internal

debates, or play devil's advocate without fear of public

scrutiny." Assembly of State of Cal. v. Dep't of Commerce, 968

F.2d 916, 920 (9th Cir. 1992).   "In order to be protected by the

deliberative process privilege, such a document must be both

'predecisional' and 'deliberative.'" Id. (citing National

Wildlife Fed'n v. U.S. Forest Service, 861 F.2d 1114, 1117 (9th

Cir. 1988)).

> A "predecisional" document is one prepared in order
> to assist an agency decisionmaker in arriving at his
> decision, and may include recommendations, draft
> documents, proposals, suggestions, and other
> subjective documents which reflect the personal
> opinions of the writer rather than the policy of the
> agency.   A predecisional document is a part of the
> "deliberative process," if the disclosure of the
> materials would expose an agency's decisionmaking
> process in such a way as to discourage candid
> discussion within the agency and thereby undermine
> the agency's ability to perform its functions.

Id. (internal quotation marks omitted).

Defendant submits the declarations of John Bies, Deputy

Assistant Attorney General in the Office of Legal Counsel, and

United States District Court
For the Northern District of California

Kurt Tidd, Director of Operations for the Joint Staff at the Pentagon, in support of its argument that the DOD memorandum is protected by the deliberative process privilege. Mr. Bies declares, "The document is predecisional because it was prepared in advance of Executive Branch decisions regarding a potential military operation in a foreign country, and it is deliberative because it contains confidential legal advice by OLC attorneys to other Executive Branch officials in connection with potential decisions regarding such an operation." Bies Dec. ¶ 17. See also Tidd Dec. ¶ 13 (same). Mr. Bies further declares that "compelled disclosure of this document would undermine the deliberative processes of the Government and chill the candid and frank communications necessary for effective governmental decision-making." Bies Dec. ¶ 17; Tidd Dec. ¶ 13.

Plaintiff counters that the government has actually adopted the reasoning in the DOD memorandum and therefore cannot withhold it pursuant to the deliberative process privilege. However, this exception to the privilege applies only "if an agency chooses expressly to adopt or incorporate by reference an intra-agency memorandum previously covered by Exemption 5 in what would otherwise be a final opinion." Sears, 421 U.S. at 161.

Plaintiff relies on the Second Circuit's decisions in National Council of La Raza v. DOJ, 411 F.3d 250 (2d Cir. 2005), to support its argument that the DOD memorandum is not protected from disclosure by Exemption Five. La Raza involved the DOJ's

United States District Court
For the Northern District of California

2002 decision that local law enforcement entities had the authority to enforce the civil provisions of federal immigration law.  In that case, the Attorney General and his staff made repeated references to the reasoning and conclusions of an OLC memorandum as the legal basis for the change in policy.  For example, in response to a letter, the Attorney General stated that he would "state clearly the policy of the Department on this issue" and referred directly to opinions from the OLC.  Id. at 353-54.  The Attorney General also cited the memorandum as the basis of the policy change in various press conferences.  Accordingly, the Second Circuit concluded that "the references to the OLC Memorandum demonstrate that the Department regarded the Memorandum as the exclusive statement of, and justification for, its new policy on the authority of states to enforce the civil provisions of immigration law."  Id. at 357.

In contrast, the speeches, press conferences and interviews cited by Plaintiff do not refer to specific OLC advice.  In fact, the only time OLC is mentioned in Plaintiff's exhibits is in a "press gaggle" by the White House Press Secretary, Jay Carney.  At that "press gaggle," Mr. Carney discussed the President's decision to provide to Congress "classified Office of Legal Counsel advice related to the subject of the Department of Justice white paper."  Burke Dec., Ex. KK at 2.  At most, this might support an argument that the government has expressly relied on the leaked White Paper because it has referred the press and the public to that document.

Stating that the President has provided Congress with OLC advice "related to the subject of" the White Paper is far from an express adoption of the analysis in the DOD memorandum.  Moreover, Plaintiff provides no other public statements regarding OLC memoranda prepared for the DOD or any other agency.

