# EXHIBIT A

| | |
|---|---|
| **From:** | Powell, Amy (CIV) <Amy.Powell@usdoj.gov> |
| **Sent:** | Thursday, July 03, 2014 8:29 AM |
| **To:** | Burke, Thomas |
| **Cc:** | Segal, Jonathan |
| **Subject:** | RE: FAC v. DOJ |

Tom –

Just following up.  We propose to file a joint notice with the Court indicating that the Government has not sought further review on certain aspects of the Second Circuit ruling and that a redacted version of the OLC-DOD memorandum has been released.  Accordingly, the parties would propose to stay any further briefing at this time in an effort to resolve any remaining differences.

There is one additional OLC opinion related to Aulaqi that has never been disclosed.  Defendant proposes to complete processing of that document on or before August 15 (and it may well be sooner; we are currently trying to negotiate a schedule in the NY matter).  Assuming that Plaintiff is satisfied with the result of that processing, Defendant is hopeful that we can stipulate to dismissal of this matter.

How does that sound?  I was hoping for a short notice and proposal to the Court instead of a mini-briefing on the remaining issues that she seems likely to ignore.  I would be happy to draft something up.

Amy

Amy Elizabeth Powell
Trial Attorney, Federal Programs Branch
Civil Division, Department of Justice
20 Massachusetts Ave NW, Room 5377
Washington, DC 20530
T: 202-514-9836
F: 202-616-8202

---

**From:** Burke, Thomas [mailto:THOMASBURKE@dwt.com]
**Sent:** Tuesday, June 24, 2014 10:32 AM
**To:** Powell, Amy (CIV)
**Subject:** RE: FAC v. DOJ

That should work.  Please call me at my office then, 415.276.6552.  Thanks, Amy.

**Thomas R. Burke** | Davis Wright Tremaine LLP
505 Montgomery Street, Suite 800 | San Francisco, CA 94111
Tel: (415) 276-6552 | Mobile: (415) 519-3406
Email: thomasburke@dwt.com | Website: www.dwt.com
Bio: www.dwt.com/lawdir/attorneys/BurkeThomas.cfm

Anchorage | Bellevue | Los Angeles | New York | Portland | San Francisco | Seattle | Shanghai | Washington, D.C.

**From:** Powell, Amy (CIV) [mailto:Amy.Powell@usdoj.gov]
**Sent:** Tuesday, June 24, 2014 7:25 AM
**To:** Burke, Thomas
**Subject:** RE: FAC v. DOJ

Sure, how about 10 am your time (1pm my time)?

Amy

---

**From:** Burke, Thomas [mailto:THOMASBURKE@dwt.com]
**Sent:** Tuesday, June 24, 2014 10:15 AM
**To:** Powell, Amy (CIV)
**Subject:** Re: FAC v. DOJ

I am speaking at a conference this morning and have a CA Supreme Court brief to put to bed this afternoon.

Instead, can we talk tomorrow morning?

**Thomas R. Burke | Davis Wright TremaineLLP**
505 Montgomery Street, Suite 800 | San Francisco, CA 94111
Tel: (415) 276-6552 | Mobile: (415) 519-3406
Email: thomasburke@dwt.com | Website:www.dwt.com
Bio:www.dwt.com/lawdir/attorneys/BurkeThomas.cfm
Anchorage | Bellevue | Los Angeles | New York | Portland | San Francisco | Seattle | Shanghai | Washington, D.C.

On Jun 24, 2014, at 7:12 AM, "Powell, Amy (CIV)" <Amy.Powell@usdoj.gov> wrote:

> Tom --
>
> Do you have time for a quick chat today or tomorrow? I just wanted your thoughts on the mootness of the pending motion for reconsideration in light of the memo's release. Email is fine too if that's easier.
>
> Amy
>
> Amy Elizabeth Powell
> Trial Attorney, Federal Programs Branch
> Civil Division, Department of Justice
> 20 Massachusetts Ave NW, Room 5377
> Washington, DC 20530
> T:  202-514-9836
> F: 202-616-8202

# EXHIBIT B

| | |
|---|---|
| **From:** | Powell, Amy (CIV) <Amy.Powell@usdoj.gov> |
| **Sent:** | Friday, August 15, 2014 2:11 PM |
| **To:** | Burke, Thomas |
| **Cc:** | Segal, Jonathan |
| **Subject:** | RE: FAC v. DOJ -- Status |
| **Attachments:** | OLC Opinion AA.pdf |

Tom –

As described to the Court, DOJ has completed processing of the attached document at issue in this matter.  See attached.

Thanks,

Amy Elizabeth Powell
Trial Attorney, Federal Programs Branch
Civil Division, Department of Justice
20 Massachusetts Ave NW, Room 5377
Washington, DC 20530
T:  202-514-9836
F: 202-616-8202

---

**From:** Burke, Thomas [mailto:THOMASBURKE@dwt.com]
**Sent:** Thursday, August 14, 2014 2:15 PM
**To:** Powell, Amy (CIV)
**Cc:** Segal, Jonathan
**Subject:** RE: FAC v. DOJ -- Status

Thanks.


**Thomas R. Burke** | Davis Wright Tremaine LLP
505 Montgomery Street, Suite 800 | San Francisco, CA 94111
Tel: (415) 276-6552 | Mobile: (415) 519-3406
Email: thomasburke@dwt.com | Website: www.dwt.com
Bio: www.dwt.com/lawdir/attorneys/BurkeThomas.cfm

Anchorage | Bellevue | Los Angeles | New York | Portland | San Francisco | Seattle | Shanghai | Washington, D.C.

---

**From:** Powell, Amy (CIV) [mailto:Amy.Powell@usdoj.gov]
**Sent:** Thursday, August 14, 2014 10:58 AM
**To:** Burke, Thomas
**Subject:** RE: FAC v. DOJ -- Status

Tom –

I'll send you an email tomorrow with the results of our processing.   Let's discuss once you have had a chance to review.

Thanks.

Amy

---

**From:** Burke, Thomas [mailto:THOMASBURKE@dwt.com]
**Sent:** Thursday, August 14, 2014 1:38 PM
**To:** Powell, Amy (CIV)
**Subject:** FAC v. DOJ -- Status

Amy, does the Government still plan to release one additional memo by tomorrow?  And if so, how will we receive it?  Please let me know.

Relatedly, I believe we owe the Court another update early next week.  We should schedule a time to discuss that too.

Thanks,

Tom


**Thomas R. Burke** | Davis Wright Tremaine LLP
505 Montgomery Street, Suite 800 | San Francisco, CA 94111
Tel: (415) 276-6552 | Mobile: (415) 519-3406
Email: thomasburke@dwt.com | Website: www.dwt.com
Bio: www.dwt.com/lawdir/attorneys/BurkeThomas.cfm

Anchorage | Bellevue | Los Angeles | New York | Portland | San Francisco | Seattle | Shanghai | Washington, D.C.



TOP SECRET/ ~~U.S. DEPARTMENT OF JUSTICE~~ NF
(b)(1)
(b)(3)
Office of Legal Counsel

Office of the Assistant Attorney General                    *Washington, D.C. 20530*

February 19, 2010

## MEMORANDUM FOR THE ATTORNEY GENERAL

*Re: Lethal Operation Against Shaykh Anwar Aulaqi* |                    (b)(1)
(b)(3)

(b)(5)

|has asked for your views on the legality of the Central Intelligence Agency's ("CIA") proposed use of lethal force in Yemen against Shaykh Anwar Aulaqi, a U.S. citizen who the CIA assesses is a senior leader of Al-Qa'ida in the Arabian Peninsula. |

(b)(5)

| Under the conditions and factual predicates as represented by the CIA and in the materials provided to us from the Intelligence Community, we believe that a decisionmaker, on the basis of such information, could reasonably conclude that the use of lethal force against Aulaqi would not violate the assassination ban in Executive Order 12333 or any applicable constitutional limitations due to Aulaqi's United States citizenship. This memorandum confirms oral advice setting forth this conclusion. |                    (b)(1)
(b)(3)

I.

(b)(1)
(b)(3)
(b)(5)

TOP SECRET/                    NF                    (b)(1)
(b)(3)

(b)(1)
(b)(3)
(b)(5)

TOP SECRET/ NF   (b)(1)
(b)(3)

(b)(1)
(b)(3)
(b)(5)

TOP SECRET/ NF   2
(b)(1)
(b)(3)

TOP SECRET//   NF   (b)(1)
(b)(3)

(b)(1)
(b)(3)
(b)(5)

TOP SECRET/                                    NF   (b)(1)
                                                    (b)(3)

                                                         (b)(1)
                                                         (b)(3)
                                                         (b)(5)

(b)(1)
(b)(3)
(b)(5)                                                              consistent with
the assassination ban in Executive Order 12333[2]                      killings in
self-defense are not assassinations                                           (b)(1)
                                                                              (b)(3)
                                                                              (b)(5)

    [2] Section 2.11 of Executive Order 12333 provides that "[n]o person employed by or acting on behalf of the
United States Government shall engage in, or conspire to engage in, assassination."  46 Fed. Reg. 59941 (Dec. 4,
1981).

TOP SECRET                          NF                              4

                                              (b)(1)
                                              (b)(3)

(b)(1)
(b)(3)
(b)(5)

The question that remains is whether Aulaqi's status as a U.S. citizen imposes any constitutional limitations that would preclude the proposed lethal action

(b)(1)
(b)(3)
(b)(5)

(b)(1)
(b)(3)
(b)(5)
being a U.S. person does not give a member of al Qa'ida a constitutional immunity from attack.
(b)(1)
(b)(3)
(b)(5)

This conclusion finds support in Supreme Court case law addressing whether a U.S. citizen who acts as an enemy combatant may be subject to the use of certain types of military force. *See Hamdi v. Rumsfeld*, 542 U.S. 507, 521-24 (2004) (plurality opinion); *cf. also Ex parte Quirin*, 317 U.S. 1, 37-38 (1942) ("[c]itizens who associate themselves with the military arm of the enemy government,

(b)(1)
(b)(3)

TOP SECRET/              NF

(b)(1)
(b)(3)

and with its aid, guidance and direction enter [the United States] bent on hostile acts," may be
treated as "enemy belligerents" under the law of war).         (b)(1)
                                                          (b)(3)

      Because Aulaqi is a U.S. citizen, the Fifth Amendment's Due Process Clause, as well as
the Fourth Amendment, likely applies in some respects, even while he is abroad (in this case, in
Yemen). *See Reid v. Covert*, 354 U.S. 1, 5-6 (1957) (plurality opinion); *United States v.
Verdugo-Urquidez*, 494 U.S. 259, 269-70 (1990); *see also In re Terrorist Bombings of U.S.
Embassies in East Africa*, 552 F.3d 157, 167-68 (2d Cir. 2008). In *Hamdi*, a plurality of the
Supreme Court used the *Mathews v. Eldridge* balancing test to outline the due process rights of a
U.S. citizen captured on the battlefield in Afghanistan and detained in the United States,
explaining that "the process due in any given instance is determined by weighing 'the private
interest that will be affected by the official action,' against the Government's asserted interest,
'including the function involved' and the burdens the Government would face in providing
greater process." *Hamdi*, 542 U.S. at 529 (plurality opinion) (quoting *Mathews v. Eldridge*, 424
U.S. 319, 335 (1976)).                 (b)(1)
                                       (b)(3)

                                                       (b)(1)
                                                       (b)(3)
                                                       (b)(5)

(b)(1)
(b)(3)
(b)(5)
                                     the plurality in *Hamdi* stated that
"[t]he parties agree that initial captures on the battlefield need not receive the process we discuss
here; that process is due only when the determination is made to *continue* to hold those who have
been seized," and the plurality thus found it "unlikely that this basic process will have the dire
impact on the central functions of warmaking that the Government forecasts." 542 U.S. at 534
(plurality opinion).                         on the battlefield, the
Government's interests and burdens preclude offering a process to judge whether a detainee is
truly an enemy combatant                   In the case of a member, associate, or
affiliate of al-Qa'ida operating abroad in circumstances where capture is infeasible, and it is
known that the individual                 continued and imminent threat

                          given the weight of the government's interest
in using an authorized means of force to respond to an imminent threat posed by the activities of
a person operating as a member, associate, or affiliate of an enemy force.

                                         to the extent Fourth Amendment
principles are relevant in the context of operations against a U.S. person who is a member of al-
Qa'ida and whose activities pose a continued and imminent threat, the proposed lethal operation
would not violate the Fourth Amendment,        *Verdugo-Urquidez*, 494 U.S. at 273-74

(b)(1)
(b)(3)
(b)(5)

(b)(1)
(b)(3)
(b)(5)

(b)(1)
(b)(3)

(b)(1)
(b)(3)
(b)(5)

TOP SECRET/                  NF                  6

(b)(1)
(b)(3)

~~TOP SECRET/~~ NF

(b)(1)
(b)(3)

("Application of the Fourth Amendment to these circumstances [i.e., foreign policy operations] could significantly disrupt the ability of the political branches to respond to foreign situations involving our national interest.")

(b)(1)
(b)(3)
(b)(5)

This conclusion draws further support from the fact that, even in domestic law enforcement operations, the Supreme Court has noted that "if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape and if, where feasible, some warning has been given." *Tennessee v. Garner*, 471 U.S. 1, 11-12 (1985).

(b)(1)
(b)(3)
(b)(5)

where                              a capture operation is infeasible and      the

(b)(1)
(b)(3)
(b)(5)

targeted person is part of a dangerous enemy force and poses a continued and imminent threat to U.S. persons or interests, the use of lethal force would not violate the Fourth Amendment.

(b)(1)
(b)(3)
(b)(5)

For these reasons, and on these understandings, we do not believe the Constitution prohibits the proposed lethal action, does not violate the assassination ban in Executive Order 12333.

(b)(1)
(b)(3)
(b)(5)

Please let us know if we can be of further assistance.  (U)

David J. Barron
Acting Assistant Attorney General

~~TOP SECRET/~~ NF

7

(b)(1)
(b)(3)

# EXHIBIT C



**U.S. Department of Justice**

Office of Legal Counsel

*Washington, D.C. 20530*

June 21, 2013

Peter Scheer
First Amendment Coalition
534 4th Street, Suite B
San Rafael, CA 94901

   **Re: FOIA Tracking No. FY12-005**

Dear Mr. Scheer:

   This letter further responds to your Freedom of Information Act request dated October 5, 2011, which this Office assigned tracking number **FY12-005**. I previously responded to your request on October 25, 2011.

   On May 22, 2013, at the direction of the President, the Attorney General sent a public letter to Members of the Senate Judiciary Committee "disclos[ing] certain information that until [then had] been properly classified." *See* May 22, 2013 Letter from the Attorney General to The Honorable Patrick J. Leahy, at 1 (available at http://www.justice.gov/slideshow/AG-letter-5-22-13.pdf.). In particular, the Attorney General disclosed that "[s]ince 2009, the United States, in the conduct of U.S. counterterrorism operations against al-Qa'ida and its associated forces outside of areas of active hostilities, has specifically targeted and killed one citizen, Anwar al-Aulaqi." *Id.* at 1-2. In light of this acknowledgement of the previously properly classified fact that the United States carried out the targeted strike that killed Anwar al-Aulaqi, and consistent with the Department of Justice's Notice of Withdrawal of Motion for Summary Judgment filed on May 22, 2013 in this case, we now further respond to your request as follows.

   Insofar as your request pertains to the Department of Defense, we have searched the files of the Office of Legal Counsel and have identified one record responsive to your request. We are withholding this record pursuant to FOIA Exemption One, 5 U.S.C. § 552(b)(1), which protects classified information; Exemption Three, *id.*, § 552(b)(3), which protects information specifically exempted from disclosure by statute; and Exemption Five, *id.*, § 552(b)(5), which protects information that is privileged.

   Insofar as your request pertains to any other agencies of the United States Government, pursuant to FOIA Exemptions One, Three and Five, 5 U.S.C. § 552(b)(1), (3) & (5), the Office of Legal Counsel neither confirms nor denies the existence of any responsive records. We

cannot do so because the very fact of the existence or nonexistence of such records is itself classified, protected from disclosure by statute, and privileged.

Sincerely,

Paul P. Colborn
Special Counsel

Cc:    Amy Powell, Civil Division, Department of Justice
       Thomas R. Burke, Davis Wright Tremaine LLP

# EXHIBIT D

BRIEFING ROOM      ISSUES      THE ADMINISTRATION      PARTICIPATE      1600 PENN

Search

*Home • Briefing Room • Speeches & Remarks*

**The White House**
Office of the Press Secretary

_____

For Immediate Release                                           May 23, 2013

# Remarks by the President at the National Defense University

National Defense University
Fort McNair
Washington, D.C.

2:01 P.M. EDT

THE PRESIDENT:  Good afternoon, everybody.  Please be seated.

It is a great honor to return to the National Defense University.  Here, at Fort McNair, Americans have served in uniform since 1791 -- standing guard in the earliest days of the Republic, and contemplating the future of warfare here in the 21st century.

For over two centuries, the United States has been bound together by founding documents that defined who we are as Americans, and served as our compass through every type of change.  Matters of war and peace are no different.  Americans are deeply ambivalent about war, but having fought for our independence, we know a price must be paid for freedom.  From the Civil War to our struggle against fascism, on through the long twilight struggle of the Cold War, battlefields have changed and technology has evolved.  But our commitment to constitutional principles has weathered every war, and every war has come to an end.

With the collapse of the Berlin Wall, a new dawn of democracy took hold abroad, and a decade of peace and prosperity arrived here at home.  And for a moment, it seemed the 21st century would be a tranquil time.  And then, on September 11, 2001, we were shaken out of complacency.  Thousands were taken from us, as clouds of fire and metal and ash descended upon a sun-filled morning.  This was a different kind of war.  No armies came to our shores, and our military was not the principal target.  Instead, a group of terrorists came to kill as many civilians as they could.

And so our nation went to war.  We have now been at war for well over a decade.  I won't review the full history.  What is clear is that we quickly drove al Qaeda out of Afghanistan, but then shifted our focus and began a new war in Iraq.  And this carried significant consequences for our fight against al Qaeda, our standing in the world, and -- to this day -- our interests in a vital region.

Meanwhile, we strengthened our defenses -- hardening targets, tightening transportation security, giving law enforcement new tools to prevent terror.  Most of these changes were sound.  Some caused inconvenience.  But some, like expanded surveillance, raised difficult questions about the balance that we strike between our interests in security and our values of privacy.  And in some cases, I believe we compromised our basic values -- by using torture to interrogate our enemies, and detaining individuals in a way that ran counter to the rule of law.

So after I took office, we stepped up the war against al Qaeda but we also sought to change its course.  We relentlessly targeted al Qaeda's leadership.  We ended the war in Iraq, and brought nearly 150,000 troops home.  We pursued a new strategy in Afghanistan, and increased our training of Afghan forces.  We unequivocally banned torture, affirmed our commitment to civilian courts, worked to align our policies with the rule of law, and expanded our consultations with Congress.

Today, Osama bin Laden is dead, and so are most of his top lieutenants.  There have been no large-scale attacks on the United States, and our homeland is more secure.  Fewer of our troops are in harm's way, and over the next 19 months they will continue to come home.  Our alliances are strong, and so is our standing in the world.  In sum, we are safer because of our efforts.

Now, make no mistake, our nation is still threatened by terrorists.  From Benghazi to Boston, we have been tragically reminded of that truth.  But we have to recognize that the threat has shifted and evolved from the one that came to our shores on 9/11.  With a decade of experience now to draw from, this is the moment to ask ourselves

WATCH THE VIDEO



May 23, 2013 8:33 PM
President Obama Speaks on the U.S.
Counterterrorism Strategy



LATEST BLOG POSTS

October 10, 2014 1:00 PM EDT
**Celebrating America's Newest National Monument: The San Gabriel Mountains**
President Obama will travel to Los Angeles County, California to designate the San Gabriel Mountains as America's newest national monument, and a timeless piece of our national heritage. In many ways, this nation's story is etched into its land, and as the President is recognizing with this designation, each of our monuments provides us an important cultural bridge between our past and our future.