Accordingly, the Court finds that the requested memorandum is protected by the deliberative process privilege.

b. Attorney-Client Privilege

Exemption Five also incorporates the attorney-client privilege.  Sears 421 U.S. at 154.  Such a privilege is established

> (1) When legal advice of any kind is sought (2) from a professional legal adviser in his or her capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are, at the client's instance, permanently protected (7) from disclosure by the client or by the legal adviser (8) unless the protection be waived.

United States v. Martin, 278 F.3d 988, 999 (9th Cir. 2002). Defendant submits declarations stating that the DOD Memorandum "reflects confidential communications between OLC and Executive Branch clients made for the purpose of obtaining legal advice." Bies Dec. ¶ 18.

Plaintiff does not dispute that the attorney-client privilege applies to the DOD memorandum.  Instead, it reiterates its argument that the government has waived the privilege because it has adopted the memorandum as policy.  Plaintiff also argues that the government waived the privilege when it disclosed the

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

memorandum to Congress.  However, the standard of adoption for purposes of waiving the attorney-client privilege is the same as for the deliberative process privilege.  See Brennan Ctr. for Justice v. DOJ, 697 F.3d 184, 207 (2d Cir. 2012) ("The reasons underlying the absence of Exemption 5 protection for such a document otherwise covered by the deliberative-process exemption also underlie the agency's loss of the protection of the attorney-client privilege.")  As discussed above, the government has not adopted the DOD memorandum as policy.

Plaintiff's argument with respect to the disclosure of the DOD memorandum to Congress is also unavailing.  As the D.C. Circuit observed in Murphy v. Department of Army, if disclosure of classified information to Congress were to be considered a waiver of privileges and exemptions, "executive agencies would inevitably become more cautious in furnishing sensitive information to the legislative branch."  613 F.2d 1151, 1156 (D.C. Cir. 1979).  The Murphy court concluded that this would be "at odds with public policy which encourages broad congressional access to governmental information."  Id.  Accordingly, the D.C. Circuit held that "to the extent that Congress has reserved to itself in section 552(c) the right to receive information not available to the general public, and actually does receive such information pursuant to that section (whether in the form of documents or otherwise), no waiver occurs of the privileges and exemptions which are available

to the executive branch under the FOIA with respect to the public at large." [5]  Id.

The Court finds that the requested memorandum is protected by the attorney-client privilege.  Accordingly, Exemption Five to the FOIA protects the DOD memorandum from disclosure on the basis of the deliberative process privilege and the attorney-client privilege.

C.   Glomar Response

Defendant further claims that it is exempt from disclosing whether there are responsive documents with respect to any agencies other than the DOD pursuant to Exemptions One and Three. When responding to FOIA requests, the government may "provide a Glomar response, refusing to confirm or deny the existence of records where to answer the FOIA inquiry would cause harm cognizable under a FOIA exception."  Pickard v. DOJ, 653 F.3d 782 (9th Cir. 2011) (internal quotation marks and alteration marks omitted).  Section 3.6 of E.O. 13526 specifically provides, "An agency may refuse to confirm or deny the existence or nonexistence of requested records whenever the fact of their existence or nonexistence is itself classified under this order or its predecessors."  75 Fed. Reg. 707.

---

[5] Section 552(c) is a provision of FOIA which provides, "This section is not authority to withhold information from Congress."