October 10, 2014 10:53 AM EDT
**President Obama on How Technology and Millennials Will Shape Our Economic Future**
President Obama visits Cross Campus in Los Angeles, a collaborative tech lab that brings inventors and investors together to pursue the next big idea that will continue to power our economic recovery.

October 10, 2014 8:26 AM EDT
**West Wing Week: 10/10/14 or, "Is Anybody Here Over 25?"**

hard questions -- about the nature of today's threats and how we should confront them.

And these questions matter to every American.

For over the last decade, our nation has spent well over a trillion dollars on war, helping to explode our deficits and constraining our ability to nation-build here at home. Our servicemembers and their families have sacrificed far more on our behalf. Nearly 7,000 Americans have made the ultimate sacrifice. Many more have left a part of themselves on the battlefield, or brought the shadows of battle back home. From our use of drones to the detention of terrorist suspects, the decisions that we are making now will define the type of nation -- and world -- that we leave to our children.

So America is at a crossroads. We must define the nature and scope of this struggle, or else it will define us. We have to be mindful of James Madison's warning that "No nation could preserve its freedom in the midst of continual warfare." Neither I, nor any President, can promise the total defeat of terror. We will never erase the evil that lies in the hearts of some human beings, nor stamp out every danger to our open society. But what we can do -- what we must do -- is dismantle networks that pose a direct danger to us, and make it less likely for new groups to gain a foothold, all the while maintaining the freedoms and ideals that we defend. And to define that strategy, we have to make decisions based not on fear, but on hard-earned wisdom. That begins with understanding the current threat that we face.

Today, the core of al Qaeda in Afghanistan and Pakistan is on the path to defeat. Their remaining operatives spend more time thinking about their own safety than plotting against us. They did not direct the attacks in Benghazi or Boston. They've not carried out a successful attack on our homeland since 9/11.

Instead, what we've seen is the emergence of various al Qaeda affiliates. From Yemen to Iraq, from Somalia to North Africa, the threat today is more diffuse, with Al Qaeda's affiliates in the Arabian Peninsula -- AQAP -- the most active in plotting against our homeland. And while none of AQAP's efforts approach the scale of 9/11, they have continued to plot acts of terror, like the attempt to blow up an airplane on Christmas Day in 2009.

Unrest in the Arab world has also allowed extremists to gain a foothold in countries like Libya and Syria. But here, too, there are differences from 9/11. In some cases, we continue to confront state-sponsored networks like Hezbollah that engage in acts of terror to achieve political goals. Other of these groups are simply collections of local militias or extremists interested in seizing territory. And while we are vigilant for signs that these groups may pose a transnational threat, most are focused on operating in the countries and regions where they are based. And that means we'll face more localized threats like what we saw in Benghazi, or the BP oil facility in Algeria, in which local operatives -- perhaps in loose affiliation with regional networks -- launch periodic attacks against Western diplomats, companies, and other soft targets, or resort to kidnapping and other criminal enterprises to fund their operations.

And finally, we face a real threat from radicalized individuals here in the United States. Whether it's a shooter at a Sikh Temple in Wisconsin, a plane flying into a building in Texas, or the extremists who killed 168 people at the Federal Building in Oklahoma City, America has confronted many forms of violent extremism in our history. Deranged or alienated individuals -- often U.S. citizens or legal residents -- can do enormous damage, particularly when inspired by larger notions of violent jihad. And that pull towards extremism appears to have led to the shooting at Fort Hood and the bombing of the Boston Marathon.

So that's the current threat -- lethal yet less capable al Qaeda affiliates; threats to diplomatic facilities and businesses abroad; homegrown extremists. This is the future of terrorism. We have to take these threats seriously, and do all that we can to confront them. But as we shape our response, we have to recognize that the scale of this threat closely resembles the types of attacks we faced before 9/11.

In the 1980s, we lost Americans to terrorism at our Embassy in Beirut; at our Marine Barracks in Lebanon; on a cruise ship at sea; at a disco in Berlin; and on a Pan Am flight -- Flight 103 -- over Lockerbie. In the 1990s, we lost Americans to terrorism at the World Trade Center; at our military facilities in Saudi Arabia; and at our Embassy in Kenya. These attacks were all brutal; they were all deadly; and we learned that left unchecked, these threats can grow. But if dealt with smartly and proportionally, these threats need not rise to the level that we saw on the eve of 9/11.

Moreover, we have to recognize that these threats don't arise in a vacuum. Most, though not all, of the terrorism we faced is fueled by a common ideology -- a belief by some extremists that Islam is in conflict with the United States and the West, and that violence against Western targets, including civilians, is justified in pursuit of a larger cause. Of course, this ideology is based on a lie, for the United States is not at war with Islam. And this ideology is rejected by the vast majority of Muslims, who are the most frequent victims of terrorist attacks.

Nevertheless, this ideology persists, and in an age when ideas and images can travel the globe in an instant, our response to terrorism can't depend on military or law enforcement alone. We need all elements of national power to win a battle of wills, a battle of ideas. So what I want to discuss here today is the components of such a comprehensive counterterrorism strategy.

First, we must finish the work of defeating al Qaeda and its associated forces.

Welcome to the West Wing Week, your guide to everything that's happening at 1600 Pennsylvania Avenue.

VIEW ALL RELATED BLOG POSTS

Facebook          YouTube

Twitter           Vimeo

Flickr            iTunes

Google+           LinkedIn

In Afghanistan, we will complete our transition to Afghan responsibility for that country's security. Our troops will come home. Our combat mission will come to an end. And we will work with the Afghan government to train security forces, and sustain a counterterrorism force, which ensures that al Qaeda can never again establish a safe haven to launch attacks against us or our allies.

Beyond Afghanistan, we must define our effort not as a boundless "global war on terror," but rather as a series of persistent, targeted efforts to dismantle specific networks of violent extremists that threaten America. In many cases, this will involve partnerships with other countries. Already, thousands of Pakistani soldiers have lost their lives fighting extremists. In Yemen, we are supporting security forces that have reclaimed territory from AQAP. In Somalia, we helped a coalition of African nations push al-Shabaab out of its strongholds. In Mali, we're providing military aid to French-led intervention to push back al Qaeda in the Maghreb, and help the people of Mali reclaim their future.

Much of our best counterterrorism cooperation results in the gathering and sharing of intelligence, the arrest and prosecution of terrorists. And that's how a Somali terrorist apprehended off the coast of Yemen is now in a prison in New York. That's how we worked with European allies to disrupt plots from Denmark to Germany to the United Kingdom. That's how intelligence collected with Saudi Arabia helped us stop a cargo plane from being blown up over the Atlantic. These partnerships work.

But despite our strong preference for the detention and prosecution of terrorists, sometimes this approach is foreclosed. Al Qaeda and its affiliates try to gain foothold in some of the most distant and unforgiving places on Earth. They take refuge in remote tribal regions. They hide in caves and walled compounds. They train in empty deserts and rugged mountains.

In some of these places -- such as parts of Somalia and Yemen -- the state only has the most tenuous reach into the territory. In other cases, the state lacks the capacity or will to take action. And it's also not possible for America to simply deploy a team of Special Forces to capture every terrorist. Even when such an approach may be possible, there are places where it would pose profound risks to our troops and local civilians -- where a terrorist compound cannot be breached without triggering a firefight with surrounding tribal communities, for example, that pose no threat to us; times when putting U.S. boots on the ground may trigger a major international crisis.

To put it another way, our operation in Pakistan against Osama bin Laden cannot be the norm. The risks in that case were immense. The likelihood of capture, although that was our preference, was remote given the certainty that our folks would confront resistance. The fact that we did not find ourselves confronted with civilian casualties, or embroiled in an extended firefight, was a testament to the meticulous planning and professionalism of our Special Forces, but it also depended on some luck. And it was supported by massive infrastructure in Afghanistan.

And even then, the cost to our relationship with Pakistan -- and the backlash among the Pakistani public over encroachment on their territory -- was so severe that we are just now beginning to rebuild this important partnership.

So it is in this context that the United States has taken lethal, targeted action against al Qaeda and its associated forces, including with remotely piloted aircraft commonly referred to as drones.

As was true in previous armed conflicts, this new technology raises profound questions -- about who is targeted, and why; about civilian casualties, and the risk of creating new enemies; about the legality of such strikes under U.S. and international law; about accountability and morality. So let me address these questions.

To begin with, our actions are effective. Don't take my word for it. In the intelligence gathered at bin Laden's compound, we found that he wrote, "We could lose the reserves to enemy's air strikes. We cannot fight air strikes with explosives." Other communications from al Qaeda operatives confirm this as well. Dozens of highly skilled al Qaeda commanders, trainers, bomb makers and operatives have been taken off the battlefield. Plots have been disrupted that would have targeted international aviation, U.S. transit systems, European cities and our troops in Afghanistan. Simply put, these strikes have saved lives.

Moreover, America's actions are legal. We were attacked on 9/11. Within a week, Congress overwhelmingly authorized the use of force. Under domestic law, and international law, the United States is at war with al Qaeda, the Taliban, and their associated forces. We are at war with an organization that right now would kill as many Americans as they could if we did not stop them first. So this is a just war -- a war waged proportionally, in last resort, and in self-defense.

And yet, as our fight enters a new phase, America's legitimate claim of self-defense cannot be the end of the discussion. To say a military tactic is legal, or even effective, is not to say it is wise or moral in every instance. For the same human progress that gives us the technology to strike half a world away also demands the discipline to constrain that power -- or risk abusing it. And that's why, over the last four years, my administration has worked vigorously to establish a framework that governs our use of force against terrorists -- insisting upon clear guidelines, oversight and accountability that is now codified in Presidential Policy Guidance that I signed yesterday.

In the Afghan war theater, we must -- and will -- continue to support our troops until the transition is complete at the end of 2014. And that means we will continue to take strikes against high value al Qaeda targets, but also against forces that are massing to support attacks on coalition forces. But by the end of 2014, we will no longer have the

same need for force protection, and the progress we've made against core al Qaeda will reduce the need for unmanned strikes.

Beyond the Afghan theater, we only target al Qaeda and its associated forces. And even then, the use of drones is heavily constrained. America does not take strikes when we have the ability to capture individual terrorists; our preference is always to detain, interrogate, and prosecute. America cannot take strikes wherever we choose; our actions are bound by consultations with partners, and respect for state sovereignty.

America does not take strikes to punish individuals; we act against terrorists who pose a continuing and imminent threat to the American people, and when there are no other governments capable of effectively addressing the threat. And before any strike is taken, there must be near-certainty that no civilians will be killed or injured -- the highest standard we can set.

Now, this last point is critical, because much of the criticism about drone strikes -- both here at home and abroad -- understandably centers on reports of civilian casualties. There's a wide gap between U.S. assessments of such casualties and nongovernmental reports. Nevertheless, it is a hard fact that U.S. strikes have resulted in civilian casualties, a risk that exists in every war. And for the families of those civilians, no words or legal construct can justify their loss. For me, and those in my chain of command, those deaths will haunt us as long as we live, just as we are haunted by the civilian casualties that have occurred throughout conventional fighting in Afghanistan and Iraq.

But as Commander-in-Chief, I must weigh these heartbreaking tragedies against the alternatives. To do nothing in the face of terrorist networks would invite far more civilian casualties -- not just in our cities at home and our facilities abroad, but also in the very places like Sana'a and Kabul and Mogadishu where terrorists seek a foothold. Remember that the terrorists we are after target civilians, and the death toll from their acts of terrorism against Muslims dwarfs any estimate of civilian casualties from drone strikes. So doing nothing is not an option.

Where foreign governments cannot or will not effectively stop terrorism in their territory, the primary alternative to targeted lethal action would be the use of conventional military options. As I've already said, even small special operations carry enormous risks. Conventional airpower or missiles are far less precise than drones, and are likely to cause more civilian casualties and more local outrage. And invasions of these territories lead us to be viewed as occupying armies, unleash a torrent of unintended consequences, are difficult to contain, result in large numbers of civilian casualties and ultimately empower those who thrive on violent conflict.

So it is false to assert that putting boots on the ground is less likely to result in civilian deaths or less likely to create enemies in the Muslim world. The results would be more U.S. deaths, more Black Hawks down, more confrontations with local populations, and an inevitable mission creep in support of such raids that could easily escalate into new wars.

Yes, the conflict with al Qaeda, like all armed conflict, invites tragedy. But by narrowly targeting our action against those who want to kill us and not the people they hide among, we are choosing the course of action least likely to result in the loss of innocent life.

Our efforts must be measured against the history of putting American troops in distant lands among hostile populations. In Vietnam, hundreds of thousands of civilians died in a war where the boundaries of battle were blurred. In Iraq and Afghanistan, despite the extraordinary courage and discipline of our troops, thousands of civilians have been killed. So neither conventional military action nor waiting for attacks to occur offers moral safe harbor, and neither does a sole reliance on law enforcement in territories that have no functioning police or security services -- and indeed, have no functioning law.

Now, this is not to say that the risks are not real. Any U.S. military action in foreign lands risks creating more enemies and impacts public opinion overseas. Moreover, our laws constrain the power of the President even during wartime, and I have taken an oath to defend the Constitution of the United States. The very precision of drone strikes and the necessary secrecy often involved in such actions can end up shielding our government from the public scrutiny that a troop deployment invites. It can also lead a President and his team to view drone strikes as a cure-all for terrorism.

And for this reason, I've insisted on strong oversight of all lethal action. After I took office, my administration began briefing all strikes outside of Iraq and Afghanistan to the appropriate committees of Congress. Let me repeat that: Not only did Congress authorize the use of force, it is briefed on every strike that America takes. Every strike. That includes the one instance when we targeted an American citizen -- Anwar Awlaki, the chief of external operations for AQAP.

This week, I authorized the declassification of this action, and the deaths of three other Americans in drone strikes, to facilitate transparency and debate on this issue and to dismiss some of the more outlandish claims that have been made. For the record, I do not believe it would be constitutional for the government to target and kill any U.S. citizen -- with a drone, or with a shotgun -- without due process, nor should any President deploy armed drones over U.S. soil.

But when a U.S. citizen goes abroad to wage war against America and is actively plotting to kill U.S. citizens, and

when neither the United States, nor our partners are in a position to capture him before he carries out a plot, his citizenship should no more serve as a shield than a sniper shooting down on an innocent crowd should be protected from a SWAT team.

That's who Anwar Awlaki was -- he was continuously trying to kill people. He helped oversee the 2010 plot to detonate explosive devices on two U.S.-bound cargo planes. He was involved in planning to blow up an airliner in 2009. When Farouk Abdulmutallab -- the Christmas Day bomber -- went to Yemen in 2009, Awlaki hosted him, approved his suicide operation, helped him tape a martyrdom video to be shown after the attack, and his last instructions were to blow up the airplane when it was over American soil. I would have detained and prosecuted Awlaki if we captured him before he carried out a plot, but we couldn't. And as President, I would have been derelict in my duty had I not authorized the strike that took him out.

Of course, the targeting of any American raises constitutional issues that are not present in other strikes -- which is why my administration submitted information about Awlaki to the Department of Justice months before Awlaki was killed, and briefed the Congress before this strike as well. But the high threshold that we've set for taking lethal action applies to all potential terrorist targets, regardless of whether or not they are American citizens. This threshold respects the inherent dignity of every human life. Alongside the decision to put our men and women in uniform in harm's way, the decision to use force against individuals or groups -- even against a sworn enemy of the United States -- is the hardest thing I do as President. But these decisions must be made, given my responsibility to protect the American people.

Going forward, I've asked my administration to review proposals to extend oversight of lethal actions outside of warzones that go beyond our reporting to Congress. Each option has virtues in theory, but poses difficulties in practice. For example, the establishment of a special court to evaluate and authorize lethal action has the benefit of bringing a third branch of government into the process, but raises serious constitutional issues about presidential and judicial authority. Another idea that's been suggested -- the establishment of an independent oversight board in the executive branch -- avoids those problems, but may introduce a layer of bureaucracy into national security decision-making, without inspiring additional public confidence in the process. But despite these challenges, I look forward to actively engaging Congress to explore these and other options for increased oversight.

I believe, however, that the use of force must be seen as part of a larger discussion we need to have about a comprehensive counterterrorism strategy -- because for all the focus on the use of force, force alone cannot make us safe. We cannot use force everywhere that a radical ideology takes root; and in the absence of a strategy that reduces the wellspring of extremism, a perpetual war -- through drones or Special Forces or troop deployments -- will prove self-defeating, and alter our country in troubling ways.

So the next element of our strategy involves addressing the underlying grievances and conflicts that feed extremism -- from North Africa to South Asia. As we've learned this past decade, this is a vast and complex undertaking. We must be humble in our expectation that we can quickly resolve deep-rooted problems like poverty and sectarian hatred. Moreover, no two countries are alike, and some will undergo chaotic change before things get better. But our security and our values demand that we make the effort.

This means patiently supporting transitions to democracy in places like Egypt and Tunisia and Libya -- because the peaceful realization of individual aspirations will serve as a rebuke to violent extremists. We must strengthen the opposition in Syria, while isolating extremist elements -- because the end of a tyrant must not give way to the tyranny of terrorism. We are actively working to promote peace between Israelis and Palestinians -- because it is right and because such a peace could help reshape attitudes in the region. And we must help countries modernize economies, upgrade education, and encourage entrepreneurship -- because American leadership has always been elevated by our ability to connect with people's hopes, and not simply their fears.

And success on all these fronts requires sustained engagement, but it will also require resources. I know that foreign aid is one of the least popular expenditures that there is. That's true for Democrats and Republicans -- I've seen the polling -- even though it amounts to less than one percent of the federal budget. In fact, a lot of folks think it's 25 percent, if you ask people on the streets. Less than one percent -- still wildly unpopular. But foreign assistance cannot be viewed as charity. It is fundamental to our national security. And it's fundamental to any sensible long-term strategy to battle extremism.

Moreover, foreign assistance is a tiny fraction of what we spend fighting wars that our assistance might ultimately prevent. For what we spent in a month in Iraq at the height of the war, we could be training security forces in Libya, maintaining peace agreements between Israel and its neighbors, feeding the hungry in Yemen, building schools in Pakistan, and creating reservoirs of goodwill that marginalize extremists. That has to be part of our strategy.

Moreover, America cannot carry out this work if we don't have diplomats serving in some very dangerous places. Over the past decade, we have strengthened security at our embassies, and I am implementing every recommendation of the Accountability Review Board, which found unacceptable failures in Benghazi. I've called on Congress to fully fund these efforts to bolster security and harden facilities, improve intelligence, and facilitate a quicker response time from our military if a crisis emerges.

But even after we take these steps, some irreducible risks to our diplomats will remain. This is the price of being the world's most powerful nation, particularly as a wave of change washes over the Arab World. And in balancing

the trade4offs between security and active diplomacy, I firmly believe that any retreat from challenging regions will only increase the dangers that we face in the long run.  And that's why we should be grateful to those diplomats who are willing to serve.

Targeted action against terrorists, effective partnerships, diplomatic engagement and assistance -- through such a comprehensive strategy we can significantly reduce the chances of large-scale attacks on the homeland and mitigate threats to Americans overseas.  But as we guard against dangers from abroad, we cannot neglect the daunting challenge of terrorism from within our borders.

As I said earlier, this threat is not new.  But technology and the Internet increase its frequency and in some cases its lethality.  Today, a person can consume hateful propaganda, commit themselves to a violent agenda, and learn how to kill without leaving their home.  To address this threat, two years ago my administration did a comprehensive review and engaged with law enforcement.

And the best way to prevent violent extremism inspired by violent jihadists is to work with the Muslim American community  -- which has consistently rejected terrorism -- to identify signs of radicalization and partner with law enforcement when an individual is drifting towards violence.  And these partnerships can only work when we recognize that Muslims are a fundamental part of the American family.  In fact, the success of American Muslims and our determination to guard against any encroachments on their civil liberties is the ultimate rebuke to those who say that we're at war with Islam.