United States District Court
For the Northern District of California

1.   Exemption One

With respect to Exemption One, Defendant presents evidence that OLC opinions are requested "only when there is some practical need for the advice."  Bies Dec. ¶ 4 (citing Memorandum for Attorneys of the Office from David J. Barron, Re: Best Practices for OLC Legal Advice and Written Opinions (2010), available at www.justice.gov/olc/pdf/olc-legal-advice-opinions.pdf (last accessed April 3, 2014)).  Accordingly, Defendant contends that disclosing whether or not OLC provided a legal opinion to a specific agency itself discloses which agencies considered targeting al-Awlaki, were involved in the decision to do so, or carried out the operation.  Defendant contends that such a disclosure would tend to reveal "intelligence activities (including covert action), intelligence sources or methods" and "foreign relations or foreign activities of the United States, including confidential sources."  75 Fed. Reg. 707.  Information pertaining to these topics can be properly classified pursuant to E.O. 13526 §§ 1.4(c) and (d).

Plaintiff counters that it is not seeking classified information and "it is willing to accept any document without knowing what agency requested analysis, or what agency received it."  Plaintiff's Cross-Motion at 24.  However, Plaintiff does not provide any authority to support its proposal and the government does not respond to the argument.  Moreover, the production of or disclosure of the existence or non-existence of any documents

United States District Court
For the Northern District of California

aside from the DOD memorandum, even if redacted as Plaintiff describes, would disclose the number of agencies that received OLC advice regarding the killing of al-Awlaki.

Accordingly, the Court finds that Defendant's partial Glomar response was justified under Exemption One.

### 2. Exemption Three

Defendant further argues that Exemption Three applies because the partial Glomar response is justified by the NSA and, to the extent the Glomar response concerns the CIA, the CIA Act. As discussed above, the NSA protects information that could improperly reveal "intelligence sources and methods from unauthorized disclosure." 50 U.S.C. § 3024(i)(1). The CIA Act protects from disclosure the "functions" of the CIA, which Defendant asserts include "clandestine intelligence activities and the utilization of intelligence sources and methods." 50 U.S.C. § 3507; Hudson Dec. ¶ 25.

As discussed above, with respect to the CIA, disclosing whether the CIA received an OLC memorandum regarding the targeting of al-Awlaki would disclose whether the CIA considered targeting al-Awlaki, was involved in the decision to do so, or was involved in the operation. This could be considered a clandestine intelligence activity.

Plaintiff counters that the CIA has acknowledged its involvement in the killing of al-Awlaki. Plaintiff cites a

statement made by Leon Panetta while he was Secretary of Defense.
While visiting troops, then-Secretary Panetta stated, "Having
moved from the CIA to the Pentagon, obviously I have a hell of a
lot more weapons available to me in this job than I had in the
CIA, although the Predators aren't bad."  Burke Dec., Ex. M at 2.
The implication that Predators (drones) were "available" to Mr.
Panetta when he was Director of the CIA is far from official
confirmation that the CIA was involved in the targeted killing of
al-Awlaki.

Plaintiff also cites a February 10, 2013 appearance by
Representative Mike Rogers on Face the Nation.  During that
program, when asked, "[H]as the administration been straight with
Congress in sharing information on what the rules are about using
[drones]," Representative Rogers stated,

> I think they have. . . . there's a change in 2008 in
> July under the previous administration, George Bush,
> that changed the way we could use air strikes to target
> belligerents or al Qaeda, who are planning to kill
> Americans.  That changed in July of '08.  And it ramped
> up.  And that was taken over when Barack Obama became
> president.  And as the chairman of the House
> Intelligence Committee, even as a member, [I] was aware
> and part of those discussions.  And now as chairman,
> even before they conducted that first air strike that
> took Awlaki--and remember this is the guy that was
> trying to kill some--a whole bunch of U.S. citizens over
> Detroit on Christmas Day.  This guy was a bad guy.  So
> our options were limited.  This was a tool that we could
> use to stop further terrorist attacks against Americans.
> I supported it then.  Monthly, I have my committee go to
> the CIA to review them.  I as chairman review every
> single air strike that we use in the war on terror, both
> from the civilian and the military side when it comes to
> terrorist strikes.  There is plenty of oversight here.
> There's not an American list somewhere overseas for
> targeting.  That does not exist.