Thwarting homegrown plots presents particular challenges in part because of our proud commitment to civil liberties for all who call America home.  That's why, in the years to come, we will have to keep working hard to strike the appropriate balance between our need for security and preserving those freedoms that make us who we are.  That means reviewing the authorities of law enforcement, so we can intercept new types of communication, but also build in privacy protections to prevent abuse.

That means that -- even after Boston -- we do not deport someone or throw somebody in prison in the absence of evidence.  That means putting careful constraints on the tools the government uses to protect sensitive information, such as the state secrets doctrine.  And that means finally having a strong Privacy and Civil Liberties Board to review those issues where our counterterrorism efforts and our values may come into tension.

The Justice Department's investigation of national security leaks offers a recent example of the challenges involved in striking the right balance between our security and our open society.  As Commander-in-Chief, I believe we must keep information secret that protects our operations and our people in the field.  To do so, we must enforce consequences for those who break the law and breach their commitment to protect classified information.  But a free press is also essential for our democracy.  That's who we are.  And I'm troubled by the possibility that leak investigations may chill the investigative journalism that holds government accountable.

Journalists should not be at legal risk for doing their jobs.  Our focus must be on those who break the law.  And that's why I've called on Congress to pass a media shield law to guard against government overreach.  And I've raised these issues with the Attorney General, who shares my concerns.  So he has agreed to review existing Department of Justice guidelines governing investigations that involve reporters, and he'll convene a group of media organizations to hear their concerns as part of that review.  And I've directed the Attorney General to report back to me by July 12th.

Now, all these issues remind us that the choices we make about war can impact -- in sometimes unintended ways -- the openness and freedom on which our way of life depends.  And that is why I intend to engage Congress about the existing Authorization to Use Military Force, or AUMF, to determine how we can continue to fight terrorism without keeping America on a perpetual wartime footing.

The AUMF is now nearly 12 years old.  The Afghan war is coming to an end.  Core al Qaeda is a shell of its former self.  Groups like AQAP must be dealt with, but in the years to come, not every collection of thugs that labels themselves al Qaeda will pose a credible threat to the United States.  Unless we discipline our thinking, our definitions, our actions, we may be drawn into more wars we don't need to fight, or continue to grant Presidents unbound powers more suited for traditional armed conflicts between nation states.

So I look forward to engaging Congress and the American people in efforts to refine, and ultimately repeal, the AUMF's mandate.  And I will not sign laws designed to expand this mandate further.  Our systematic effort to dismantle terrorist organizations must continue.  But this war, like all wars, must end.  That's what history advises.  That's what our democracy demands.

And that brings me to my final topic:  the detention of terrorist suspects.  I'm going to repeat one more time:  As a matter of policy, the preference of the United States is to capture terrorist suspects.  When we do detain a suspect, we interrogate them.  And if the suspect can be prosecuted, we decide whether to try him in a civilian court or a military commission.

During the past decade, the vast majority of those detained by our military were captured on the battlefield.  In Iraq, we turned over thousands of prisoners as we ended the war.  In Afghanistan, we have transitioned detention facilities to the Afghans, as part of the process of restoring Afghan sovereignty.  So we bring law of war detention to

an end, and we are committed to prosecuting terrorists wherever we can.

The glaring exception to this time-tested approach is the detention center at Guantanamo Bay.  The original premise for opening GTMO -- that detainees would not be able to challenge their detention -- was found unconstitutional five years ago.  In the meantime, GTMO has become a symbol around the world for an America that flouts the rule of law.  Our allies won't cooperate with us if they think a terrorist will end up at GTMO.

During a time of budget cuts, we spend $150 million each year to imprison 166 people -- almost $1 million per prisoner.  And the Department of Defense estimates that we must spend another $200 million to keep GTMO open at a time when we're cutting investments in education and research here at home, and when the Pentagon is struggling with sequester and budget cuts.

As President, I have tried to close GTMO.  I transferred 67 detainees to other countries before Congress imposed restrictions to effectively prevent us from either transferring detainees to other countries or imprisoning them here in the United States.

These restrictions make no sense.  After all, under President Bush, some 530 detainees were transferred from GTMO with Congress's support.  When I ran for President the first time, John McCain supported closing GTMO -- this was a bipartisan issue.  No person has ever escaped one of our super-max or military prisons here in the United States -- ever.  Our courts have convicted hundreds of people for terrorism or terrorism-related offenses, including some folks who are more dangerous than most GTMO detainees.  They're in our prisons.

And given my administration's relentless pursuit of al Qaeda's leadership, there is no justification beyond politics for Congress to prevent us from closing a facility that should have never have been opened.  (Applause.)

AUDIENCE MEMBER:  Excuse me, President Obama --

THE PRESIDENT:  So -- let me finish, ma'am.  So today, once again --

AUDIENCE MEMBER:  There are 102 people on a hunger strike.  These are desperate people.

THE PRESIDENT:  I'm about to address it, ma'am, but you've got to let me speak.  I'm about to address it.

AUDIENCE MEMBER:  You're our Commander-In-Chief --

THE PRESIDENT:  Let me address it.

AUDIENCE MEMBER:  -- you an close Guantanamo Bay.

THE PRESIDENT:  Why don't you let me address it, ma'am.

AUDIENCE MEMBER:  There's still prisoners --

THE PRESIDENT:  Why don't you sit down and I will tell you exactly what I'm going to do.

AUDIENCE MEMBER:  That includes 57 Yemenis.

THE PRESIDENT:  Thank you, ma'am.  Thank you.  (Applause.)  Ma'am, thank you.  You should let me finish my sentence.

Today, I once again call on Congress to lift the restrictions on detainee transfers from GTMO.  (Applause.)

I have asked the Department of Defense to designate a site in the United States where we can hold military commissions.  I'm appointing a new senior envoy at the State Department and Defense Department whose sole responsibility will be to achieve the transfer of detainees to third countries.

I am lifting the moratorium on detainee transfers to Yemen so we can review them on a case-by-case basis.  To the greatest extent possible, we will transfer detainees who have been cleared to go to other countries.

AUDIENCE MEMBER:  -- prisoners already.  Release them today.

THE PRESIDENT:  Where appropriate, we will bring terrorists to justice in our courts and our military justice system.  And we will insist that judicial review be available for every detainee.

AUDIENCE MEMBER:  It needs to be --

THE PRESIDENT:  Now, ma'am, let me finish.  Let me finish, ma'am.  Part of free speech is you being able to speak, but also, you listening and me being able to speak.  (Applause.)

Now, even after we take these steps one issue will remain – just how to deal with those GTMO detainees who we know have participated in dangerous plots or attacks but who cannot be prosecuted, for example, because the evidence against them has been compromised or is inadmissible in a court of law. But once we commit to a process of closing GTMO, I am confident that this legacy problem can be resolved, consistent with our commitment to the rule of law.

I know the politics are hard. But history will cast a harsh judgment on this aspect of our fight against terrorism and those of us who fail to end it. Imagine a future -- 10 years from now or 20 years from now – when the United States of America is still holding people who have been charged with no crime on a piece of land that is not part of our country. Look at the current situation, where we are force-feeding detainees who are being held on a hunger strike. I'm willing to cut the young lady who interrupted me some slack because it's worth being passionate about. Is this who we are? Is that something our Founders foresaw? Is that the America we want to leave our children? Our sense of justice is stronger than that.

We have prosecuted scores of terrorists in our courts. That includes Umar Farouk Abdulmutallab, who tried to blow up an airplane over Detroit; and Faisal Shahzad, who put a car bomb in Times Square. It's in a court of law that we will try Dzhokhar Tsarnaev, who is accused of bombing the Boston Marathon. Richard Reid, the shoe bomber, is, as we speak, serving a life sentence in a maximum security prison here in the United States. In sentencing Reid, Judge William Young told him, "The way we treat you…is the measure of our own liberties."

AUDIENCE MEMBER: How about Abdulmutallab -- locking up a 16-year-old -- is that the way we treat a 16-year old? (Inaudible) -- can you take the drones out of the hands of the CIA? Can you stop the signature strikes killing people on the basis of suspicious activities?

THE PRESIDENT: We're addressing that, ma'am.

AUDIENCE MEMBER: – thousands of Muslims that got killed – will you compensate the innocent families -- that will make us safer here at home. I love my country. I love (inaudible) –

THE PRESIDENT: I think that -- and I'm going off script, as you might expect here. (Laughter and applause.) The voice of that woman is worth paying attention to. (Applause.) Obviously, I do not agree with much of what she said, and obviously she wasn't listening to me in much of what I said. But these are tough issues, and the suggestion that we can gloss over them is wrong.

When that judge sentenced Mr. Reid, the shoe bomber, he went on to point to the American flag that flew in the courtroom. "That flag," he said, "will fly there long after this is all forgotten. That flag still stands for freedom."

So, America, we've faced down dangers far greater than al Qaeda. By staying true to the values of our founding, and by using our constitutional compass, we have overcome slavery and Civil War and fascism and communism. In just these last few years as President, I've watched the American people bounce back from painful recession, mass shootings, natural disasters like the recent tornados that devastated Oklahoma. These events were heartbreaking; they shook our communities to the core. But because of the resilience of the American people, these events could not come close to breaking us.

I think of Lauren Manning, the 9/11 survivor who had severe burns over 80 percent of her body, who said, "That's my reality. I put a Band-Aid on it, literally, and I move on."

I think of the New Yorkers who filled Times Square the day after an attempted car bomb as if nothing had happened.

I think of the proud Pakistani parents who, after their daughter was invited to the White House, wrote to us, "We have raised an American Muslim daughter to dream big and never give up because it does pay off."

I think of all the wounded warriors rebuilding their lives, and helping other vets to find jobs.

I think of the runner planning to do the 2014 Boston Marathon, who said, "Next year, you're going to have more people than ever. Determination is not something to be messed with."

That's who the American people are -- determined, and not to be messed with. And now we need a strategy and a politics that reflects this resilient spirit.

Our victory against terrorism won't be measured in a surrender ceremony at a battleship, or a statue being pulled to the ground. Victory will be measured in parents taking their kids to school; immigrants coming to our shores; fans taking in a ballgame; a veteran starting a business; a bustling city street; a citizen shouting her concerns at a President.

The quiet determination; that strength of character and bond of fellowship; that refutation of fear – that is both our sword and our shield. And long after the current messengers of hate have faded from the world's memory, alongside the brutal despots, and deranged madmen, and ruthless demagogues who litter history  -- the flag of the United States will still wave from small-town cemeteries to national monuments, to distant outposts abroad. And

that flag will still stand for freedom.

Thank you very, everybody.  God bless you.  May God bless the United States of America.  (Applause.)

3:00 P.M. EDT

WWW.WHITEHOUSE.GOV

En español  |  Accessibility  |  Copyright Information  |  Privacy Policy  |  Contact
USA.gov  |  Developers  |  Apply for a Job

# EXHIBIT E

**The New York Times**

POLITICS

# AP Sources: Justice Dept. To Reveal Drone Memo

By THE ASSOCIATED PRESS   MAY 20, 2014, 5:47 P.M. E.D.T.

WASHINGTON — On the eve of a critical Senate vote and under court order, the Obama administration signaled it will publicly reveal a secret memo describing its legal justification for using drones to kill U.S. citizens suspected of terrorism overseas.

Two administration officials told The Associated Press that the Justice Department has decided not to appeal a Court of Appeals ruling requiring disclosure of a redacted version of the memo under the Freedom of Information Act. The officials spoke on condition of anonymity because they were not authorized to speak publicly about the matter.

The decision to release the documents comes as the Senate is to vote Wednesday on advancing President Barack Obama's nomination of the memo's author, Harvard professor and former Justice Department official David Barron, to sit on the 1st U.S. Circuit Court of Appeals in Boston. Sen. Rand Paul, R-Ky., had vowed to fight Barron's confirmation, and some Democratic senators were calling for the memo's public release before a final vote.

Wednesday's expected procedural vote would allow the Senate to move ahead with a final vote on Barron on Thursday. "I think we'll be OK," Senate Majority Leader Harry Reid, D-Nev., said earlier Tuesday.

Anwar al-Awlaki, an al-Qaida leader born in the United States, was killed after being targeted by a drone strike in Yemen in September 2011.

Some legal scholars and human rights activists complained that it was illegal for the U.S. to kill American citizens away from the battlefield without a trial.

Some senators, including those in Obama's own party, have called for the public release of the memo before the final confirmation vote. The White House agreed under the pressure to show senators unredacted copies of all written legal advice written by Barron regarding the potential use of lethal force against U.S. citizens in counterterrorism operations.

Until now, the administration has fought in court to keep the writings from public view. But administration officials said that Solicitor General Donald Verrilli Jr. decided this week not appeal an April 21 ruling requiring disclosure by the 2nd U.S. Circuit Court of Appeals in New York and that Attorney General Eric Holder concurred with his opinion.

The release could take some time, since the redactions are subject to court approval. And the administration also is insisting that a classified ruling on the case also be redacted to protect information classified for national security, but not the legal reasoning, one of the officials said.

The drone strike that killed al-Awlaki also killed another U.S. citizen, Samir Khan, an al-Qaida propagandist. Al-Awlaki's 16-year-old son, Abdulrahman, was killed the following month in another drone attack.

The American Civil Liberties Union and two reporters for The New York Times, Charlie Savage and Scott Shane, filed a FOIA suit. In January 2013, U.S. District Court Judge Colleen McMahon ruled that she had no authority to order the documents disclosed, although she chided the Obama administration for refusing to release them.

But a three-judge appeals court panel noted that after McMahon ruled, senior government officials spoke about the subject. The panel rejected the government's claim that the court could not consider official disclosures made after McMahon's ruling, including a 16-page Justice Department white paper on the subject and public comments by Obama in May in which he acknowledged his role in the al-Awlaki killing, saying he had "authorized the strike that took him out."

The ACLU urged senators in a letter Tuesday not to move forward on the confirmation vote until they have a chance to see any Barron memos on the administration's drone program, not just those involving U.S. citizens.

Paul issued a statement Tuesday saying he still opposes Barron's nomination. "I rise today to say that there is no legal precedent for killing American citizens not directly involved in combat and that any nominee who rubber stamps and grants such power to a president is not worthy of being placed one step away from the Supreme Court," Paul said in remarks prepared for delivery on the Senate floor Wednesday provided by his office.

Sen. Ron Wyden, D-Ore., has been pushing for public disclosure of Barron's writings and was one of several Democrats who had been refusing to say whether he'd vote for confirmation without it. "That's certainly very constructive," Wyden said when told of the decision not to appeal.

The administration's decision won over at least one senator, Mark Udall, D-Colo., who had been opposed to Barron because of the memo's secrecy. "This is a welcome development for government transparency and affirms that although the government does have the right to keep national security secrets, it does not get to have secret law," Udall said.

———
———

Associated Press writer Alan Fram contributed to this report.

© 2014 The New York Times Company

# EXHIBIT F

POLITICS BLOG
## After white paper and secret memo, DOJ still can't 'confirm or deny'

By Bob Egelko on February 14, 2013 6:22 PM

0

On Feb. 4, NBC News published a leaked "white paper" outlining the Obama administration's legal rationale for lethal drone strikes. On Feb. 6, President Obama ordered a classified Justice Department memo on drones and the legality of targeted killings released to congressional intelligence committees.

On Feb. 7, the Justice Department told a federal judge in Oakland that it still could not confirm or deny — for national security reasons — the "existence or nonexistence" of any government document on the legality of "targeting any particular individual." Presumably with a drone, though the department avoided using the word.

Whether the department's Office of Legal Counsel has ever prepared such a document "is a currently and properly classified fact that is protected from disclosure by statute and would reveal confidential deliberations and attorney-client communications," Obama administration lawyers told Chief U.S. District Judge Claudia Wilken, who is presiding over the only remaining case in the nation seeking disclosure of the information.

They didn't mention the white paper or the president's disclosure to Congress — presumably, according to an opposing lawyer, because there's no way to reconcile those developments with the government's public stonewalling.

Obama's decision to release the classified memo to members of Congress "eliminated the argument that there was no such document," said Thomas Burke, attorney for the First Amendment Coalition, which sued a year ago for any documents detailing the administraiton's legal basis for drone strikes targeting U.S. citizens. The suit was prompted by the September 2011 bombing in Yemen that killed Anwar al-Awlaki, a U.S.-born Muslim cleric linked by U.S. officials to al Qaeda and the perpetrators of terrorist attacks. Another drone strike in Yemen two weeks later killed al-Awlaki's 16-year-old son, also a U.S. citizen.

Last week's events "made public what we already knew," Burke said. "It would strain credibility to insist that no such legal analysis had been prepared by the Justice Department."

That assumes, of course, that the classified document discusses a legal rationale for death by drone. That certainly appears to be the subject of the publicly released white paper, which declares that a U.S. citizen can be legally targeted abroad if a "informed, high-level official of the U.S. government" has determined that the person poses an "imminent threat of violent attack against the United States" and that "capture is infeasible."

The First Amendment Coalition has forwarded a copy of the white paper to Wilken, along with a video of last week's Senate testimony on the subject by John Brennan, Obama's counterterrorism adviser and nominee to head the CIA. The coalition wants the judge to order the secret memo released to her so she can review it in private, a request that the Justice Department is certain to resist.

"The First Amendment Coalition has never been interested in any intelligence data," only in the legal justification for executing a terrorist suspect without a trial or judicial approval, Burke said. "The administration says very publicly and very repeatedly that our program is legal. ...What now seems perfectly reasonable in the president's mind is that the legal basis for the program should be known to congressional leaders. If so, it ought to be known to the public."

**Categories: Obama Military Policy, secrecy**

Comments are closed.

FOLLOW BOB



**Bob Egelko**

---

BLOG SEARCH

Keyword search across all the entries in this blog.

Keyword                                GO

---

RECENT POLITICS BLOG

**Jerry Brown hits airwaves with ads — for Props. 1 and 2**

**Dem-on-Dem debate: No knockouts, but plenty of jabs (VIDEO)**

**Live tweets: Rep. Mike Honda, Ro Khanna debate**

**Big tasks for Honda, Khanna in debate**

 **Space photos show California drying since 2002**

## MOST POPULAR

**1** Reports: Seahawks could move back to AFC West

**2** Tesla unveils the all-wheel drive Model 'D'

**3** TV Party: Henry Rollins Shares 10 Things You Don't Know...

**4** Microsoft CEO to women: Don't ask for a raise

**5** Ebola joke gets passenger kicked off plane, leads to latest...

## TOP VIDEOS

Barbara Walters Reveals Her Cancer Scare
E! Online 

More videos:

  

## ARCHIVES

Browse previous blog posts by month and year of entry. You'll see all the posts for that time period.

Select Month

## POLITICS BLOG
## CATEGORIES

2014 campaign |

2014 governor's race |

2014 House races | Barbara Boxer |

Barbara Lee | Bill Clinton |

California politics |

Carla Marinucci | Climate change |

Congress | Connecticut |

Dianne Feinstein | drought |

environment | Foreign policy |

gun control | gun laws |

guns; gun control; NRA; Obama; |

Dianne Feinstein; lobbying

Israel | Jerry Brown | LGBT |

LGBT Rights | Media and Politics |

Mike Honda | Nancy Pelosi |

National Parks | Neel Kashkari |

Oakland | Obama | Ro Khanna |

Uncategorized | voting

## TWITTER FEED

Tweets from @SFGate/politics-writers

## RECENT ENTRIES

**Jerry Brown hits airwaves with ads — for Props. 1 and 2**

**Dem-on-Dem debate: No knockouts, but plenty of jabs (VIDEO)**

**Live tweets: Rep. Mike Honda, Ro Khanna debate**

**Big tasks for Honda, Khanna in debate**

**Space photos show California drying since 2002**

**Wait 'til 2016, Nancy Pelosi says**

**Khanna supporters file House Ethics complaint over Honda**

staff emails

**Gay-rights group delivers
redemption for Bill Clinton**

Ghostery blocked Brightcove video player.