Burke Dec., Ex. QQ at 7.  This statement does nothing to confirm that the CIA was involved in the decision-making leading to the killing of al-Awlaki.  Moreover, as Defendant argues, a statement by a Member of Congress does not constitute official disclosure by an Executive Branch agency.  See Frugone v. CIA, 169 F.3d 772, 774 (D.C. Cir. 1999) ("[W]e do not deem 'official' a disclosure made by someone other than the agency from which the information is being sought.").

Finally, Plaintiff asserts that the D.C. Circuit has found that "the Government has already confirmed the CIA's involvement in the use of drones."  Plaintiff's cross motion at 25 (citing ACLU v. CIA, 710 F.3d 422 (D.C. Cir. 2013)).  In ACLU, the D.C. Circuit addressed whether the CIA properly issued a Glomar response to a request for any records held by it "pertaining to the use of unmanned aerial vehicles ('drones') to carry out targeted killings."  710 F.3d at 425.  The CIA justified its Glomar response under Exemptions One and Three, arguing that any response would reveal whether the CIA "at least had an intelligence interest in drone strikes."  Id. at 429 (quoting government declaration).  The D.C. Circuit held that public statements cited by the ACLU "do not acknowledge that the CIA itself operates drones" but found that the statements indicate that the CIA "has an interest in drone strikes."  Id. at 429-430.

Accordingly, the D.C. Circuit held that the Glomar response was not "untenable."  Id. at 432.

However, in this case, Plaintiff is seeking information specifically related to the killing of al-Awlaki.  The finding that the CIA has made public statements sufficient to disclose a general "intelligence interest in drone strikes" is far from an official disclosure that the CIA received OLC advice regarding the decision to target al-Awlaki.  Accordingly, to the extent that the Glomar response pertains to the CIA, the Court finds that it is also justified by the CIA Act under Exemption Three.

It is not clear how disclosure of which agencies received advice from the OLC regarding the targeted killing of al-Awlaki could improperly disclose intelligence sources and method protected by the NSA.  However, as discussed above, the Court finds that the Glomar response is justified in full by Exemption One.  Accordingly, the Court need not decide whether it is also justified by the NSA under Exemption Three.

D.   In Camera Review

Plaintiff requests that the Court review in camera any responsive memoranda Defendant identifies, noting that the Second Circuit ordered the government to make documents available to it for such review.  The request is based on Plaintiff's argument that an in camera review "would conclusively prove the absurdity of the Government's claims that national security is jeopardized by public knowledge--not of its general role in al-Awlaki's death,

37

which has already been publicly admitted, nor of the precise nature of that role, which could not possibly be deduced--but of certain statutes and case law references."

As discussed above, Defendant bears the burden of establishing any claimed exemptions and Defendant may rely upon declarations or affidavits to satisfy that burden "so long as the evidence offered enables the court to make an independent assessment of the government's claim of exemption." Church of Scientology v. U.S. Dep't of Army, 611 F.2d 738, 742 (9th Cir. 1979) (citing EPA v. Mink, 410 U.S. 73, 93 (1973)).  Only if "the court finds the affidavits or testimony submitted too generalized to establish eligibility for an exemption" may it exercise its discretion to "examine the disputed documents in camera for a first-hand determination of their exempt status." Church of Scientology, 611 F.2d at 742 (citing 5 U.S.C. § 552(a)(4)(B)).

Defendant counters that in camera review is not appropriate because its affidavits are sufficient to establish that the DOD Memorandum was exempt from disclosure under the FOIA.  As discussed above, the Court finds that any OLC memoranda are protected from disclosure by Exemption Five.  Accordingly, in camera review of the memorandum is not required.

CONCLUSION

For the reasons stated above, the Court GRANTS Defendant's motion for summary judgment (Docket No. 63) and DENIES Plaintiff's

cross-motion for summary judgment (Docket No. 66).  The Clerk of the Court shall enter judgment and close the file.

IT IS SO ORDERED.

Dated: 4/11/2014

_____
CLAUDIA WILKEN
United States District Judge