# EXHIBIT G

(http://www.chicagotribune.com)

# Lawsuits seek more than U.S. acknowledgement of drone killings

May 23, 2013 | Reuters

(http://twitter.com/share)

By David Ingram

WASHINGTON, May 23 (Reuters) - President Barack Obama is facing demands in court to reveal more about the U.S. drone program, despite his speech addressing it on Thursday and his government's acknowledgement a day earlier that four Americans have died in drone strikes.

Civil liberties advocates, news organizations and the families of those who died have brought lawsuits in New York, Washington and Oakland, California, challenging the government's refusal to provide information.

Now that the drone program's existence has at last been confirmed, government lawyers on Wednesday indicated they would abandon their previous arguments, which did not confirm or deny the drone program. In the case in Oakland, they said they would give a new response to the Freedom of Information Act request filed by the First Amendment Coalition within 30 days.

That suit asks the government to release the legal justification behind the 2011 targeted drone killing of Anwar al-Awlaki, a U.S. citizen and militant cleric in Yemen.

In a separate case in Washington, a federal judge acted immediately after news reports emerged on the U.S. acknowledgement of the four American deaths, and late Wednesday she ordered Justice Department lawyers to file a memorandum next month on the implications of U.S. Attorney General Eric Holder's letter on Wednesday about the drone program.

The letter from Holder to lawmakers confirmed for the first time reports that New Mexico-born cleric Awlaki died after he was targeted in a U.S. attack.

Three other U.S. citizens have died in drone attacks but were not intended targets, Holder wrote. Those other Americans were Awlaki's teenage son Abdulrahman; Samir Khan, an American of Pakistani origin who died in Yemen; and Jude Kenan Mohammed of North Carolina, who was indicted on U.S. terrorism charges in 2009 and was killed in Pakistan.

Holder's letter was intended as a step toward reducing government secrecy around the drone attacks, which the United States considered essential in fighting militants in Pakistan and Yemen. The administration has come under criticism from Democratic and Republican lawmakers for withholding information about the drone program.

On Thursday, Obama announced plans for restricting drone attacks, including putting the military in charge of the program, rather than the CIA.

The American Civil Liberties Union said on Thursday the details in Holder's letter will not be enough to get the organization to back down from lawsuits it has filed in New York and Washington federal courts.

DAMAGES SOUGHT

"We hope that the government will move beyond unverifiable allegations and actually respond on the merits to our lawsuit seeking due process," Hina Shamsi, director of the ACLU's National Security Project, said in a phone interview.

The ACLU represents family members of Awlaki and his son, and of Khan in one of the lawsuits. After seeing news reports about Holder's letter, U.S. District Judge Rosemary Collyer in Washington on Wednesday ordered Justice Department lawyers to file a memorandum on its impact.

The suit asks for a finding that the government violated the three men's rights and for damages, possibly including money. The Justice Department asked for the suit to be dismissed, saying it involves classified information and that the drone strikes are a matter best left to Obama, not the courts.

A Justice Department spokesman declined to comment on Thursday.

Lawsuits by the ACLU, the New York Times and the First Amendment Coalition, a free speech organization, seek documents related to the drone program. They want to see a memorandum from

the Justice Department's Office of Legal Counsel that lays out the arguments giving the U.S. government authority to target Awlaki despite his U.S. citizenship.

In trying to defeat the First Amendment Coalition's suit, the Justice Department initially responded that it could neither confirm nor deny the existence of any memorandum.

Reversing themselves, lawyers on Wednesday wrote, "The president has determined that the United States' responsibility for that operation can now be publicly acknowledged." They promised an update within 30 days.

Thomas Burke, a lawyer for the First Amendment Coalition, said he was "incredibly encouraged" by the week's events and optimistic the legal memorandum might be declassified at least in part.

"We've been waiting a long time, and the public's been waiting a long time, to see and review and debate among themselves the legal position of the United States," Burke said.

The New York Times is pursuing the same kind of information in federal court in New York, with the support of the Reporters Committee for Freedom of the Press, a journalist group.

(Reporting by David Ingram; Editing by Karey Van Hall and Bill Trott)

### Featured Articles







Michael Jordan marries longtime girlfriend (/2013-04-27/sports/sns-rt-bkn-bobcats-bulls-newssx5b6d3a1-20130427_1_juanita-vanoy-girlfriend-yvette-marriage-license)

Body pulled from lake identified as 32-year-old Lake Forest woman (/2014-05-09/news/chi-body-pulled-from-lake-identified-as-32yearold-lake-forest-woman-20140509_1_boat-ramp-rebecca-long-lake-forest)

Cause of ALS is found, Northwestern team says (/2011-08-22/news/ct-met-northwestern-als-breakthrough-20110822_1_als-patients-proteins-northwestern-research)

MORE:

Illinois haunted house rankings 2013 (/2013-10-17/entertainment/chi-top-

illinois-haunted-houses-2013-20130806_1_haunted-house-ken-spriggs-dream-reapers)

Life Skill #201: Washing a baseball cap (/2013-08-06/features/sc-fam-0806-lifeskill-wash-cap-20130806_1_hat-brim-wool)

Pain relievers: What are the differences? (/2011-01-13/news/sc-health-0112-pain-reliever-differen20110113_1_alcohol-warning-chronic-pain-tylenol)

TV pitchman Kevin Trudeau sentenced to 10 years in prison (/2014-03-17/business/chi-kevin-trudeau-sentenced-20140317_1_kevin-trudeau-global-information-network-guzman)

Winter boot showdown (/2012-02-19/features/ct-sun-0219-warren-shopping-winter-boots-20120217_1_cold-feet-warmest-winter)

An easier way to go (/2012-11-14/health/sc-health-1114-colonoscopy-20121114_1_colorectal-cancer-colonoscopy-colon-cancer-alliance)

## Related Articles

Appeals court skeptical of Obama secrecy around drone... (/2012-09-20/news/sns-rt-us-usa-legal-dronesbre88j121-20120920_1_drone-program-drone-strikes-drone-attacks)
*September 20, 2012*

US court skeptical of Obama secrecy around drone killings (/2012-09-20/business/sns-rt-usa-legaldronesl1e8kjdom-20120920_1_drone-program-drone-attacks-drone-strike)
*September 20, 2012*

U.S. drones attack militants in Pakistan, Yemen (/2012-03-30/news/sns-rt-usa-dronesl2e8eu7ty-20120330_1_drone-strikes-drone-operations-drone-program)
*March 30, 2012*

Voice of the People, Feb. 17 (/2013-02-18/opinion/ct-vp-0217voicelettersbriefs-20130216_1_drone-attacks-drone-program-drone-strikes)
*February 18, 2013*

Terms of Service
(http://www.chicagotribune.com/tos/)

Privacy Policy
(http://www.chicagotribune.com/privacy/)

Index by Date
(/2013/may/23)

Index by Keyword
(/keywords)

**Connect**

Like us on Facebook
www.chicagotribune.com
(https://www.facebook.com/chicagotribune)
(http://www.chicagotribune.com)

Follow us on Twitter

(http://twitter.com/#!/chicagotribune)

Chicago Tribune

# EXHIBIT H

# MINNPOST

# Drone controversy highlights the importance of government transparency

By Matt Ehling | 02/25/13



REUTERS

As drone use has burgeoned, its growth has lacked a critical check.

Unmanned aerial vehicles (colloquially known as "drones") have become subjects of intense discussion and controversy, sparking debates in Washington hearings and statehouses alike.

Drone-based weapons platforms have become tools of choice in overseas counterterrorism operations. Their ability to hit targets without exposing military personnel to live-fire risks has led to their widespread adoption in recent years. The PBS newsmagazine "Frontline" has reported that more than 6,000 unmanned aircraft are available for military missions – a tenfold expansion from a decade ago.

Drones have also started to infiltrate into the domestic arena, where law-enforcement agencies have been using lightweight drones to conduct a variety of surveillance operations. Police drones can be equipped with all manner of monitoring equipment – from high-resolution cameras to thermal-imaging devices that can read heat signatures within buildings. In 2015, the Federal

Aviation Administration (FAA) is also scheduled to institute a permitting process for civilian drone operations, further integrating drones into domestic airspace and raising additional questions about their deployment.

As drone use has burgeoned, its growth has lacked a critical check. Government entities – particularly those at the federal level – have been resistant to public-record requests about some of the weightiest drone-related matters. Their resistance raises serious questions about the public's ability to hold its government accountable in its use of this controversial technology.



Matt Ehling

## FOIA, drones, and secrecy

The Freedom of Information Act (FOIA) is the federal government's primary open records law, and has facilitated public access to government documents for almost five decades. At its most basic, the FOIA presumes that government information is public unless it falls under one of FOIA's nine exemptions (such as its exemption for active criminal investigations). Exempt data can be redacted from government documents, but the remaining data is presumed to be public, and can be released upon request.

The FOIA also largely holds the government to a 20-day time frame, during which it must respond to requests for government information, and provide answers as to whether it will release documents in whole or in part.

Both of these foundational FOIA presumptions have been undercut in recent decades, to the point where agencies routinely delay document production for months or years, and sometimes withhold much more information than they are legally entitled to. When significant public policy matters arise, the FOIA – designed to be the public's key to unlocking data necessary to evaluate these matters – increasingly stumbles under the weight of agency obstruction. Recognizing this problem, Washington, D.C.-based FOIA attorney Scott Hodes has noted that "one of the central tenets of FOIA – namely for citizens to find out what their government is up to – is in critical condition."

To make the FOIA work in such circumstances, requesters may need to resort to litigation in order to compel agencies to produce the documents that they seek. Such was the case with the Electronic Frontier Foundation (EFF), a public-policy group that sought documents related to the number of operational drones within the United States. EFF submitted a FOIA request for this information in April of 2011, but had to resort to court action to compel the FAA to produce such basic data after a delay of many months.

# Drones and lethal force

At present, the most controversial drone-related issue has involved the use of a drone to target and kill a U.S. citizen outside of a battlefield environment. That citizen – al-Qaida propagandist Anwar al-Awlaki – was killed by a missile attack in Yemen in 2011. Once publicly disclosed, the Awlaki operation raised immediate questions about the breadth of the Obama administration's assertions about when, where, and under what circumstances it could target and kill other American citizens.

The legal justifications for such executive branch actions are frequently generated by the Office of Legal Counsel (OLC), a component of the U.S. Department of Justice (DOJ). After the Awlaki killing became public, the New York Times reported that the OLC had produced a legal opinion on the matter. Several organizations – including the New York Times, the ACLU, and the First Amendment Coalition – filed FOIA requests for the document. My own organization – Public Record Media (PRM) – also sought the Awlaki memo, and requested access to other drone-related legal opinions in order to learn more about the scope of the OLC's decision making in this area. PRM's FOIA request asked for legal memos about the delivery of lethal force via drones in two circumstances: against U.S. citizens outside the United States, and against any person within the United States.

We sought the last category of records based on the supposition that counterterrorism and domestic drone missions may intersect in the near future (in the context of border defense, for instance.)

The multiple FOIA requests for the Awlaki memo all dealt with substantive questions about the government's most invasive and consequential authority – its ability to take human life in the furtherance of its national security mission. The definitions and boundaries of that mission have sparked intense pubic controversy over the last ten years, making independent review of government decisions in this area especially critical.

How, then, has the government responded to public inquiries about the scope of its powers – particularly within the FOIA context?

# Legal memos and government secrecy

Since the advent of the War on Terrorism, tremendous pressure has been applied to the legal infrastructure of government transparency. During the George W. Bush administration, the executive branch pushed hard against the FOIA. Bush-era agencies tried to retroactively re-classify documents, and instituted a generalized resistance to the release of information through public record requests.

The Bush administration also sought to expand the degree to which it could withhold the legal basis for its actions from public scrutiny – effectively closing off access to legal memos, even if

they were stripped of operational details. During the Bush years, several legal battles centered on OLC opinions written to describe the scope of purported executive branch powers. The Bush administration refused to "confirm or deny" the existence of many of these memos, and fought FOIA disclosure in court fervently.

In 2009, the incoming Obama administration took steps to reverse this trend, by publicly disclosing the contents of several Bush-era OLC opinions on detention authority, domestic use of the military, and torture. Upon taking office, Obama also signed directives governing how executive agencies would respond to FOIA requests in the future. At least according to the letter of those directives, the Bush-era practice of reflexively withholding documents under FOIA was no more.

## The OLC drone memo

Over the past four years, actual agency practice has varied considerably from the mandates set forth in the president's 2009 orders. The OLC's response to FOIA requests for the Awlaki memo provides a case study.

The OLC told all FOIA requesters that they could neither "confirm nor deny" the existence of the Awlaki memo. Courts have upheld the use of this so-called "Glomar" response in situations in which acknowledging the existence of a document would reveal a classified fact. However, the government's prolific use of the Glomar response has led to increasingly absurd results.

After receiving Glomar responses to their FOIA requests, the New York Times, the ACLU, and First Amendment coalition moved on to litigation, hoping to force the release of the Awlaki memo. While the Obama administration fought the release of information in federal court, its top officials publicly discussed many specifics that – presumably – were contained within the Awlaki memo itself. The president and his top advisers disclosed the existence of a U.S. drone program. They confirmed that U.S forces killed Anwar al-Awlaki. John Brennan and Eric Holder even gave speeches at prominent universities that described parts of the legal framework at issue in the OLC memo cases. While battling disclosure in court, the administration released pieces of relevant information at times and places politically advantageous to itself.

This Glomar schism — and the strange duality it represents — was remarked on by federal Judge Colleen McMahon in her ruling on the consolidated New York Times/ACLU suit for the Awlaki memo. While noting the grave public policy matters at issue in the FOIA requests, Judge McMahon nonetheless ruled in favor of the government, and allowed the DOJ to keep the OLC drone memo under wraps. "The Alice-in-Wonderland nature of this pronouncement is not lost on me," wrote Judge McMahon, "but ... I can find no way around the thicket of laws and precedents."

## PRM's drone lawsuit

PRM had a different result flow from its OLC request. While we received a Glomar response to our

request for the Awlaki memo, we also received a more specific reply to our requests for opinions on the delivery of lethal force against citizens overseas, and lethal force against persons inside the United States. Regarding these last two categories, OLC stated that they held documents "responsive to the remaining items" in our request, but denied access to them all. We only pursued access to the last (domestic) category, since there was already ongoing litigation related to the other issues. We challenged OLC's withholding at the agency level, but received no substantive response after a four-month period. This period provided OLC with an opportunity to make clarifications, or to expand on its withholding justifications, but it did neither. Understanding the government to be withholding documents, PRM (represented by attorney JT Haines) filed suit to gain access.

Once we filed suit, the DOJ reversed course and said that it, in fact, had *no* memos similar to those that we sought. We held out for additional information, and the DOJ eventually filed a sworn declaration stating that the OLC knew that it had no responsive memos in October of 2011. However, in a Nov. 3, 2011, FOIA response letter, OLC told us that they held "documents responsive to the remaining items" of our request. Since there were no underlying records, we moved to dismiss the case. We then sought fees due to the fact that we went to court based upon DOJ's representation that there were responsive documents. Chief Magistrate Judge Arthur Boylan recently awarded fees in our case due to the DOJ's change in position. His order noted:

> *"Despite the fact that no documents were produced, the Plaintiff and the public at large can still glean important information from this change — namely, the government does not possess any documents related to the lethal use of UAVs within U.S. jurisdiction."*

The order in our case underscores the importance of clarity in agency FOIA responses, and we are hopeful that it will be upheld as proceedings continue. One can also hope that such clarity will be brought to bear on the larger legal fight over the Awlaki memo, which is still continuing in federal court.

## Hiding in plain sight

Despite the ongoing courtroom battle over disclosure of the Awlaki memo, the Obama administration recently leaked what has been described as a "summary version" of the memo to ABC News, in advance of John Brennan's CIA confirmation hearings. The full text of the opinion was also later released to members of congressional intelligence committees who had unsuccessfully attempted to get access to it for months.

The leaked drone "white paper" goes on at some length about the presumptions underscoring the administration's use of lethal force against American citizens. Those presumptions are constrained, in some fashion, by the parameters that the administration has set for its own

analysis. The white paper describes the use of lethal force against Americans as constitutional if used overseas, against an al-Qaeda leader engaged in operational planning, and when capture is not feasible.

Within this analysis, there are many areas that could lead to problematic expansions of executive authority. The white paper describes "non-judicial" due process, and sets out a broad reading of the concept of "imminence," for example. This later concept is drawn from 4th Amendment case law governing police use of force in "shoot-or-be-shot" situations. However, the white paper stretches this concept to cover an arguably non-imminent situation, decoupling it from prior legal parameters.

The only way to know for sure how sound (or potentially problematic) the OLC's analysis is, is to see the Awlaki memo itself, even if it is stripped of operational details. Such redacted opinions have been released in the past, and the FOIA provides sufficient mechanisms to do so.

## Drones are just the first controversy

FOIA scrutiny of government conduct is increasingly important as the government's powers and capabilities increase. Remotely piloted drones are merely the first step toward more ambitious and unconventional weapons systems that will raise serious policy (as well as moral) questions for our society. The Defense Advanced Research Projects Agency (DARPA) is well down the road toward the development of so-called autonomous weapons systems — weapons that make movement, targeting, and "kill" decisions on their own, independent of human operators. Will the government attempt to prevent the public from understanding the future use of machines that raise such fundamental and weighty questions?

The existence of our democratic republic is premised upon the consent of an informed public. In order to preserve that balance, the public needs to understand the legal basis for actions that the government undertakes in its name — particularly when the stakes are so high.

*Matt Ehling is a St. Paul-based writer and television producer. He is the president of Public Record Media (PRM), a media organization that seeks out and publishes government documents.*

**WANT TO ADD YOUR VOICE?**
If you're interested in joining the discussion, add your voice to the Comment section below, or consider writing a Community Voices commentary. For more information about Community Voices, email Susan Albright at salbright@minnpost.com.

**Get MinnPost's top stories in your inbox**

Enter email address

SUBSCRIBE NOW

☑ Daily newsletter          ☑ Sunday Review

**RELATED CONTENT:**

THE GLEAN
### Minnesota legislators want rules on local police use of drones
BY BRIAN LAMBERT | 02/14/13
Gun dealers "answer" Rybak; heart transplants up; sometimes love hurts; cat videos to invade State Fair; snow impact mixed; minimum-wage boost backed; and more.

CHRISTIAN SCIENCE MONITOR
### States consider drone bans: Overreaction or crucial for privacy rights?
BY GLORIA GOODALE | 02/07/13
Charlottesville, Va., this week passed the nation's first ban on drones, and some states are considering similar measures. But drones can also be helpful tools, experts say.

**Related Tags:**

**COMMENTS (1)**

**September 11, 2001--attack on**

SUBMITTED BY NEAL ROVICK ON FEBRUARY 25, 2013 - 10:19AM.

September 11, 2001--attack on NYC and DC

September 19, 2001--Attorney General Ashcroft introduces draft Patriot Act in Senate and House

October 25, 2001--Patriot Act passed and signed into law

...According to attorney Joseph Margulies, who successfully led Rasul vs Bush in the Supreme Court, "The president has treated the war on terror as an armed conflict and has invoked his constitutional power as commander in chief. The precise scope of president's war power is ill defined and subject of endless constitutional debate" (http://dc.cod.edu/cgi/viewcontent.cgi?article=1123&context=essai)

Unwarranted surveillance, permanent collection of data, torture, drones, removal of data access--all spring from the continuing "emergency" of the global war on terror.

The dissection of the Patriot Act and analysis of its effects is long overdue.

# EXHIBIT I

# Group demands DOJ memo authorizing drone strike

*February 29, 2012 - 9:55 PM*

*PAUL ELIAS, Associated Press*

Share on Facebook    Share on Twitter

SAN FRANCISCO (AP) — The latest call for the Obama administration to publicly release its legal justification for a drone strike that killed U.S.-born al-Qaida cleric Anwar al-Awlaki in Yemen last year came Wednesday in the form of a federal lawsuit.

The First Amendment Coalition of San Rafael is demanding release of a reported U.S. Department of Justice memo that authorized the attack that also killed a second American, Samir Khan, who edited al-Qaida's Internet magazine.

The free speech advocates argued in the lawsuit filed in federal court in San Francisco that the American public has a right to know the "legal justification for the use of lethal force against al-Awlaki and potentially other U.S. citizens who join forces with foreign terrorist organizations that threaten U.S. interests."

The coalition filed the lawsuit after the DOJ rejected a formal request for the memo made under the Freedom of Information Act. The DOJ cited national security in refusing to even acknowledge the memo's existence.

The New York Times and the American Civil Liberties Union previously filed separate lawsuits after receiving similar DOJ rejections after making FOIA requests for the memo. Several other groups have also filed FOAI requests and a growing number of politicians in both political parties are calling on the Obama administration to release the memo.

DOJ spokesman Charles Miller in Washington, D.C., declined comment Wednesday.

Peter Scheer, the coalition's executive director, said the administration is entitled to redact portions of the memo that would disclose sensitive national security information. But he said the public is entitled to see portions of the memo that lay out the legal framework authorizing the killing of American citizens on foreign soil.

"Whatever one's views on this administration's counter-terrorism policy, the use of lethal force by the U.S. government against a U.S. citizen is a situation that cries out for a public airing and debate," Scheer said in a press release.

Scheer and the coalition argue that much of what the DOJ seeks to protect has already been made public in its own court filings, media reports and diplomatic cables leaked by the website Wikileaks.

Wikileaks, for instance, reported the Yemeni government agreed to allow U.S. drone strikes on its soil. Several media outlets have also reported on the memo's existence and content in the days after the Sept. 30 attack.

The DOJ's own lawyers publicly disclosed previously secret details concerning al-Awlaki's activities for al-Qaeda when it filed court papers in the federal case of underwear bomber Umar Farouk Abdulmutallab.

Abdulmutallab was sentenced earlier this month to life in prison after admitting he attempted to blow up an international flight with a bomb in his underwear as the plane approached Detroit on Christmas 2009. The Nigerian told FBI agents that his mission was approved after a three-day visit with al-Awlaki in 2009.

*(Copyright 2012 Associated Press. All Rights Reserved. This material may not be published, broadcast, rewritten, or redistributed.)*

## Featured Video



**Hazmat Suited Workers Remove Ebola Jokester From Flight**



**'Last Man Standing' Pokes Fun at Obama Administration**



**Union Workers Protest Obama Administration's EPA Regs: 'Don't Even Mention His Name'**

Share on Facebook    Share on Twitter

# Group demands DOJ memo authorizing drone strike

**By Paul Elias**

**Associated Press** / **February 29, 2012**

SAN FRANCISCO—The latest call for the Obama administration to publicly release its legal justification for a drone strike that killed U.S.-born al-Qaida cleric Anwar al-Awlaki in Yemen last year came Wednesday in the form of a federal lawsuit.

The First Amendment Coalition of San Rafael is demanding release of a reported U.S. Department of Justice memo that authorized the attack that also killed a second American, Samir Khan, who edited al-Qaida's Internet magazine.

The free speech advocates argued in the lawsuit filed in federal court in San Francisco that the American public has a right to know the "legal justification for the use of lethal force against al-Awlaki and potentially other U.S. citizens who join forces with foreign terrorist organizations that threaten U.S. interests."

The coalition filed the lawsuit after the DOJ rejected a formal request for the memo made under the Freedom of Information Act. The DOJ cited national security in refusing to even acknowledge the memo's existence.

The New York Times and the American Civil Liberties Union previously filed separate lawsuits after receiving similar DOJ rejections after making FOIA requests for the memo. Several other groups have also filed FOAI requests and a growing number of politicians in both political parties are calling on the Obama administration to release the memo.

DOJ spokesman Charles Miller in Washington, D.C., declined comment Wednesday.

Peter Scheer, the coalition's executive director, said the administration is entitled to redact portions of the memo that would disclose sensitive national security information. But he said the public is entitled to see portions of the memo that lay out the legal framework authorizing the killing of American citizens on foreign soil.

"Whatever one's views on this administration's counter-terrorism policy, the use of lethal force by the U.S. government against a U.S. citizen is a situation that cries out for a public airing and debate," Scheer said in a press release.

Scheer and the coalition argue that much of what the DOJ seeks to protect has already been made public in its own court filings, media reports and diplomatic cables leaked by the website Wikileaks.

Wikileaks, for instance, reported the Yemeni government agreed to allow U.S. drone strikes on its soil. Several media outlets have also reported on the memo's existence and content in the days after the Sept. 30 attack.

The DOJ's own lawyers publicly disclosed previously secret details concerning al-Awlaki's activities for al-Qaeda when it filed court papers in the federal case of underwear bomber Umar Farouk Abdulmutallab.

Abdulmutallab was sentenced earlier this month to life in prison after admitting he attempted to blow up an international flight with a bomb in his underwear as the plane approached Detroit on Christmas 2009. The Nigerian told FBI agents that his mission was approved after a three-day visit with al-Awlaki in 2009.

© Copyright 2012 Associated Press. All rights reserved. This material may not be published, broadcast, rewritten, or redistributed.

# EXHIBIT J



Published on *San Francisco Bay Guardian* (http://www.sfbg.com)

SFBG > This Week > Printer-friendly

# In the dark

By *Kate Conger*
Created *02/04/2014 - 4:41pm*

Bay Area plaintiffs seek legal memo justifying drone strikes against US citizens

A battle for transparency that has dragged on for years is nearing a milestone, as Bay Area civil liberties advocates await a judge's ruling on whether the federal government will be forced to hand over memos outlining its legal justification for overseas drone strikes targeting US citizens.

The First Amendment Coalition, an Oakland-based civil liberties organization, submitted a Freedom of Information Act request in October 2011 seeking a legal memo prepared by the Office of Legal Counsel to the US Department of Justice.

Initially referenced in the New York Times and the Washington Post, the memo reportedly justifies the legal arguments underpinning the DOJ's decision to track down and execute Anwar al-Awlaki, an American-born Al Qaeda operative who was killed by a US drone strike in Yemen in September 2011.

In its request, FAC noted that it was not interested in factual information about intelligence sources, but rather "discussion of the legal issues posed by prospective military action against a dangerous terrorist who also happens to be a US citizen."

It's hard to see how releasing a legal memo would constitute a threat to national security, an exemption that allows government to classify much of its information about military operations, but nevertheless federal authorities refused to honor FAC's request.

In fact, the DOJ took its denial a step further, stating that it "neither confirms nor denies the existence of the document described in your request ... because the very existence or nonexistence of such a document is in fact classified."

After filing an appeal and getting nowhere, the civil liberties organization filed suit in Feb. 2012, demanding the release of the memo. Attorney Tom Burke, of Davis Wright Tremaine LLP, is representing FAC.

"We are not interested in how the US government found Al-Awlaki," he explained. "Our suit is to release that memo with all intelligence information redacted."

In Oakland on Jan. 23, US District Judge Claudia Wilken heard arguments from Burke and DOJ lawyers in motions for summary judgment, seeking a pretrial decision to settle the matter. By press time, Wilken still had not issued her ruling.

"It's hard to know the ruling," Burke said in a phone interview a week after the hearing. "The judge was being very short and blunt." He added, "We've been fighting for this for years. If the ruling doesn't go our way, I look forward to taking this to the Ninth Circuit [Court of Appeals]."

Meanwhile, the US District Court for the Southern District of New York heard two similar cases, brought against the DOJ by the New York Times and a New York chapter of the American Civil Liberties Union. In January of 2013, that court decided in favor of the DOJ, albeit with grave reservations.

"I find myself stuck in a paradoxical situation in which I cannot solve a problem because of contradictory restraints and rules — a veritable Catch-22," Judge Colleen McMahon wrote in her opinion. "I can find no way around the thicket of laws and precedents that effectively allow the Executive Branch of our Government to proclaim as perfectly lawful certain actions that seem on their face incompatible with our Constitution and laws, while keeping the reasons for their conclusion a secret."

The New York Times and ACLU appealed the decision, and are currently awaiting further ruling from the Court of Appeals for the Second Circuit.

The American citizens at the heart of these convoluted proceedings are al-Awlaki, his teenage son, Abdulrahman al-Awlaki, and Samir Khan. Al-Awlaki and his son — who was 16 at the time of his death — were both born in the United States, while Khan was a naturalized citizen of Pakistani origin.

Although all three were killed in strikes associated with counter terrorism operations, the elder al-Awlaki was the only one specifically targeted, according to a letter Attorney General Eric Holder wrote to members of Congress last May.

While the US government's use of drone strikes has always been politically contentious because of stray civilian deaths, the use of this tactic to target American citizens has been particularly controversial. How is it that the US government — a global beacon for democracy and due process — can find guilty and execute its own citizens without a modicum of a trial?

"Judge McMahon expressed serious concerns that what the government was doing was unconstitutional," said Brett Kaufman, an ACLU attorney who is handling the cases concerning drone strikes. "But on the merits of [the Freedom of Information Act], which was the issue before her, she had to agree with the DOJ."

*Francisco Alvarado contributed to this report.*

<u>News</u>    <u>Volume 48, Issue 19</u>    <u>Brian McMahon</u>

**Source URL:** <u>http://www.sfbg.com/2014/02/04/dark</u>

# EXHIBIT K

## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

PUBLIC RECORD MEDIA, LLC,

                    Plaintiff,

          v.

UNITED STATES DEPARTMENT
OF JUSTICE,

                    Defendant.

Civil No. 12-1225  (MJD/AJB)


**ORDER ON MOTION FOR
ATTORNEYS' FEES AND COSTS**

This matter is before the Court, Chief Magistrate Judge Arthur J. Boylan, on a motion for fees and costs by Public Record Media, LLC [Docket No. 22]. The matter has been referred to the magistrate judge under 28 U.S.C. § 636 and Local Rule 72.2(b) for an order on the motion. This matter is decided on the documents and without hearing. Jonathan Haines represents Plaintiff. Amy E. Powell represents Defendant.

Based upon the file, memorandums, and arguments of counsel, **IT IS HEREBY ORDERED THAT** Plaintiff's Motion for Fees and Costs [Docket No. 22] is **GRANTED** as provided herein.


Dated: __January 29, 2013___

                              __s/Arthur J. Boylan_____
                              Arthur J. Boylan
                              United States Chief Magistrate Judge

## MEMORANDUM

Plaintiff Public Record Media, LLC, ("Plaintiff") filed a Freedom of Information Act ("FOIA") request with Defendant Department of Justice ("Defendant") on October 11, 2011. The request enumerated three different categories of information sought by Plaintiff.[1] The first category sought information related to lethal force used by the United States against Anwar al-Awlaki. At issue in this matter, however, are the second and third categories, each of which requested information relating to the United States' use of lethal force via "unmanned aerial vehicles" (UAVs). The second category sought information related to lethal UAV force outside of the jurisdiction of the United States, while the third category sought information related to lethal UAV force within the jurisdiction of the United States.[2]

On November 3, 2011, Defendant responded in writing to Plaintiff's request. In its response, Defendant first stated that it could neither confirm nor deny the existence of documents described in the first category of Plaintiff's request. Defendant then addressed the requests of the second and third categories simultaneously as follows: "We have identified several documents that are responsive to the remaining items in your request." Defendant further stated that it was withholding these identified documents pursuant to FOIA Exemptions 1, 3 and 5.[3]

After receiving Defendant's response, Plaintiff filed an administrative appeal with Defendant.[4] In its appeal, Plaintiff narrowed the scope of its initial request to only those documents described in the third category of its request. On May 22, 2012, after not receiving a

---

[1] Exhibit A, Exhibits in Support of Plaintiff's Fee Motion [Docket No. 24].
[2] *Id.*
[3] *Id.*, Exhibit B.
[4] Plaintiff's appeal was dated December 29, 2011 (*Id.*, Exhibit C); however, Defendant states in its opposing memorandum (Page 4, Docket No. 27) that the letter of appeal was not received by the DOJ Office of Information and Policy until April 24, 2012. Regardless, the Defendant failed to make a determination on the appeal within 20 days after receipt of the appeal, as required by 5 U.S.C. § 522(a)(6)(A).

timely determination on its appeal, Plaintiff initiated a lawsuit seeking documents related to its

third category of requests, asserting that Defendant "has improperly withheld responsive

memoranda and/or legal opinions from Plaintiff under FOIA"[5] Thereafter, during a

teleconference in July 2012 and again in a written confirmation letter dated August 3, 2012,[6]

Defendant informed Plaintiff that none of the "responsive records" it identified (and withheld) in

its initial response related to the third-category request. Instead, it stated that "any responsive

records located are responsive to the second category, construed broadly."[7] After learning that no

documents relating the third-category request existed, Plaintiff stipulated to a dismissal of its

claim.[8] The present issue, discussed below, arises out of Plaintiff's motion for attorney's fees

and costs, pursuant to 5 U.S.C. § 522(a)(4)(E).

### DISCUSSION

　　Under FOIA, the Court may award reasonable attorney's fees and costs to a plaintiff

whose claim against a governmental agency has "substantially prevailed." *See* 5 U.S.C. §

522(a)(4)(E)(i). A plaintiff is considered to have "substantially prevailed" if relief has been

obtained through either "(I) a judicial order, or an enforceable written agreement or consent

decree; or (II) a voluntary or unilateral change in position by the agency, if the complainant's

claim is not insubstantial" 5 U.S.C. § 522(a)(4)(E)(ii). The language of this statute naturally

divides the attorney-fee inquiry into a two-prong analysis that addresses both fee *eligibility* and

fee *entitlement. See Brayton v. Office of the U.S. Trade Rep.*, 641 F.3d 521, 524 (D.C. Cir. 2011)

(citing *Judicial Watch, Inc. v. U.S. Dep't of Commerce,* 470 F.3d 363, 368-69 (D.C. Cir. 2006)).

First, the Court must determine whether a plaintiff has "substantially prevailed" and is therefore

---

[5] Complaint [Docket No. 1].
[6] Exhibit D, Exhibits in Support of Plaintiff's Fee Motion.
[7] *Id.*
[8] Order of Chief U.S. District Court Judge Michael J.Davis [Docket No. 21].

"eligible" to receive fees. *Citizens for Responsibility and Ethics in Wash. v. U.S. Dep't of Justice*, 820 F.Supp.2d 39, 43 (D.C. Cir. 2011). If the Court determines that a plaintiff is eligible, it must then weigh a variety of factors to determine whether a plaintiff is "entitled" to fees. *Id.* Finally, if it is determined that a plaintiff is both eligible and entitled to fees, the Court will consider whether the fees requested are reasonable under the lodestar standard.

<u>Plaintiff's Fee Eligibility</u>

A plaintiff no longer needs to win court-ordered relief on the merits of his FOIA claim in order to be eligible for a fee award. *See Brayton*, 641 F.3d 521 at 525. Instead, following amendments to the attorney's fees provisions of FOIA under the OPEN Government Act of 2007, a plaintiff is considered to have "substantially prevailed" and is thereby eligible for fees if his claim causes a voluntary or unilateral change in the position of the agency involved. *See id.; see also Davis v. U.S. Dep't of Justice,* 610 F.3d 750, 752 (D.C. Cir. 2010) (describing this change as a "catalyst theory" approach).

In the present case, the Court finds that Plaintiff's claim did in fact cause Defendant to change its position regarding the third-category request, and therefore Plaintiff "substantially prevailed," making it eligible for an award of attorney's fees. In its initial response to Plaintiff's request, Defendant did not address the second and third category requests individually, but instead addressed them simultaneously in one vague sentence: "We have identified several documents that are responsive to the remaining items in your request."[9] Based on the construction of this sentence alone (i.e., the documents are described as responsive to the remaining "items" – the plural word "items" suggests both the second and third categories, not just one category), as well as the sentence's natural meaning in the context of Defendant's letter as a whole, it was reasonable for Plaintiff to conclude that responsive documents were identified

---

[9] Exhibit B, Exhibits in Support of Plaintiff's Fee Motion.

4

to match the descriptions of both the second and third category requests. Yet, after Plaintiff's legal claim was initiated, Defendant notified Plaintiff that no documents were identified as responsive to the third-category request.

The change from an initial, (seemingly) positive identification of documents relating to the government's lethal use of UAVs within its jurisdiction to the final conclusion that no such documents exist is a substantial change in position. Despite the fact that no documents were ever produced, the Plaintiff and the public at large can still glean important information from this change – namely, the government does not possess any documents related to the lethal use of UAVs within U.S. jurisdiction. This information was only made available after Plaintiff initiated its claim, and therefore Plaintiff is determined to have "substantially prevailed" in its claim.

<u>Plaintiff's Fee Entitlement</u>

Having determined that Plaintiff is eligible for fees, the Court must next consider whether Plaintiff is entitled to fees. The goal of this analysis is to ensure that fees are awarded in a manner consistent with the purpose of FOIA's amended fee provision. *Citizens for Responsibility*, 820 F.Supp.2d 39 at 45. The amended fee provision aimed "to remove the incentive for administrative resistance to disclosure requests based not on the merits of exemption claims, but on the knowledge that many FOIA plaintiffs do not have the financial resources or economic incentives to pursue their requests through expensive litigation." *Davy v. C.I.A.*, 550 F.3d 1155, 1158 (D.C. Cir. 2008) (citing *Nationwide Bldg. Maint., Inc. v. Sampson*, 559 5.2d 704, 711 (D.C. Cir. 1977)).

With this purpose in mind, the Court must consider at least four factors when making a determination as to attorney fee entitlement: (1) the public benefit derived from the case; (2) the commercial benefit to the plaintiff; (3) the nature of the plaintiff's interest in the records; and (4)

5

the reasonableness of the agency's withholding of the requested documents. *Citizens for Responsibility*, 820 F.Supp.2d 39 at 45 (citations omitted). None of these factors is in and of itself dispositive, and "[t]he sifting of those criteria over the facts of a case is a matter of district court discretion." *Id.* (citing *Davy*, 550 F.3d 1155 at 1159 and *Tax Analysts v. U.S. Dep't of Justice*, 965 F.2d 1092, 1094 (D.C. Cir. 1992)).

The first "public benefit" factor tests whether "the disclosure will assist the citizenry generally in making an informed judgment as to governmental operations." *Aviation Data Service v. F.A.A.*, 687 F.2d 1319, 1323 (10th. Cir. 1982). As previously discussed, despite the fact that Plaintiff's suit did not uncover any documents, it did nevertheless provide the public with the benefit of important information that was not available to the public prior to the suit. Namely, Plaintiff's suit led to the government's statement that there is no documentation related to the lethal use of UAVs within the jurisdiction of the United States; however, the government was able to identify documentation to such use outside of U.S. jurisdiction. This information, which reveals the general scope of the United States' lethal use of UAVs, is in and of itself valuable information that benefits the public, even if the public does not gain access to any relevant documents. Furthermore, the public can easily gain access to this information through the Plaintiff's website, which invokes the second and third factors for consideration.

The second and third factors inquire into the nature of Plaintiff's interest in the information it is seeking, including any commercial benefit the Plaintiff might obtain with such information. *See Citizens for Responsibility*, 820 F.Supp.2d 39 at 45 (noting that as a threshold matter, these factors are closely related and often considered together). A public interest, rather than a private commercial interest, will weigh in favor of an award of fees. *See id.* In its motion, Plaintiff identifies itself as a Minnesota media organization that seeks and publishes government

6

documents on its website at no charge "for the benefit of policy makers, the press, and the public." (Docket No. 23, p. 3). There is no evidence that Plaintiff's attempt to obtain information from the Defendant, including the lawsuit it initiated in furtherance of this attempt, provided any commercial benefit to Plaintiff. Instead, Plaintiff asserts that one of its goals in obtaining such information is to provide to the public "government documents related to national security matters that are frequently discussed in the national and international press."[10] Defendant does not challenge these assertions.

Finally, in cases where the government initially refused to disclose records, the Court must consider the reasonableness of Defendant's initial withholding of the documents requested. The parties seem to agree that this factor is not relevant to the case at hand, because no documents related to the third-category request were actually in existence, and therefore, no documents related to the third category were actually withheld.

In sum, because Plaintiff was seeking information to benefit the public without any commercial benefits to itself, and because the public can derive a benefit from the information discerned after the initiation of Plaintiff's lawsuit, the Court finds that Plaintiff is entitled to fees pursuant to FOIA.

Reasonableness of Fees

Having determined that Plaintiff is both eligible and entitled to fees, the Court must now decide whether $14, 712.50 is reasonable compensation for Plaintiff's legal fees and costs. Plaintiff claims that its lodestar calculation includes 95.75 hours of work at a rate of $150 per hour (for a total of $14,362.50), plus a $350 filing fee expense. To date, Plaintiff has not provided the Court with any documentation to support this claim. Even when Defendant's opposing memorandum alerted the Court (and Plaintiff) that sufficient documentation of the fees

---

[10] Plaintiff's Memorandum in Support of Motion for Fees and Costs, Page 4 [Docket No. 23].

requested was absent from the record,[11] Plaintiff still failed to submit any documentation

regarding its fees with its reply memorandum. Instead, Plaintiff stated that if would provide

whatever additional documentation is required only "[w]hen and if directed by the Court."[12]

Plaintiff's failure to substantiate its claim with relevant documentation, [13] despite having several

opportunities to do so, is grounds for this Court to dismiss its claim. *See Blazy v. Tenet*, 194 F.3d

90, 98 (D.C. Cir. 1999) (dismissing a claim for fees and litigation costs because the plaintiff

failed to provide documentary evidence to support his claim for fees, "[e]ven after the

Government's opposition brief put him on notice that the necessary documentation was

missing").

Even if the Court does not entirely dismiss the claim for fees, it may still reduce the

award accordingly "[w]here the documentation of hours is inadequate." *Hensley v. Eckerhart*,

461 U.S. 424, 433 (1983) (holding that the party seeking an award of fees should submit

evidence supporting the hours worked and rates claimed). Defendant notes that Plaintiff failed to

meet its burden of providing documentation adequate to establish that the hourly rate charged by

Plaintiff is a reasonable rate in the community. Still, Defendant does not suggest, nor does this

Court believe, that a rate of $150 per hour is an unreasonable rate within the local legal

community. Instead, Defendant takes issue with the claim that 95.75 hours is a reasonable

amount of time to spend on this case.

---

[11] Defendant's Memorandum in Opposition to Plaintiff's Motion for Fees, Pages 13-14 [Docket No. 27].
[12] Plaintiff's Reply Memorandum in Support of Fees Motion, Page 14 [Docket No. 28].
[13] Instead of offering documentation to the Court in support of its claim for attorney fees, Plaintiff argues that the information it provided in its motion papers regarding its fee amount was sufficient under Federal Rule of Civil Procedure 54(d)(2)(c), which provides that "[t]he court *may* decide issues of liability for fees before receiving submissions on the value of services" (emphasis added). Note that the court is not required to decide issues of liability for fees and value of services separately. Therefore, Plaintiff's seemingly unnecessary withholding of documents in support of it its own claim tends to suggest that Plaintiff may not have in its possession sufficient documentation regarding its attorney's fees.

Defendant correctly points out that FOIA does not provide reimbursement for fees incurred at the administrative stage. *See Nw. Coal. for Alts. to Pesticides v. Browner*, 965 F.Supp. 59, 65 (D.C. Cir. 1997). In response, Plaintiff contends that the 95.75 hours includes only time spent on litigation, not time spent on administrative appeal.[14] Plaintiff also states that "at the outset of this suit and for two months thereafter" it was under the understanding that the parties would be litigating Defendant's use of FOIA exemptions to withhold documents, and it was preparing for litigation related to the use of these exemptions.[15] In the absence of adequate documentation or support for Plaintiff's lodestar calculation, the Court is compelled to exercise its discretion to determine the reasonableness of the hours Plaintiff claims to have worked while completing its initial complaint against Defendant and preparing for litigation over a two-month period before a dismissal was stipulated. The Court finds 50 hours to be a reasonable amount of time to spend on legal work of this nature, at the reasonable rate of $150 per hour, and thereby grants Plaintiff's motion for fees in the reduced amount of $7,500 plus its $350 filing fee. The remaining 45.75 undocumented hours of work claimed by Plaintiff are hereby excluded as unreasonable.

## CONCLUSION

For the foregoing reasons, Plaintiff is found to be both eligible and entitled to an award of attorney's fees. However, because Plaintiff provided no documentation to support the hours it claimed to have expended on this case, the Court determines that Plaintiff's work reasonably required 50 hours of work at its rate of $150 per hour. Therefore, Plaintiff is granted an award of attorney's fees in the amount $7,500, plus its $350 filing fee, for a total award of $7,850.

---

[14] Plaintiff's Reply Memorandum in Support of Fees Motion, Page 14 [Docket No. 28].
[15] *Id.*

# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

PUBLIC RECORD MEDIA, LLC,

        Plaintiff,

v.

                          **ORDER**
                          Civil File No. 12-1225 (MJD/AJB)

U.S. DEPARTMENT OF JUSTICE,

        Defendant.

Jonathan T. Haines, Counsel for Plaintiff.

Amy E. Powell and Judson O. Littleton, U.S. Department of Justice, and Bahram Samie, Assistant United States Attorney, Counsel for Defendant.

      The above-entitled matter comes before the Court on Defendant's objections to Chief Magistrate Judge Arthur J. Boylan's January 29, 2103 Order awarding Plaintiff $7,500 in attorney's fees and $350 in costs.  In Plaintiff's response to Defendant's timely objections to the Chief Magistrate Judge's Order, Plaintiff also objected to the amount of the fee award and requested a higher fee award.  However, a party objecting to a Magistrate Judge's order must file its objection within 14 days after service of that order, unless a different time is prescribed by the Magistrate Judge or District Judge.  "[A] party may not

1

thereafter assign as error a defect in the Magistrate Judge's order to which objection was not timely made." Local Rule 72.2(a). No different time was prescribed in this case, and Plaintiff filed its "objection," buried within its response to Defendant's objection, on February 25, 2013, more than 14 days after service of the order. Therefore, Plaintiff's objection is untimely, no explanation is given for this untimeliness, and Plaintiff's objection to the amount of the fee award is disregarded.

    As to Defendant's objections, this Court will reverse a magistrate judge's order on a nondispositive issue if it is clearly erroneous or contrary to law. 28 U.S.C. § 636(b)(1)(A); D. Minn. L.R. 72.2(a). The Court has reviewed the submissions and the record in this case and concludes that Chief Magistrate Judge Boylan's January 29, 2013 Order is neither clearly erroneous nor contrary to law. Therefore, the Order is affirmed.


    Accordingly, based upon the files, records, and proceedings herein, **IT IS HEREBY ORDERED**:

1.    Chief United States Magistrate Judge Arthur J. Boylan's January 29, 2013 Order [Docket No. 29] is **AFFIRMED**.

2.      Defendant's objections to that Order [Docket No. 33] are
        **OVERRULED**.


Dated:  May 7, 2013                         s/ Michael J. Davis
                                            Michael J. Davis
                                            Chief Judge
                                            United States District Court

# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

PUBLIC RECORD MEDIA, LLC,

        Plaintiff,


v.                                          **ORDER**
                                            Civil File No. 12-1225 (MJD/AJB)


U.S. DEPARTMENT OF JUSTICE,

        Defendant.

Jonathan T. Haines, Counsel for Plaintiff.

Amy E. Powell and Judson O. Littleton, U.S. Department of Justice, and Bahram Samie, Assistant United States Attorney, Counsel for Defendant.

The above-entitled matter comes before the Court on Defendant's letter request for permission to file a motion for reconsideration.  [Docket No. 41] Defendant requests permission to file a formal motion for reconsideration or, in the alternative, requests that the Court treat its letter as a formal motion for reconsideration and motion to alter or amend the judgment.  Plaintiff has filed a letter opposing Defendant's letter.  [Docket No.  42]  The Court grants Defendant's request to deem its letter as a formal motion for reconsideration.

1

On January 29, 2103, Chief United States Magistrate Judge Arthur J. Boylan issued an Order awarding Plaintiff $7,500 in attorney's fees and $350 in costs. [Docket No. 29]  Defendant filed an objection to that January 29 Order.  [Docket No. 33]  On May 7, 2013, after additional briefing by both parties, this Court issued an Order affirming the January 29 Order based on its conclusion that the January 29 Order was neither clearly erroneous nor contrary to law.  [Docket No. 40]

Defendant now asserts that a post-judgment order awarding attorney's fees is dispositive of a claim for fees and, therefore, requires de novo review.  See, e.g., McCombs v. Meijer, Inc., 395 F.3d 346, 360 (6th Cir. 2005); Estate of Conners by Meredith v. O'Connor, 6 F.3d 656, 659 (9th Cir. 1993).  Defendant concludes that this Court erred when it reviewed the Chief Magistrate Judge's Order under the nondispositive deferential standard, rather than the dispositive de novo standard, and that, under the de novo standard, the Court should reject the attorney's fee award.

The Court concludes that it would be appropriate to conduct a de novo review, treating the January 29 Order as a Report and Recommendation.  The Court has now conducted a de novo review upon the record.  28 U.S.C. §

2

636(b)(1); Local Rule 72.2(b).  Based upon that review, the Court concludes that

the award of attorney's fees is warranted.  As fully explained in the January 29

Report and Recommendation, Plaintiff substantially prevailed, and Plaintiff is

entitled to fees because its lawsuit provided a valuable public benefit and it acted

in the public interest rather than in a commercial interest.  Moreover, with regard

to the question of the reasonableness of Defendant's withholding of the

requested documents, the Court finds that this factor does not alter its analysis of

Plaintiff's entitlement to an award of attorney's fees.  As the Report and

Recommendation noted, no documents related to the third-category request

existed, so none were actually withheld.  Moreover, Defendant failed to show

that it had a reasonable basis for not informing Plaintiff that no documents

existed for the third category requested until after Plaintiff filed the current

lawsuit.  Thus, the Court adopts the Report and Recommendation of Chief

United States Magistrate Judge Arthur J. Boylan dated January 29, 2013.

 Accordingly, based upon the files, records, and proceedings herein, **IT IS**

**HEREBY ORDERED:**

 1. Defendant's letter request for permission to file a motion for
   reconsideration [Docket No. 41] shall be deemed a Motion for
   Reconsideration, and Defendant's Motion for Reconsideration
   [Docket No. 41] is **DENIED.**

2.      The January 29, 2013 Order [Docket No. 29] shall be designated as a
        Report and Recommendation.

3.      The Court **ADOPTS** the Report and Recommendation of Chief
        United States Magistrate Judge Arthur J. Boylan dated January 29,
        2013 [Docket No. 29].

4.      Plaintiff is granted an award of attorney's fees in the amount of
        $7,500, plus its $350 filing fee, for a total award of $7,850.


Dated:  June 7, 2013                    s/ Michael J. Davis
                                        Michael J. Davis
                                        Chief Judge
                                        United States District Court

4

# EXHIBIT L

**Politics**

# John Brennan confirmed as CIA director, but filibuster brings scrutiny of drone program

    

   920

Senate con          ohn Brennan as head of CIA

By a vote of 63-34, the Senate confirmed John Brennan as director of the CIA on Thursday. (The Washington Post)

**By Peter Finn and Aaron Blake** March 7, 2013 ✉

Follow @PeterFinnWP    Follow @aaronblakewp

Sen. Rand Paul (R-Ky.) forced Washington slightly off its axis Thursday after he filibustered President Obama's pick to head the CIA. The rare "talking filibuster" generated extraordinary scrutiny of the

**The Most** Popular

All Over

WNYC - NEW YORK PUBLIC RADIO

"I Did Not Have..." Remembering Clinton 1998...

THE DENVER POST

DIA accused of rigging $53 million airport concessions...

HONOLULU STAR-ADVERTISER

Jurors do not indict officer in video

Obama administration's drone-strike program and revealed some surprising divisions and alliances on Capitol Hill over the president's anti-terrorism tactics overseas.

The filibuster culminated in the Senate confirmation of John O. Brennan to be director of the CIA by a vote of 63 to 34. But it scrambled the usual partisan landscape in the Capitol, with some Republican lawmakers attacking Paul for criticizing the president, while liberals and Democrats praised him. Of the 81 votes to end the filibuster, 28 were from Republicans, 13 of whom also voted to confirm Brennan.

The filibuster began Wednesday afternoon and lasted for nearly 13 hours, ending after midnight on Thursday. Paul was demanding that the White House clarify that it would not use aerial drones on U.S. soil to kill American citizens suspected of terrorism — a point on which he felt the administration had not been sufficiently clear.

Brennan's nomination forced the administration to be more forthcoming about its secretive drone operations, which have devastated al-Qaeda's core leadership in Pakistan and have been expanded to target affiliated groups in Yemen and Somalia.

Sen. Lindsey O. Graham (R-S.C.), one of the

administration's harshest Republican critics but a supporter of the drone program, said the filibuster caused him to change his vote on the Brennan nomination to support Obama.

"I am going to vote for Brennan now because it's become a referendum on the drone program," Graham said. "Where were all these people during the Bush administration?"

The one Democrat who joined the filibuster, Sen. Ron Wyden (Ore.), said that Paul was asking important questions of the administration.

"I want it understood that I have great respect for this effort to really ask these kinds of questions," Wyden said. "And Senator Paul has certainly been digging into these issues in great detail."

The American Civil Liberties Union issued a statement supporting Paul. "There is now a truly bipartisan coalition in Congress and among the public demanding that President Obama turn over the legal opinions claiming the authority to kill people far from a battlefield, including American citizens," said Laura W. Murphy, director of the ACLU's Washington Legislative Office.

Brennan, a CIA veteran and former station chief in Saudi Arabia, has served as Obama's principal counterterrorism adviser for the past four years and

one of the chief architects of the program that has emerged as the spy agency's signature counterterrorism tactic. The Brennan nomination brought unprecedented scrutiny to the administration's use of drones to kill terrorist suspects overseas, and in recent days critics have questioned whether it could be imported to the United States to target American terrorism suspects at home.

A still-theoretical discussion about the domestic use of armed drones emerged in recent days from congressional demands to review Justice Department legal opinions that justified the 2011 drone killing in Yemen of Anwar al-Awlaki, a U.S. citizen.

The Obama administration turned over a number of classified memos to the Senate Intelligence Committee that laid out the legal rationale underpinning the joint CIA-military operation against Awlaki, who was described by intelligence officials as a senior operational figure in al-Qaeda's Yemen affiliate.

In a letter to Paul on Monday, Attorney General Eric H. Holder Jr. said that in an "extraordinary circumstance" such as the Sept. 11, 2001, attacks or the 1941 Japanese bombing of Pearl Harbor, it might be "necessary and appropriate" for the president to

authorize the military to use lethal force in the United States. But Holder said such a situation was "entirely hypothetical."

Paul was not satisfied.

White House spokesman Jay Carney said Thursday that "the president has not and would not use drone strikes against American citizens on American soil."

"On the broader question, the legal authorities that exist to use lethal force are bound by and constrained by the law and the Constitution," Carney continued. "The issue here isn't the technology. The method does not change the law. The president swore an oath to uphold the Constitution and he is bound by the law. Whether the lethal force in question is a drone strike or a gunshot, the law and the Constitution apply in the same way."

Holder also sent a second, brief letter to Paul: "It has come to my attention that you have now asked an additional question: 'Does the president have the authority to use a weaponized drone to kill an American not engaged in combat on American soil?'" Holder wrote.

"The answer to that question is no."

Paul said he was satisfied with the answer, although it still leaves open the possibility that a drone strike

could be used against an American who was engaged in combat on American soil.

Even as Paul eventually got what he wanted, his filibuster divided his party between the new generation of tea party-affiliated Republicans and the older generation of foreign policy hawks.

Perhaps the two most prominent hawks, Graham and John McCain (R-Ariz.), took to the Senate floor Thursday to denounce Paul's quest.

They offered a robust defense of antiterrorism policies that began in the George W. Bush administration and had been warmly embraced by almost every congressional Republican, particularly the two leading GOP senators, Minority Leader Mitch McConnell (Ky.) and Minority Whip John Cornyn (Tex.).

McCain said he was upset by Paul's assertions that the Obama administration was leaving itself or a future administration the authority to attack a U.S. citizen who was a high-profile protester, such as actress Jane Fonda, whose opposition to the Vietnam War rankled the Nixon White House.

"To somehow think that under present circumstances, we would have killed Jane Fonda, that's so ridiculous there's no way to respond to it. It's just an insult to your intelligence," McCain told

reporters Thursday.

Paul told reporters that there is now a "healthy debate" in GOP circles over the methods used in national security.

"It used to be monolithic that, whoever is in the country that we think is bad, we call them 'enemy combatants,' lock 'em up, throw away the key. . . . People are starting to understand that just by calling them an enemy combatant doesn't make them an enemy combatant," he said.

Paul said the filibuster was not planned. He had enough time for his staff to put together binders of information for him, but he didn't make other special preparations.

He also said that the support of his colleagues — more than a dozen of them took part in the filibuster, including Democrat Wyden — was mostly not coordinated.

Some said that their participation was the result of being caught up in the drama of the moment. "I, like everybody else, was sort of inspired by Senator Paul's fortitude and his courage to go down there and speak to the American people. I thought it was important to go down there and support that effort," Cornyn, the No. 2 GOP leader, said in an interview Thursday.

Some Democrats were a little bewildered by what unfolded: a junior Republican senator taking a position on an antiterrorism program that was far to the left of most of their caucus, but creating such a stir that senior Republican senators felt compelled to go to the floor to defend him.

Sen. Martin Heinrich (D-N.M.), just two months into his tenure here, has the distinction of being the newcomer who has to sit in the chair presiding over debate late on Wednesdays — which meant he watched about three hours of Paul's speeches up close while the chamber was mostly empty. "I was actually very engaged. It was fascinating to sit there and listen to him," Heinrich said Thursday.

The Justice Department memo on Awlaki is believed to weigh factors such as the imminence of the threat he posed and the inability of U.S. forces to mount an operation to capture him.

In congressional testimony this week, Holder noted that the possibility of capturing terrorists is much greater in the United States and the use of deadly force is not permissible if capture is feasible, as in ordinary police operations. He also agreed that the United States does not have the constitutional power to kill terrorism suspects in the country who do not pose an imminent threat.

But Sen. Michael S. Lee (R-Utah) said that under his reading of a government white paper on targeting killing, the government's definition of imminent threat appeared quite elastic.

"Imminence doesn't need to involve anything imminent," said Lee. "What does it mean if it doesn't have to involve something immediate?

Holder said he had attempted to explain the government's definition of imminent threat in a speech last March at Northwestern University.

He said that evaluation "incorporates considerations of the relevant window of opportunity to act, the possible harm that missing the window would cause to civilians, and the likelihood of heading off future disastrous attacks against the United States."

Paul Kane and Julie Tate contributed to this report.

Aaron Blake covers national politics and writes regularly for The Fix.

# EXHIBIT M

drone memorandum released                                                    +jon        1        Share

Web    News    Images    Shopping    Videos    More ▾    Search tools

About 352,000 results (0.40 seconds)

**U.S. Court Releases Obama Administration's 'Drone Memo ...**
www.npr.org/.../u-s-court-releases-obama-administrations-drone-mem...    NPR ▾
Jun 23, 2014 - The United States Court of Appeals for the Second Circuit has released a
long-secret memo in which the Obama administration lays out its ...

**Legal memo backing drone strike that killed American ...**
www.washingtonpost.com/...memo...drone...released/...    The Washington Post ▾
Jun 23, 2014 - A federal court on Monday released a previously secret government
memo outlining the legal justification for the 2011 killing of Anwar al-Awlaki ...

**Drone Memo Justifying Anwar al-Awlaki's Killing Released**
www.huffingtonpost.com/.../anwar-al-awlaki-drone-...    The Huffington Post ▾
Jun 23, 2014 - A federal court released on Monday a Justice Department memorandum
justifying the drone killing of Anwar al-Awlaki, but government ...

**Obama's 'drone memo' is finally public. Now show us the ...**
www.theguardian.com › Opinion › Drones    The Guardian ▾
Jun 24, 2014 - But despite the release of the drone memo, the American public still
does not ... In one instance, the long sought-after drone memo references ...

**Court releases memo justifying drone strikes on Americans ...**
www.foxnews.com/.../drone-killing-memo-released-af...    Fox News Channel ▾
Jun 23, 2014 - Secret memo justifying drone strike on US citizen released. A federal
appeals court on Monday released a once-secret memo that provides the ...

**New York court releases government memo justifying drone ...**
rt.com/usa/167924-court-release-memo-drone-killing/    RT ▾
Jun 23, 2014 - Nearly three years after an American drone strike in Yemen killed United
States citizen Anwar Al-Awlaki, the official Department of Justice ...

**Five Takeaways from the Newly Released Drone Memo ...**
https://www.aclu.org/.../five-takeaways-n...    American Civil Liberties Union ▾
Jun 23, 2014 - Monday morning, a federal appeals court released a government
memorandum, dated July 16, 2010, authorizing both the Department of ...

**Targeting Anwar al-Awlaki Was Legal, Justice Department ...**
www.nytimes.com/.../justice-department-found-it-law...    The New York Times ▾
Jun 23, 2014 - Court Releases Large Parts of Memo Approving Killing of American in ...
more than a year before the September 2011 drone strike in Yemen ...

**Court releases memo of U.S. justifying drone attacks on ...**
www.reuters.com/.../us-usa-drones-memo-idUSKBN0EY1VP201...    Reuters ▾
Jun 23, 2014 - WASHINGTON (Reuters) - A federal appeals court on Monday released
a redacted version of the U.S. Justice Department's memorandum of ...

**Here's the Secret Memo That Justified Anwar al-Awlaki ...**
time.com/2912137/memo-anwar-al-awlaki-doj-released/    Time ▾
Jun 23, 2014 - A federal court released a legal memo that justified the drone killing of
alleged American terrorist Anwar al-Awlaki on Monday, after years of ...

1   2   3   4   5   6   7   8   9   10        Next

# EXHIBIT N

Contact Us    Press Room    Site Map    Donate

# FIRST AMENDMENT COALITION
Defending Free Speech and Your Right to Know

**FAC Home**    **News**    **Legal Hotline**    **Asked & Answered**    **Public Records**    **Open Meetings**    **Resources**    **About Us**    **Donate**

## 1st Amendment News

[Search...]

You are here: Home → US releases to FAC new legal memo on 2010 killing of Anwar al-Awlaki. Here's our analysis.
← Feedback from recent column, "Snowden Go Home"    FAC sues Palm Springs water agencies for data on water use by corporate customers →

## US releases to FAC new legal memo on 2010 killing of Anwar al-Awlaki. Here's our analysis.

[Search...]

By Peter Scheer • August 15, 2014 • Peter Scheer • Comments Off

ShareThis



The Justice Department on Friday released to the First Amendment Coalition a newly de[...]d legal memo advising the CIA on the legality of a proposed "lethal operation" against Anwar al-[...] he American citizen who joined forces with Al-Qaida and was killed in a US drone strike in Yemen in S[...]er 2010.

The memo is posted below.

The newly released memo, dated February 19, 2010, was provided to FAC in connection with our ongoing FOIA lawsuit against the Justice Department for access to all legal memos on the Awlaki killing. The administration had previously released a longer legal memo, dated July 10, 2010, on the same subject matter.

Release of the longer memo was the result of a federal court of appeals decision (in a case filed by the NY Times and the ACLU), as well as pressure from Congress, which had threatened to derail the judicial nomination of David Barron over access to the memo. Mr. Barron, now Judge Barron, wrote both Awlaki memos as a lawyer in the Justice Department's Office of Legal Counsel (OLC).

The February 19 memo is not only shorter than the July 10 memo, it is heavily redacted. The six-page document contains more deletions than it does written text. Comparing the two, the February 10 memo gives the impression of being more hastily prepared——perhaps because the CIA, which requested the legal opinion, was anticipating an earlier opportunity to target Awlaki.

The February 19 memo focuses on the key issues posed by the planned strike: Awlaki's rights, as a citizen, and limitations on government power (if any) that derive from those rights. The July 10 memo covers that territory too, but is devoted mainly to an analysis of potential constraints imposed by US statutes and international law. The latter focus suggests that, as planning for the operation proceeded, the CIA may have sought assurances that its personnel would not face liability for their involvement.

What does the February 10 memo conclude? The many redactions notwithstanding, the memo gives a green light to the CIA, provided (1) the threat posed by Awlaki is imminent and continuing and 2) his capture, as an alternative to killing him, is not feasible. These conditions are sufficient, under the circumstances, to meet the requirements of the fifth amendment's due process clause and the fourth amendment's guaranty against unreasonable "searches and seizures," the memo says.

Notably absent from the February 10 memo is any discussion of how—and with what degree of certainty—





### Sign up for Flash newsletter

Email Address

First Name

### Main Menu

FAC Home
  1st Amendment News
    On Access by Peter Scheer
    Coalition News
    Commentary
  Legal Hotline
    Asked & Answered
  Open Meetings
    The Brown Act (text of the law

the government must determine that these conditions are met. As applied to Awlaki, the conditions were presumed to have been met based on the CIA's representations to the Justice Department. The CIA's representations appear to have been accepted by the Justice Department at face value. If that is the case, does anyone get to question those representations? Only President Obama?

Ironically, the main legal authority relied on by the Justice Department for its expansive view of government power is a 2006 Supreme Court decision that sharply curtailed government power (specifically, the government's claimed power to hold Guantanamo detainees, without a hearing, indefinitely). However, the 2006 decision prescribed a legal framework that the memo applies to Awlaki.

If there is one line that summarizes the legal analysis in the February 10 memo, it is this: " *[redaction] being a US citizen [redaction] does not give a member of al Qa'da a constitutional immunity from attack [redaction].*" (Memo page 5).

—PETER SCHEER

1 / 7



Download (PDF, 2.21MB)

**Your contributions make our work possible.**



**Comments are closed.**

updated 2013)
Templates for Brown Act complaint letters
Brown Act Primer: Public bodies subject to the Act
California Sunshine Ordinances
Public Records
CPRA – 2012 Text of the law
Sample CPRA request letter
CPRA Primer: Access to records
The Bagley-Keene Act (text of the law updated 2012)
2012 Guide to Bagley-Keene Act
FOIA: Sample Reqest Letter
Federal Freedom of Information Act (FOIA) (2012 text of law)
FOIA: Your Right to Federal Records (2011)
Resources
News Gathering
California Shield Law (text)
CA Proposition 59 — The Sunshine Act
FAC Litigation
FAC Friend of the Court Briefs — Index
Chinese language resources – 欢迎 光临 加州 第一 修 正 法 案 联 盟
Spanish Language Resources (Espanol)
About Us
Our Board
Our Advisory Board
Contact Us
Press Room
Site Map
Donate

**Major support of FAC is provided by**

Pat & Rowland Rebele Raymond Pryke CS Fund
McCormick Foundation John S. and James L. Knight

**Quick Links**

Contact Us
Press Room

Foundation Central Valley Foundation Susan McClatchy
Allen McCombs

Site Map
Donate

First Amendment Coalition

(FAC) is a GuideStar Exchange Silver Participant
Want to learn more about the GuideStar Exchange?
Click here



FIRST AMENDMENT COALITION © 2014. All Rights Reserved.

Powered by WordPress. Designed by **WOO**THEMES

Contact Us    Press Room    Site Map    Donate

# FIRST AMENDMENT COALITION
Defending Free Speech and Your Right to Know

FAC Home    News    Legal Hotline    Asked & Answered    Public Records    Open Meetings    Resources    About Us    Donate

## 1st Amendment News

🔍 Search...

You are here: Home → FAC sues US for memo on "lethal targeting" of al Qaeda figure (& US citizen) al-Awlaki, killed in 2010 drone strike
← Intelligence analysis firm says U.S. preparing indictment of Julian Assange    Sign ordinance: U.S. Supreme Court affirms free speech rights →

# FAC sues US for memo on "lethal targeting" of al Qaeda figure (& US citizen) al-Awlaki, killed in 2010 drone strike

By 1stamendmnt • February 29, 2012 • Coalition News • Comments Off

ShareThis

SAN RAFAEL, CA—The First Amendment Coalition (FAC) today filed suit to require the Obama Administration to make public its legal rationale for the "lethal targeting" of Anwar al-Awlaki, an American-born US citizen and al-Qaeda operative who was killed in a CIA drone strike in Yemen last [Se]ptember. The lawsuit seeks public access under the FOIA to portions of a 2010 Justice Department legal [memo] that reportedly analyzes legal issues raised by the killing of al-Awlaki.

The nonprofit group's suit, filed in federal District Court in San Francisco, claims that, whil[e certain g]overnment may keep secret legitimately sensitive national security information contained in the mem[o, the p]ublic is entitled to see the portions of the document showing the Justice Department's legal justifi[cation f]or the use of lethal force against al-Awlaki and potentially other US citizens who join forces with foreig[n terroris]t organizations that threaten US interests.

"Whatever one's views on this administration's counter-terrorism policy, the use of lethal force by the US government against a US citizen is a situation that cries out for a public airing and debate," said Peter Scheer, the executive director of FAC, whose offices are in San Rafael, CA. "Without a public discussion of the government's authority in this legally murky area–including limits on the exercise of that authority–the American people will have grave doubts, and fears, about what their government is doing," said Scheer.

"If the Justice Department has blessed the use of lethal force against US citizens abroad, the public have the right to know about this and this can certainly happen without compromising national security," said Thomas R. Burke, a partner with Davis Wright Tremaine LLP in San Francisco, who is representing FAC in this matter.

The existence of the Justice Department legal memo was first reported by the New York Times, which said the 50-page document concluded, among other things, that al-Awlaki, as a US citizen, could be killed by US military force only if his capture in Yemen would be impractical.

In denying FAC's FOIA request for the Justice Department memo, the government said that it could neither confirm nor deny that it had the document since the memo's very "existence or nonexistence . . . is itself classified . . ." Although the Obama administration, in unofficial statements, has boasted about the success of drone strikes against terrorists, the use of drones in counter-terrorist operations remains classified.

One reason for classifying information about such actions in Yemen, where al-Awlaki was killed, has been to

## News Quick Links

1st Amendment News
Coalition News
Commentary

## Main Menu

FAC Home
   1st Amendment News
      On Access by Peter Scheer
      Coalition News
      Commentary
   Legal Hotline
      Asked & Answered
   Open Meetings
      The Brown Act (text of the law updated 2013)
      Templates for Brown Act complaint letters
      Brown Act Primer: Public bodies subject to the Act
      California Sunshine Ordinances
   Public Records
      CPRA – 2012 Text of the law
      Sample CPRA request letter
      CPRA Primer: Access to records
      The Bagley-Keene Act (text of the law updated 2012)
      2012 Guide to Bagley-Keene Act
      FOIA: Sample Reqest Letter
      Federal Freedom of Information Act (FOIA) (2012 text of law)
      FOIA: Your Right to Federal Records (2011)
   Resources
      News Gathering
         California Shield Law (text)

protect the secrecy surrounding the Yemeni government's agreement to permit drone strikes on its soil, according to the New York Times' account. However, that agreement was disclosed in diplomatic cables obtained by Wikileaks and made public through various media outlets.

Also, the Justice Department has recently revealed substantial details about al-Awlaki's activities for al-Qaeda of the Arabian Peninsula that explain the US government's eagerness to see him neutralized as a threat. These previously secret details were disclosed just two weeks ago in a sentencing memorandum filed in federal district court in New York in the trial of "underwear bomber" Umar Farouk Abdulmutallab.

The sentencing memorandum describes al-Awlaki's role in recruiting and training Abdulmutallab, who has pleaded guilty to attempting to blow up a commercial airliner over Detroit in 2009. The Justice Department's new al-Awlaki disclosures were filed not under seal, but in open court as an exhibit to the sentencing memorandum.

FAC is a section 501C(3) nonprofit organization dedicated to freedom of speech and government transparency. FAC provides legal information and consultations for journalists, bloggers and others; files friend- of-court briefs in important appeals; and initiates strategic litigation in its own name—as in this case. FAC's website is:

firstamendmentcoalition.org

Burke, FAC's lawyer in this matter, successfully prosecuted FOIA lawsuits against the FBI and TSA to compel the first public release of documents about the use of the "no fly" and "selectee" lists to screen passengers after 9/11 and to reveal problems with the U.S. Treasury Department's global terrorist watch list.

1 / ?

Loading...

CA Proposition 59 — The Sunshine Act

FAC Litigation

FAC Friend of the Court Briefs — Index

Chinese language resources – 欢 迎 光 临 加 州 第 一 修 正 法 案 联 盟

Spanish Language Resources (Espanol)

About Us

   Our Board

   Our Advisory Board

   Contact Us

   Press Room

   Site Map

Donate

Download (PDF, 4.16MB)

CONTACT:

PETER SCHEER
First Amendment Coalition
415.886.7081 (direct)
pscheer@firstamendmentcoalition.org
534 4th Street, Suite B
San Rafael, CA 94901

THOMAS BURKE Esq.
Davis Wright Tremaine
415-276-6552
thomasburke@dwt.com

505 Montgomery Street, Suite 800

San Francisco, California, 94111-6533

-END-

**Your contributions make our work possible.**



**Comments are closed.**

## Major support of FAC is provided by

Pat & Rowland Rebele Raymond Pryke CS Fund
McCormick Foundation John S. and James L. Knight
Foundation Central Valley Foundation Susan McClatchy
Allen McCombs

## Quick Links

Contact Us

Press Room

Site Map

Donate



FIRST AMENDMENT COALITION © 2014. All Rights Reserved.

Powered by WordPress. Designed by **WOO THEMES**

Contact Us    Press Room    Site Map    Donate

# FIRST AMENDMENT COALITION
Defending Free Speech and Your Right to Know

FAC Home    News    Legal Hotline    Asked & Answered    Public Records    Open Meetings    Resources    About Us    Donate

## 1st Amendment News

Search...

You are here: Home → Court battles continue over transparency in drone targeted killings
← Google's Antitrust Wrist Slap Is Right Result for Wrong Reason: Right Reason: ...earch Results are Protected Speech    Strengthening free speech in 2013 →



# Court battles continue over transparency in dron...rgeted killings

By donal brown • January 8, 2013 • 1st Amendment News, News & Opinion • Com...

ShareThis

Notwithstanding the ruling by a federal district judge in New York last week that allows the federal government to avoid addressing the issue of whether its targeting killing policies are unconstitutional (Courthouse News Service), the court battles are just beginning.

In her ruling, Judge Coleen McMahon indicated she wanted to rule against the government but that "I can find no way around the thicket of laws and precedents that effectively allow the Executive Branch of our government to proclaim as perfectly valid certain actions that seem on their face incompatible with our Constitution and laws, while keeping the reasons for their conclusions a secret."

In an editorial, The New York Times disagreed with the judge, saying that the administration had used the killing of American-born U.S. citizen Anwar al-Awlaki in a drone strike in September of 2011 in his re-election campaign. Such public discussion of the strike on al-Awlaki puts the issue squarely into the public forum.

The *First Amendment Coalition* filed a FOIA suit in February of 2012 seeking legal rationale for the killing of al-Awlaki. The FAC lawsuit will proceed in a different federal court division and requests far fewer records so that if it succeeds in federal circuit court, it is possible that given conflicting decisions at the circuit level, the Supreme Court may some day take it on, a case that raises serious Constitutional issues. -db

**Your contributions make our work possible.**



**Comments are closed.**

## News Quick Links

1st Amendment News
Coalition News
Commentary

## Main Menu

FAC Home
   1st Amendment News
      On Access by Peter Scheer
      Coalition News
      Commentary
   Legal Hotline
      Asked & Answered
   Open Meetings
      The Brown Act (text of the law updated 2013)
      Templates for Brown Act complaint letters
      Brown Act Primer: Public bodies subject to the Act
      California Sunshine Ordinances
   Public Records
      CPRA – 2012 Text of the law
      Sample CPRA request letter
      CPRA Primer: Access to records
      The Bagley-Keene Act (text of the law updated 2012)
      2012 Guide to Bagley-Keene Act
      FOIA: Sample Reqest Letter
      Federal Freedom of Information Act (FOIA) (2012 text of law)
      FOIA: Your Right to Federal Records (2011)
   Resources
      News Gathering
         California Shield Law (text)

CA Proposition 59 — The Sunshine Act

FAC Litigation

FAC Friend of the Court Briefs — Index

Chinese language resources – 欢迎光临加州第一修正法案联盟

Spanish Language Resources (Espanol)

About Us

Our Board

Our Advisory Board

Contact Us

Press Room

Site Map

Donate

## Major support of FAC is provided by

Pat & Rowland Rebele Raymond Pryke CS Fund McCormick Foundation John S. and James L. Knight Foundation Central Valley Foundation Susan McClatchy Allen McCombs



## Quick Links

Contact Us

Press Room

Site Map

Donate



**First Amendment Coalition**

(FAC) is a GuideStar Exchange Silver Participant Want to learn more about the GuideStar Exchange? Click here

FIRST AMENDMENT COALITION © 2014. All Rights Reserved.

Powered by WordPress. Designed by **WOO**THEMES

Contact Us    Press Room    Site Map    Donate

# FIRST AMENDMENT COALITION
Defending Free Speech and Your Right to Know

FAC Home    News    Legal Hotline    Asked & Answered    Public Records    Open Meetings    Resources    About Us    Donate    🔊

## 1st Amendment News

Search...

You are here: Home — AG Holder, in speech, describes al-Awlaki "lethal targeting" memo that is the subject of recent FAC suit
← Sunshine Week: Obama administration wants to extend exemptions under Freedom of Information Act
California: School district action on superintendent done without public notice →

## AG Holder, in speech, describes al-Awlaki "lethal targeting" memo that is the subject of recent FAC suit

By 1stamendmnt • March 15, 2012 • Coalition News • Comments Off

ShareThis

FAC—Attorney General Eric Holder last week began the process of explaining the administration's controversial policy regarding the "lethal targeting" of terrorists abroad who are also US citizens.

Holder's remarks offered a distillation of the legal rationale developed in a classified Department of Justice memo that is the subject of a First Amendment Coalition (FAC) lawsuit. The memo concerns al Qaeda operative al-Awlaki, a New Mexico-born American citizen who was killed in a US drone strike in Yemen in September 2010.

FAC's suit, filed last month seeks release of the al-Awlaki memo, either redacted or in an unclassified version. Separate suits for this memo and related documents have also been filed by the New York Times (in federal court in Manhattan) and the ACLU (in federal court in Washington, DC). FAC's suit is pending in federal district court in San Francisco.

In all three cases the federal government takes the position that it needn't respond to the FOIA claims on the merits because the very existence (or nonexistence) of the al-Awlaki memo is classified. Consistent with this position, Holder in his talk before a law school audience in Chicago, did not mention al-Awlaki by name or refer directly to the Justice Department memo.

Nonetheless, his remarks were surprisingly specific as he outlined an aggressive assertion of government authority to preemptively attack and kill a US citizen—without judicial intervention or review of any kind—who has taken on an operative and high-level role in al Qaeda or its associated organizations.

Holder, summarizing the government's position, spelled out the circumstances in which "an operation using lethal force in a foreign country" could be used "against a U.S. citizen who is a senior operational leader of al Qaeda or associated forces", and who is "actively engaged in planning to kill Americans."

Such an operation, Holder said, "would be lawful at least" where: "First, the U.S. government has determined, after a thorough and careful review, that the individual poses an imminent threat of violent attack against the United States; second, capture is not feasible; and third, the operation would be conducted in a manner consistent with applicable law of war principles."

Here, verbatim, is the portion of Holder's speech dealing with these issues:

### News Quick Links

1st Amendment News
Coalition News
Commentary

### Main Menu

FAC Home
   1st Amendment News
      On Access by Peter Scheer
      Coalition News
      Commentary
   Legal Hotline
      Asked & Answered
   Open Meetings
      The Brown Act (text of the law updated 2013)
      Templates for Brown Act complaint letters
      Brown Act Primer: Public bodies subject to the Act
      California Sunshine Ordinances
   Public Records
      CPRA – 2012 Text of the law
      Sample CPRA request letter
      CPRA Primer: Access to records
      The Bagley-Keene Act (text of the law updated 2012)
      2012 Guide to Bagley-Keene Act
      FOIA: Sample Reqest Letter
      Federal Freedom of Information Act (FOIA) (2012 text of law)
      FOIA: Your Right to Federal Records (2011)
   Resources
      News Gathering
      California Shield Law (text)

CA Proposition 59 — The Sunshine Act

FAC Litigation

FAC Friend of the Court Briefs — Index

Chinese language resources —欢 迎 光 临 加 州 第 一 修 正 法 案 联 盟

Spanish Language Resources (Espanol)

About Us

Our Board

Our Advisory Board

Contact Us

Press Room

Site Map

Donate

". . .It is preferable to capture suspected terrorists where feasible – among other reasons, so that we can gather valuable intelligence from them – but we must also recognize that there are instances where our government has the clear authority – and, I would argue, the responsibility – to defend the United States through the appropriate and lawful use of lethal force.

This principle has long been established under both U.S. and international law. In response to the attacks perpetrated – and the continuing threat posed – by al Qaeda, the Taliban, and associated forces, Congress has authorized the President to use all necessary and appropriate force against those groups. Because the United States is in an armed conflict, we are authorized to take action against enemy belligerents under international law. The Constitution empowers the President to protect the nation from any imminent threat of violent attack. And international law recognizes the inherent right of national self-defense. None of this is changed by the fact that we are not in a conventional war.

Our legal authority is not limited to the battlefields in Afghanistan. Indeed, neither Congress nor our federal courts has limited the geographic scope of our ability to use force to the current conflict in Afghanistan. We are at war with a stateless enemy, prone to shifting operations from country to country. Over the last three years alone, al Qaeda and its associates have directed several attacks – fortunately, unsuccessful – against us from countries other than Afghanistan. Our government has both a responsibility and a right to protect this nation and its people from such threats.

This does not mean that we can use military force whenever or wherever we want. Intern...     ...egal principles, including respect for another nation's sovereignty, constrain our ability to act ...ly. But the use of force in foreign territory would be consistent with these international legal principle...ucted, for example, with the consent of the nation involved – or after a determination that the natio...le or unwilling to deal effectively with a threat to the United States.

Furthermore, it is entirely lawful – under both United States law and applicable law of war...es – to target specific senior operational leaders of al Qaeda and associated forces. This is not a novel concept. In fact, during World War II, the United States tracked the plane flying Admiral Isoroku Yamamoto – the commander of Japanese forces in the attack on Pearl Harbor and the Battle of Midway – and shot it down specifically because he was on board. As I explained to the Senate Judiciary Committee following the operation that killed Osama bin Laden, the same rules apply today.

Some have called such operations "assassinations." They are not, and the use of that loaded term is misplaced. Assassinations are unlawful killings. Here, for the reasons I have given, the U.S. government's use of lethal force in self defense against a leader of al Qaeda or an associated force who presents an imminent threat of violent attack would not be unlawful — and therefore would not violate the Executive Order banning assassination or criminal statutes.

Now, it is an unfortunate but undeniable fact that some of the threats we face come from a small number of United States citizens who have decided to commit violent attacks against their own country from abroad. Based on generations-old legal principles and Supreme Court decisions handed down during World War II, as well as during this current conflict, it's clear that United States citizenship alone does not make such individuals immune from being targeted. But it does mean that the government must take into account all relevant constitutional considerations with respect to United States citizens – even those who are leading efforts to kill innocent Americans. Of these, the most relevant is the Fifth Amendment's Due Process Clause, which says that the government may not deprive a citizen of his or her life without due process of law.

The Supreme Court has made clear that the Due Process Clause does not impose one-size-fits-all requirements, but instead mandates procedural safeguards that depend on specific circumstances. In cases arising under the Due Process Clause – including in a case involving a U.S. citizen captured in the conflict against al Qaeda – the Court has applied a balancing approach, weighing the private interest that will be affected against the interest the government is trying to protect, and the burdens the government would face in providing additional process. Where national security operations are at stake, due process takes into account the realities of combat.

Here, the interests on both sides of the scale are extraordinarily weighty. An individual's interest in making sure that the government does not target him erroneously could not be more significant. Yet it is imperative for the government to counter threats posed by senior operational leaders of al Qaeda, and to protect the innocent people whose lives could be lost in their attacks.

Any decision to use lethal force against a United States citizen – even one intent on murdering Americans and who has become an operational leader of al-Qaeda in a foreign land – is among the gravest that

government leaders can face. The American people can be – and deserve to be – assured that actions taken in their defense are consistent with their values and their laws. So, although I cannot discuss or confirm any particular program or operation, I believe it is important to explain these legal principles publicly.

Let me be clear: an operation using lethal force in a foreign country, targeted against a U.S. citizen who is a senior operational leader of al Qaeda or associated forces, and who is actively engaged in planning to kill Americans, would be lawful at least in the following circumstances: First, the U.S. government has determined, after a thorough and careful review, that the individual poses an imminent threat of violent attack against the United States; second, capture is not feasible; and third, the operation would be conducted in a manner consistent with applicable law of war principles.

The evaluation of whether an individual presents an "imminent threat" incorporates considerations of the relevant window of opportunity to act, the possible harm that missing the window would cause to civilians, and the likelihood of heading off future disastrous attacks against the United States. As we learned on 9/11, al Qaeda has demonstrated the ability to strike with little or no notice – and to cause devastating casualties. Its leaders are continually planning attacks against the United States, and they do not behave like a traditional military – wearing uniforms, carrying arms openly, or massing forces in preparation for an attack. Given these facts, the Constitution does not require the President to delay action until some theoretical end-stage of planning – when the precise time, place, and manner of an attack become clear. Such a requirement would create an unacceptably high risk that our efforts would fail, and that Americans would be killed.

Whether the capture of a U.S. citizen terrorist is feasible is a fact-specific, and potentially time-sensitive, question. It may depend on, among other things, whether capture can be accomplished in the window of time available to prevent an attack and without undue risk to civilians or to U.S. personnel. Given the nature of how terrorists act and where they tend to hide, it may not always be feasible to capture a United States citizen terrorist who presents an imminent threat of violent attack. In that case, our government has the clear authority to defend the United States with lethal force.

Of course, any such use of lethal force by the United States will comply with the four fundamental law of war principles governing the use of force. The principle of necessity requires that the target have definite military value. The principle of distinction requires that only lawful targets – such as combatants, civilians directly participating in hostilities, and military objectives – may be targeted intentionally. Under the principle of proportionality, the anticipated collateral damage must not be excessive in relation to the anticipated military advantage. Finally, the principle of humanity requires us to use weapons that will not inflict unnecessary suffering.

These principles do not forbid the use of stealth or technologically advanced weapons. In fact, the use of advanced weapons may help to ensure that the best intelligence is available for planning and carrying out operations, and that the risk of civilian casualties can be minimized or avoided altogether.

Some have argued that the President is required to get permission from a federal court before taking action against a United States citizen who is a senior operational leader of al Qaeda or associated forces. This is simply not accurate. "Due process" and "judicial process" are not one and the same, particularly when it comes to national security. The Constitution guarantees due process, not judicial process.

The conduct and management of national security operations are core functions of the Executive Branch, as courts have recognized throughout our history. Military and civilian officials must often make real-time decisions that balance the need to act, the existence of alternative options, the possibility of collateral damage, and other judgments – all of which depend on expertise and immediate access to information that only the Executive Branch may possess in real time. The Constitution's guarantee of due process is ironclad, and it is essential – but, as a recent court decision makes clear, it does not require judicial approval before the President may use force abroad against a senior operational leader of a foreign terrorist organization with which the United States is at war – even if that individual happens to be a U.S. citizen.

That is not to say that the Executive Branch has – or should ever have – the ability to target any such individuals without robust oversight. Which is why, in keeping with the law and our constitutional system of checks and balances, the Executive Branch regularly informs the appropriate members of Congress about our counterterrorism activities, including the legal framework, and would of course follow the same practice where lethal force is used against United States citizens.

Now, these circumstances are sufficient under the Constitution for the United States to use lethal force against a U.S. citizen abroad – but it is important to note that the legal requirements I have described may not apply in every situation – such as operations that take place on traditional battlefields.

*The unfortunate reality is that our nation will likely continue to face terrorist threats that – at times – originate with our own citizens. When such individuals take up arms against this country – and join al Qaeda in plotting attacks designed to kill their fellow Americans – there may be only one realistic and appropriate response. We must take steps to stop them – in full accordance with the Constitution. In this hour of danger, we simply cannot afford to wait until deadly plans are carried out – and we will not.*

*This is an indicator of our times – not a departure from our laws and our values. For this Administration – and for this nation – our values are clear. We must always look to them for answers when we face difficult questions, like the ones I have discussed today. As the President reminded us at the National Archives, "our Constitution has endured through secession and civil rights, through World War and Cold War, because it provides a foundation of principles that can be applied pragmatically; it provides a compass that can help us find our way."*

*Our most sacred principles and values – of security, justice and liberty for all citizens – must continue to unite us, to guide us forward, and to help us build a future that honors our founding documents and advances our ongoing – uniquely American – pursuit of a safer, more just, and more perfect union. In the continuing effort to keep our people secure, this Administration will remain true to those values that inspired our nation's founding and, over the course of two centuries, have made America an example of strength and a beacon of justice for all the world. This is our pledge.*

=================

**Your contributions make our work possible.**



Comments are closed.

## Major support of FAC is provided by

Pat & Rowland Rebele Raymond Pryke CS Fund
McCormick Foundation John S. and James L. Knight
Foundation Central Valley Foundation Susan McClatchy
Allen McCombs

## Quick Links

Contact Us
Press Room
Site Map
Donate





**First Amendment Coalition**
(FAC) is a GuideStar Exchange Silver Participant
Want to learn more about the GuideStar Exchange?
Click here

FIRST AMENDMENT COALITION © 2014. All Rights Reserved.

Powered by WordPress. Designed by WOOTHEMES

# EXHIBIT O



## Obama administration to release secret memo justifying drone strikes on U.S. citizens

By Tim Sampson (/authors/tim-sampson/) ✉ (mailto:tim@dailydot.com?subject=Obama%20administration%20to%20release%20secret%20memo%20justifying%20drone%20strikes%20on%20U.S...

Relenting to a court of appeals ruling and mounting political pressure, the Obama (http://www.dailydot.com/tags/obama/) administration will release (http://www.usatoday.com/story/news/politics/2014/05/20/justice-dept-drone-memo/9347697/) the classified memo that lays out the legal justification for using unmanned aerial drones (http://www.dailydot.com/tags/drones/) to kill U.S. citizens abroad.

The decision to disclose the memo rather than fight a court ruling ordering its release comes as the Senate prepares to vote on whether or not the memo's author should be allowed to sit on the federal bench.

The government (http://www.nytimes.com/aponline/2014/05/20/us/politics/ap-us-drone-killing-memo-.html?partner=rss&emc=rss&smid=tw-nytimes&_r=1) sites two unnamed administration officials, who say the Justice Department does not plan to appeal a recent ruling (http://www.nytimes.com/2014/04/22/nyregion/panel-orders-release-of-document-justifying-targeted-killing-of-anwar-al-awlaki.html) by the 2nd U.S. Circuit Court of Appeals in New York that requires the memo's disclosure under Freedom of Information Act guidelines. Until recently, the administration had fought to keep the document classified, but according to the unnamed officials, both Solicitor General Donald Verrilli Jr. and Attorney General Eric Holder now support the document's release.

The administration's decision comes as the Senate is set to vote on the confirmation of President Barack Obama's nominee to fill a vacancy on the 1st U.S. Circuit Court of Appeals in Boston. David Barron is a Harvard professor and former Justice Department official who faces stiff resistance from some senators for creating the legal framework by which the United States can use drones to kill citizens living overseas who are suspected of terrorist activity. The Senate is set to take a procedural vote on Barron's nomination Wednesday, clearing the way for a final confirmation vote Thursday.

Republican Rand Paul (http://www.dailydot.com/tags/rand-paul/) of Kentucky and other senators have vowed to do everything in their power to block Barron's nomination because of the memos. Even some members of the president's own party have called for the memo's release prior to a final vote.

Partially fulfilling these senators' wish, the memo will be released, but doing so won't happen quickly. DOJ officials must first redact parts of the document, and their edits will have to be reviewed by the court. The DOJ will also redact parts of the court ruling ordering the release.

Due to this security procedure, the memo will not be available before senators vote on Thursday. However, Senate Majority Leader Harry Reid (http://www.dailydot.com/tags/harry-reid/) (D-Nev.) said he's confident that he has enough votes to approve the president's nominee.

Controversy over the drone memo began back in 2011, when a U.S. military drone strike was used to kill Anwar al-Awlaki (http://www.dailydot.com/news/twitter-al-qaede-anwar-al-awlaki-death/), an American-born al-Qaida leader living in Yemen. That same drone strike also killed al-Qaida propagandist Samir Khan, also a U.S. citizen.

The U.S. has called hearings on drone strikes in its ongoing efforts to eradicate threats of terrorism, a practice that has been heavily criticized by human rights advocates for, among other things, inflicting deadly collateral damage on civilians.

For drone opponents, the execution of al-Awlaki and other U.S. citizens without due process is a bridge too far. They questioned the legality of such tactics and the administration has only spoken of Barron's memo as justification without actually revealing its text.

The American Civil Liberties Union (http://www.dailydot.com/tags/aclu/) (ACLU) and reporters for *the New York Times* filed FOIA lawsuits against the DOJ, which was initially struck down by a U.S. District Court judge in 2013. These parties won on appeal last month.

The ACLU is calling on senators to hold off on Barron's confirmation until the documents have actually been released. Meanwhile, Paul says he is unswayed by the ruling.

"I rise today to say that there is no legal precedent for killing American citizens not directly involved in combat and that any nominee who rubber stamps and grants such power to a president is not worthy of being placed one step away from the Supreme Court," Paul said from the Senate floor.

But according to the AP, the administration's decision to release the memo has won over at least one vote: Sen. Mark Udall (http://www.dailydot.com/tags/mark-udall/) (D-Colo.), who initially opposed Barron's confirmation now says he'll vote in favor of the judicial nominee.

*Photo KAZ Vorpal/Flickr (https://www.flickr.com/photos/kazvorpal/8555137435/in/photolist-6Rr8H2-hPPk4w-cobF47-cotrMq-gKZdjo-9AjDP5-6bLXME-2L1wh-dBR3ZF-78giQL-aJThmZ-bDviKy-e2Zjiz-cFsHxG-c4YjiL-jfVVki-c4Yj80-8cbGux-8cf5io-FtfRz-ekW2f7-6LcNPY-4g44be-9KM9Db-bRNMHX-bCU4cY-bB3w8V-bo8DSY-ejD1DP-9ro5QV-9ro8A6-9rr8e1-9rr4su-9rr4SU-9ro8te-bDLTPM-bre9gf-i6QS5m-bRNMPa-bRNMKF-bCU46u-bCU47m-9DMupY-6fiGYR-dLWNbQ-e7qkLQ-awxjhu-6bDyP3-bh5Q36-7uHMQr) (CC BY-SA 2.0)*

---

| comments

˅ livefyre
(http://livefyre
1 person listening

, Sign in

---

|  |  | + Follow |  | Share | Post comment as... |

lewest | Oldest

 sabinenamba (http://www.twitter.com/#!/sabinenamba) @sabinenamba (http://www.twitter.com/#!/sabinenamba) from Twitter (http://www.twitter.com/#!/sabinenamba) (http://www.twitter.com/#!/sabinenamba)
**@dailydot (https://twitter.com/#!/dailydot) @GaeMar01 (https://twitter.com/#!/GaeMar01)** we had **#Georgebush (https://twitter.com/#!/search/realtime/%23Georgebush)** Jr. memo on the torture... I am waiting for a memo justifying peace!

21 M.

Like   Repl

 A_PathofGrace (http://www.twitter.com/#!/AZBump) @AZBump (http://www.twitter.com/#!/AZBump) from Twitter (http://www.twitter.com/#!/AZBump) (https://twitter.com/#!/AZBump)
**@dailydot (https://twitter.com/#!/dailydot)** "justifying" ;{

21 M.

Like   Repl

 Jessalyn22 (http://www.twitter.com/#!/jessalyn22) @jessalyn22 (http://www.twitter.com/#!/jessalyn22) from Twitter (http://www.twitter.com/#!/jessalyn22) (https://twitter.com) (http://www.twitter.com/#!/jessalyn22)
**@dailydot (https://twitter.com/#!/dailydot)** apparently, it isn't going to be all that secretive. You could have just said memo.

21 M.

Like   Repl

# EXHIBIT P

**SFGATE**  http://www.sfgate.com/bayarea/article/Feds-can-hide-rationale-for-killing-U-S-citizen-5401933.php

# Feds can hide rationale for killing U.S. citizen, judge rules

Bob Egelko  Updated 6:00 am, Tuesday, April 15, 2014

A Bay Area federal judge says the Obama administration can keep secret a memo spelling out the legal rationale for a 2011 drone attack in Yemen that killed a U.S. citizen and alleged terrorist mastermind.

The Justice Department was entitled to withhold the memo on the grounds of national security and lawyer-client confidentiality, Chief U.S. District Judge Claudia Wilken of Oakland said Friday.

Although U.S. Attorney General Eric Holder and other Obama administration officials have made public statements justifying drone strikes, Wilken said none of them was specific enough for her to rule against the government's claim of secrecy and require officials to disclose the legal rationale for the Yemen attack.

## Sued by local group

The ruling dismissed a suit by the First Amendment Coalition, an open-government advocacy group in San Rafael. The organization sued after a September 2011 drone strike in Yemen that killed Anwar al-Awlaki, a U.S.-born Muslim cleric whom authorities suspected of organizing an attempt to blow up a Detroit-bound airliner in 2009. Another U.S. citizen was also killed in the drone attack, and Awlaki's U.S.-born, 16-year-old son was killed by a drone in Yemen the following month.

**MORE BY BOB EGELKO**

**Point Reyes oyster farmer appeals to U.S. high court**

**College athletes and NCAA headed for June trial**

 **FBI finds 'priceless' Bay Area storage facility**

A federal judge in New York dismissed a similar disclosure suit in January 2013, filed by the New York Times and the American Civil Liberties Union. The plaintiffs have appealed the dismissal.

On April 4, a judge in Washington, D.C., dismissed a damage suit against U.S. officials by parents of those killed in the drone strikes, saying officials who order such attacks "must be trusted" to act legally and are not subject to judicial oversight.

In its lawsuit, the First Amendment Coalition said it wasn't seeking disclosure of classified intelligence information, just the legal rationale for killing U.S. citizens without a trial or judicial review.

## Defense Department **paper**

That rationale is reportedly described in a 16-page Defense Department "white paper" that was leaked to the news media last year after being circulated to members of Congress. Among its conclusions was that the U.S. can launch a drone attack when it suspects the target is planning violence and does not have to wait until it has evidence of an immediate assault.

The First Amendment Coalition's lawyers argued that the government waived any claim of confidentiality when Holder, in a March 2012 speech, outlined the "legal principles" for such attacks - that a U.S. citizen must post an imminent threat of violence against the United States, and capture is "not feasible."

Other administration legal officials have publicly discussed similar standards for lethal strikes without prior judicial approval.

But Wilken said the officials had only described overall legal principles that applied to targeted killings and had not spelled out the reasoning that apparently is contained in the Defense Department memo. The government is entitled to withhold the "confidential legal advice" its lawyers provided on the sensitive subject, the judge said.

Thomas Burke, a lawyer for the First Amendment Coalition, said he expects to appeal the ruling.

"The administration claims and insists it is being transparent about this program," Burke said, but "all that is happening now is the proverbial 'Trust us.' "

Bob Egelko is a San Francisco Chronicle staff writer. E-mail: begelko@sfchronicle.com Twitter: @egelko